UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ZOILA IGLESIAS, individually and as next friend
J.R. and K.R. infants,

                      Plaintiffs,             08 Civ. 1595 (AKH)

      -against-

JOHN MATTINGLY, et al.,             **DECLARATION OF**
                                        **PLAINTIFF IN OPPOSITION**
                     Defendants.        **TO THE MOTION TO DISMISS**
-----------------------------------------------------------------X

        ZOILA IGLESIAS, hereby declares under penalty of perjury that the following is

true and correct:

        1.      I am the adult plaintiff in the above-entitled action, and I reside at 45

Jackson Street, New York, New York.

        2.      I make this declaration in opposition to the motion to dismiss of defendant

Gladys Carrion.

        3.      I have five children, and I raised them from the time they were born until

they became adults.

        4.      The children have given me wonderful grandchildren.

        5.      I have never been accused of abusing, neglecting, or otherwise mistreating

my children.

        6.      For many years, I have cared for four of my grandchildren, and I have

always provided loving care to my grandchildren.

**My oldest grandson, R.R.**

        7.      R.R. is my oldest grandson.  He was born on October 28, 1994, and is now

13 years old.

8.    In 1998, when R.R. was four years old, my son and his girlfriend asked me to take custody of R.R., because they were unable to care for him.

9.    I agreed, and I began taking care of R.R.  Also, I went to court to get a court order giving me legal custody of R.R.

10.   R.R. has been with my, in my custody, for the past ten years.

**My youngest grandson, A.Q.**

11.   A.Q. was born on August 28, 2004, and is the son of my second son.  He has lived with me for his entire life.  I have had legal custody of A.Q. since he was born.

12.   He is the brother of K.R. and J.R., and the first cousin of R.R.

**My granddaughter K.R.**

13.   K.R. is the older sister of A.Q. She was born on December 26, 2001.

14.   When K.R. was little, I saw her often.  I frequently baby-sat for her.

15.   We had a very good relationship, and K.R. loved her cousin R.R., who was living with me.

16.   When K.R. was barely three years old, her father (my oldest son) and her mother became unable to care for her.

17.   An ACS caseworker, Mr. Omaludun, asked me if I would be willing to take care of K.R.  Naturally, I agreed.

18.   K.R. came to live with me on January 20, 2005.

19.   Nobody told me that I could choose whether to take legal custody of K.R. or to care for K.R. as a foster child.  Instead, Mr. Omaludun said that I would be K.R.'s foster

2

mother. The decision had already been made by somebody else.

20.    After K.R. came to live with me, Ms. Vargas, a supervisor at the foster care agency Coalition for Hispanic Family Services ("Coalition"), asked me to sign some papers. The Coalition then gave me a license to be K.R.'s foster mother.

21.    I always treated K.R. the same as I treated my other grandchildren. I gave them all a lot of love, and I treated them all equally. In my mind, there was no difference. The fact that K.R. was officially my foster child and R.R. and A.Q. were in my legal custody did not make any difference to me. I loved them all equally, and I took care of them all equally.

**My middle grandson, J.R.**

22.    J.R., born December 7, 2002,  is the older brother of A.Q. and K.R.

23.    In April, 2005, J.R's father (my son) asked me to watch J.R., who was just over two years old at the time. I agreed.

24.    My son never returned to pick J.R. up.

25.    About 48 hours after J.R.'s father disappeared, I called Lianne Clarke Parris and Ms. Vargas at the Coalition, and told them that J.R. had come to live with me.

26.    Ms. Parris told me that I should keep J.R. She said that I should not send him back to his birth parents because they were unable to care for him.

27.    Some days later, Ms. Parris told me that ACS had gone to court and had gotten legal custody of J.R. She said that I would be J.R.'s foster parent. She did not tell me that I had any option to get an order of custody for J.R.

28.    Sometime after that, I received papers saying I was J.R.'s foster mother.

29.    I have cared for my four grandchildren as my own children. I have

3

provided for all of their needs, and have given them a lot of love. The children love me, as I love them.

**The removal of the children**

30. On February 6, 2008, while my youngest son was visiting me, the police came to arrest him. For reasons which I do not understand, the police arrested me, too.

31. The police took me, my son, and my grandchildren to the precinct house of the Seventh Precinct in Manhattan. After holding me for several hours, the police released me. No one ever filed any charges against me in the criminal court or any other court.

32. When the police released me, I tried to get my grandchildren back. The police told me that ACS had taken my children, and I would have to contact ACS.

33. ACS refused to return the children to me.

34. The next day, on February 7, 2008, ACS filed child neglect charges in the Family Court, claiming that I had neglect two of my grandchildren, R.R. and A.Q. ACS did not charge me with neglecting J.R. or K.R.

35. On February 7, 2008, after a trial, where I testified and Helen Colon testified, and other evidence was presented, the Family Court judge ordered ACS to return R.R. and A.Q. to me. The Family Court judge said that she couldn't do anything about J.R. and K.R. because they weren't part of that court case.

36. On February 13, 2008, a Family Court judge in Brooklyn ordered the defendants to return K.R. to me. The Family Court judge did not make any orders regarding J.R. because he said that he did not have jurisdiction over J.R., who has a case in Queens.

37. I did not see J.R. or K.R. from February 6, 2008, until February 15, 2008.

4

J.R. and K.R. were placed in two separate foster homes.

**Return of the children**

38.    Finally, around 5 pm on February 15, 2008, Lianne Clark Parris returned J.R. and K.R. to me.

39.    When the children returned, they had changed emotionally. J.R. didn't say a word until the next day. He did not want to leave my side, not even for a short time. Even now, J.R. is afraid whenever he sees a police officer. He doesn't like to speak to strangers. He is very active and nervous, and is afraid that someone is going to come and take him away again.

40.    K.R. was extremely afraid for several days after she returned to me. She didn't want to sleep by herself. She was very clingy towards me.

41.    A.Q. was also very clingy after his return. He was also extremely hungry. A.Q. was very afraid of the police, and he mentioned the police fearfully all of the time.

42.    R.R. was also very nervous for the first few days. He didn't want to stay by himself. He was especially loving and caring towards me, showing that he was afraid of being taken away again.

I declare under penalty of perjury that the foregoing is true and correct. Signed on June 9, 2008.

_Zoila Iglesias_
ZOILA IGLESIAS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ZOILA IGLESIAS, individually and as next friend
J.R. and K.R. infants,

                Plaintiffs,              08 Civ. 1595 (AKH)

      -against-

JOHN MATTINGLY, et al.,

**DECLARATION
IN OPPOSITION TO THE
MOTION TO DISMISS**

              Defendants.
--------------------------------------------------------------X

        CAROLYN A. KUBITSCHEK, hereby declares under penalty of perjury that the

following is true and correct:

        1.     I am a member of the firm of Lansner & Kubitschek, attorneys for

plaintiffs in the above-entitled action, and am fully familiar with the facts of this matter.

        2.     I make this declaration in opposition to the motion of defendant Carrión to

dismiss the case against her.

**"Kinship" foster care**

        3.     As of March, 2008, the City of New York had 16, 982 children in foster

care.  http://www.nyc.gov/html/acs/downloads/pdf/stats_monthly_update.pdf , (ACS Monthly

Updated, page 2.)  Those children are in the legal custody of the City's Commissioner of the

Administration for Children's Services ("ACS"), the City's child welfare department.

        4.     As of March, 2008, 4,952 children in foster care were living with relatives

who are serving as foster parents to the children, i.e., 29.16 percent of New York City's foster

care population.  (*Id.*)

        5.     New York City has long recognized the importance of placing its foster

children in homes with their blood relatives. (*See* Exhibit 1, Memorandum of Commissioner Scoppetta, dated February 8, 2001.)

6.    Accordingly, the City recommends that its ACS employees actively search for relatives who are willing to care for the City's foster children. (*Id.*)

7.    The City's positive experience with kinship foster care has been confirmed in a recent study by David M. Rubin, M.D., in the Archives of Pediatric Adolescent Medicine. (See Exhibit 2, annexed hereto.) Dr. Rubin found that children in kinship care do better than children whose foster parents are biological strangers to them.

8.    In addition, the Center on Law and Social Policy has found that children in kinship care fare better than those with strangers. (*See* Exhibit 3, annexed hereto.)

**Zoila Iglesias**

9.    Plaintiff Zoila Iglesias first contacted the law firm of Lansner & Kubitschek on February 8, 2008. The New York City Administration for Children's Services ("ACS") had taken her four grandchildren away from her on February 5, 2008. ACS had filed child neglect charges in the New York Family Court against her on February 7, 2008. ACS alleged that she had neglected her grandsons R.R. and A.Q. ACS did not file any charges whatsoever with regard to the infant plaintiffs J.R. and K.R. (A copy of the neglect petitions are attached as Exhibits 4 and 5. The petitions are identical except for the names of the children.)

10.    The sole allegation against Ms. Iglesias was that she failed to provide adequate supervision of her grandchildren because she "knew or should have known that" her 20-year-old son Anubis Rivas "fails to provide the subject chidlren with adequate supervision and guardianship and misues a drug or drugs . . . which is [*sic*] impairs his ability to care for the

2

subject children." (See Exhibits 4 and 5, "Addendum I, ¶3).

11.    The allegations were false. First, Ms. Iglesias has never permitted her 20-year-old son, who does not reside with her, to care for her children. On the rare occasions that Ms. Iglesias' son comes to her home, he is her guest, not her baby-sitter.

12.    When ACS filed the charges, it asked the Family Court judge to issue an order permitting the City to continue detaining R.R. and A.Q., pursuant to N.Y. Fam. Ct. Act §1027. The judge held an immediate trial on the issue. At the conclusion of the trial, the Family Court judge found that R.R. and A.Q. would not be in imminent danger if they were returned to Ms. Iglesias. Accordingly, the judge ordered the City to return R.R. and A.Q. to Ms. Iglesias forthwith. (A copy of the order returning the children are attached as Exhibit 6.)

13.    When the attorney who represented Ms. Iglesias in Family Court asked for the return of J.R. and K.R., the Family Court judge stated that she did not have jurisdiction to issue any orders retarding those two children because those children were not before her.

14.    The Family Court attorney referred Ms. Iglesias to Lansner & Kubitschek.

15.    Upon meeting Ms. Iglesias for the first time, I learned that she had not received the 10-day notice which the law requires agencies to provide when they remove children from foster parents. (See Exhibit 7, ACS "Independent Review Protocol," dated July 2, 2004, p. 95.)

16.    I knew that a foster parent has a right to a conference, known as an "Independent Review," followed by an administrative hearing.

17.    I also knew, for reasons set out below, that following such a course is almost futile.

18.    The process takes so long that both the kinship foster parent and foster children suffer irreparable injury, even if they are ultimately successful. Moreover, the regulations, policies, and practices of the New York State Commissioner of the Office of Children and Family Services, which govern the proceedings, are constitutionally deficient, making it highly unlikely that the kinship foster parents will ever succeed.

19.    Accordingly, I telephoned the Legal Aid Society, which represented J.R. and K.R. in their own Family Court cases.

20.    The Legal Aid Society agreed to make a motion, in J.R. and/or K.R.'s Family Court case, to seek the return of J.R. and K.R. to Ms. Iglesias.

21.    As the former foster parent of the two grandchildren, Ms. Iglesias lacked standing to go to the Family Court on her own behalf and could not seek any relief whatsoever in that venue.

22.    On February 13, 2008, the Legal Aid Society filed a motion by order to show cause in K. R.'s case, and obtained an order directing the return of K. R. to Ms. Iglesias within 24 hours, i.e., by 11:00 AM on February 14, 2008. (*See* Exhibit 8, attached.) As stated above, Ms. Iglesias lacked standing to seek or receive such an order on her own.

23.    Defendants failed to comply with the order.

24.    Accordingly, late in the afternoon of February 15, 2008, Ms. Iglesias commenced the instant action and sought a temporary restraining order in this Court, before Hon. Thomas P. Griesa, seeking immediate return of the foster children.

25.    While counsel for the parties were arguing the application for a temporary restraining order, sometime after 5 p.m. on February 15, 2008, the defendants finally returned J.

4

R. and K.R. to Ms. Iglesias.

26.    Accordingly, Ms. Iglesias withdrew the application.

27.    It was only a matter of luck (and hard work on the part of K.R.'s Family

Court attorney) that Ms. Iglesias succeeded in securing the return of infant plaintiffs J.R. and

K.R. to her in a comparatively short time.  Other kinship foster parents, those who have

attempted to exhaust the few administrative remedies which state law provides, have not been as

successful.

**Kinship foster parent Alice Haynes**

28.    In the case of Haynes v. Mattingly, 06 Civ. 1383 (TPG), the

Administration for Children's Services had removed Alice Haynes' 4-year-old grandniece, who

was her kinship foster child, from Ms. Haynes, because of an allegation that Ms. Haynes' own

daughter had a red mark on her face which might have been caused by abuse.  (ACS never

removed the daughter herself.)

29.    Ms. Haynes had sought an Independent Review, which was held 21 days

after the removal of her grandniece.  Ms. Haynes lost, even though ACS determined that the red

mark on her daughter's face was an allergic reaction to eating shrimp, and not child abuse.

30.    Ms. Haynes next sought a "Fair Hearing" from defendant Carrión's

predecessor.  The fair hearing was not held until more than five months after the removal of the

4-year-old grandniece.

31.    Eight months after the removal of the grandniece, defendant Carrión's

predecessor finally ruled that the City had acted in an "arbitrary and capricious" manner in

removing the grandniece from Ms. Haynes, and that the removal "was not a proper exercise of

5

discretion."

32.    Despite those findings, defendant Carrión's predecessor did not order the City to return the grandniece to Ms. Haynes.

33.    Ms. Haynes filed suit in this Court, and sought a preliminary injunction, ordering the City to return the grandniece to her, and arguing that the removal and detention of the grandniece were in violation of Rivera v. Marcus, 696 F.2d 1016 (2d Cir. 1982).

34.    At oral argument, counsel for defendant Carrión's predecessor asserted that the State Commissioner of the Office of Children and Family Services lacked the power to order the City to return a foster child to a foster parent after the City has removed the child. (See Exhibit 9, p. 8; Transcript, Haynes v. Mattingly, 06 Civ. 1383 (TPG), May 23, 2006, p. 16).

35.    When the judge asked the State Commissioner what the purpose of a fair hearing was – since the foster parent could not succeed in obtaining the return of the foster child – counsel for the Commissioner stated that "when a child is removed from foster care, the foster parent is losing an income stream and the Section 400 hearing is a chance for a foster parent to try to convince the State that she should keep her job," i.e., obtain a different foster child. (*Id.* at p. 8; Transcript, p. 17).

36.    Because of a kinship foster parent's inability to obtain due process of law, the judge in the Haynes case determined that the federal court would hold a hearing "as to the proper remedy for the violation of due process in the removal of the child" and "the relative benefit or detriment involved in having the child returned to Ms. Haynes. . . ."

37.    A few days before the scheduled hearing, the City returned Ms. Haynes' grandniece to Ms. Haynes. The child has been with Ms. Haynes since that time.

6

38.    The case of <u>Haynes v. Mattingly</u> is pending, and discovery is in process.

**Kinship foster parents Mabel and Anthony Rivera**

39.    In the case of <u>Rivera v. Mattingly</u>, 07 Civ. 7077 (TPG), the City had removed Mable and Anthony Rivera's five grandnieces from the Riveras, who were the kinship foster parents for all five, because the second oldest grandniece (who was 11), alleged that the boyfriend of Mrs. Rivera's adult daughter had had sexual relations with the oldest grandniece (who was 12), while the two grandnieces were visiting the home of Mrs. Rivera's adult daughter, at a time when Mrs. Rivera was out shopping and Mr. Rivera was caring for the three youngest grandnieces.

40.    Shortly after making the charges, the two oldest grandnieces admitted that the charges were untrue.  ACS did a complete investigation and also determined that the charges were untrue and that the Riveras were innocent of any wrongdoing.

41.    Nevertheless, at the "Independent" Review, ACS upheld the decision to remove all five grandnieces.

42.    The State Commissioner did not hold a fair hearing until four months after the removal of the children.  After the hearing, the State Commissioner issued a decision that the removal of the children had been arbitrary and capricious.  As in Alice Haynes' case, the State Commissioner declined to order the return of the grandnieces to Mr. and Mrs. Rivera.

43.    Mr. and Mrs. Rivera filed suit in this Court, <u>Rivera v. Mattingly</u>, 06 Civ. 7077 (TPG), and sought a preliminary injunction directing defendants to return the three youngest grandnieces to the Riveras.  (The two older grandnieces were in the process of returning to their mother.)  The court initially denied the motion.

7

44.     On December 4, 2006, the Court concluded that the government had deprived the Riveras and their grandnieces of due process of law in that they had had no meaningful opportunity to be heard.  (*See* Exhibit 10, <u>Rivera v. Mattingly</u>, 06 Civ. 7077 (TPG), transcript, December 4, 2006, pp. 39-42.)

45.     On December 11, 2006, nearly nine months after the removal, a judge of this Court ordered the return of one of the three grandnieces to Mr. and Mrs. Rivera.  (*See* Exhibit 11, <u>Rivera v. Mattingly</u>, 06 Civ. 7077 (TPG), transcript December 11, 2006, p. 39).

46.     On December 20, 2006, a judge of this Court ordered the return of the other two youngest grandnieces to Mr. and Mrs. Rivera.  (By that time, the two oldest grandnieces had been reunited with their mother, and were no longer in foster care.)  (See Exhibit 12, <u>Rivera v. Mattingly</u>, 06 Civ. 7077 (TPG), transcript December 20, 2006, p. 23.)

47.     The case of <u>Rivera v. Mattingly</u> is pending, and discovery is in process.

48.     Other cases challenging the removal of children from kinship foster parents are also pending in this District.

49.     In addition, I have received inquiries from other a number of attorneys in the City of New York who are presently representing kinship foster parents whose foster children have been removed by ACS.  Some of the children were subsequently returned.  In other cases, the kinship foster parents still have not secured the return of the children.

I hereby declare under penalty of perjury that the foregoing is true and correct. Signed on June 10, 2008.

CAROLYN A. KUBITSCHEK

8

CS-1
Rev. 3/99



**ADMINISTRATION FOR CHILDREN'S SERVICES**
150 WILLIAM STREET - 18TH FLOOR
NEW YORK, N.Y. 10038

NICHOLAS SCOPPETTA
*Commissioner*

**DATE:** February 8, 2001

**TO:** Staff, ACS
Executive Directors, Contract Foster Care Agencies

**FROM:** Nicholas Scoppetta

**SUBJ:** Procedure No.105/Bulletin No.01-1, *Certification/Approval of Foster Boarding Homes*

---

In order to implement the newly amended OCFS regulations (18 NYCRR 443) relating to the certification and approval of foster boarding homes, which were effective on September 27, 2000, ACS is issuing the attached Procedure/Bulletin which highlights the major changes from the earlier regulations, which contains additional ACS requirements established by local policy and which provides instructions for implementing the regulations and the policies.

ACS views the creation of the new foster boarding home licensing regulations as a tremendous opportunity to promote achievement of our reform objectives in relation to neighborhood-based services with continued emphasis on the value of kinship placements (in its new expanded definition) for children in our care. Key among these opportunities are:

- promoting more kinship placements with allowance for placement of large sibling groups together through less stringent physical space requirements, along with an exception process for approved homes;
- respecting a family's definition of "kinship" to include more distant relatives and non-relatives with significant family relationships, and allowing all "kinship" placements to be made on an emergency basis;
- granting of exceptions to non-safety related criteria for close kinship placements which, under the amended regulations, has been delegated to ACS;
- expediting permanency for a child by accepting a single foster parent/adoptive parent application, when appropriate, with a single homestudy serving both purposes.

(over)

01756

While this Procedure/Bulletin stresses only those requirements that ACS believes are the most significant, agencies are required to follow *all* the regulations concerning certification and approval of foster boarding homes. Agency homefinders and any other staff who carry out emergency or full home studies or recertifications must familiarize themselves with the applicable regulations and ACS policies. Of particular importance are the following:

- new or additional time frames relating to completing particular tasks in the emergency and full home study processes. (See summary Chart on page 9.)
- the subject matter that must be covered in all orientation sessions (See pages 12 - 13.)
- the need for OCFS Regional Office approval of each agency's foster parent training program (MAPP training). Note that ACS has prepared a training plan (including orientation) and curriculum which it will be submitting to OCFS. Upon approval, ACS will share its plan/curriculum with all contract agencies and will provide for train-the-trainer opportunities. (Agencies that wish to establish their own training plans/curricula must secure individual approval from OCFS. Further information regarding foster parent orientation/training will be sent out under separate cover.)

For your convenience, attached to this Memorandum is a summary of the differences between the new regulations and the previous regulations. Also enclosed is a complete copy of 18 NYCRR 443, *Certification, Approval and Supervision of Foster Family Boarding Homes*.

This Procedure/Bulletin replaces ACS Procedure No. 98/Bulletin 96-2A, *Referrals and Supervision of Approved Relative Foster Homes*, 4/16/96, both of which are now declared obsolete.

01757

**ARTICLE**

# Impact of Kinship Care on Behavioral Well-being for Children in Out-of-Home Care

David M. Rubin, MD, MSCE; Kevin J. Downes, MD; Amanda L. R. O'Reilly, MPH; Robin Mekonnen, MSW; Xianqun Luan, MS; Russell Localio, PhD

**Objective:** To examine the influence of kinship care on behavioral problems after 18 and 36 months in out-of-home care. Growth in placement of children with kin has occurred despite conflicting evidence regarding its benefits compared with foster care.

**Design:** Prospective cohort study.

**Setting:** National Survey of Child and Adolescent Well-Being, October 1999 to March 2004.

**Participants:** One thousand three hundred nine children entering out-of-home care following a maltreatment report.

**Main Exposure:** Kinship vs general foster care.

**Main Outcome Measures:** Predicted probabilities of behavioral problems derived from Child Behavior Checklist scores.

**Results:** Fifty percent of children started in kinship care and 17% of children who started in foster care later moved to kinship care. Children in kinship care were at lower risk at baseline and less likely to have unstable placements than children in foster care. Controlling for a child's baseline risk, placement stability, and attempted reunification to birth family, the estimate of behavioral problems at 36 months was 32% (95% confidence interval, 25%-38%) if children in the cohort were assigned to early kinship care and 46% (95% confidence interval, 41%-52%) if children were assigned to foster care only (*P*=.003). Children who moved to kinship care after a significant time in foster care were more likely to have behavioral problems than children in kinship care from the outset.

**Conclusions:** Children placed into kinship care had fewer behavioral problems 3 years after placement than children who were placed into foster care. This finding supports efforts to maximize placement of children with willing and available kin when they enter out-of-home care.

*Arch Pediatr Adolesc Med. 2008;162(6):550-556*

Author Affiliations: Pediatric Generalist Research Group (Drs Rubin and Downes, and Mss O'Reilly and Mekonnen), Safe Place: The Center for Child Protection and Health (Dr Rubin and Mss O'Reilly and Mekonnen), and Divisions of General Pediatrics (Dr Rubin and Mss O'Reilly and Mekonnen) and Biostatistics (Mr Luan), Children's Hospital of Philadelphia and Departments of Pediatrics (Dr Rubin) and Biostatistics and Epidemiology (Dr Localio), University of Pennsylvania School of Medicine, Philadelphia

THE LAST 2 DECADES HAVE brought significant growth in the number of children being raised by relatives in kinship care across the United States. According to the 2005 census, more than 2.5 million children were living with a relative caregiver other than a birth parent, representing a 55% increase from census reports in 1990.[1] Although there are many circumstances in which a child may come to reside with kin, substantiated reports of child abuse or neglect might be the most common reason. In 2002, an estimated 542 000 children were living with kin following the involvement of a child welfare agency, exceeding the number of children living in nonrelative foster care arrangements.[2] The growth in kinship care is the result of a sustained effort to improve permanency for children since the Adoption and Safe Families Act of 1997.[3] Since then, child welfare agencies have increased efforts to place children with kin despite scant and conflicting evidence of improved outcomes for children in kinship care compared with children in general foster care.

*For editorial comment see page 586*

A review of the literature delineates conflicting evidence regarding the benefits and trade-offs of raising children with kin. A large body of research acknowledges the evidence that children in kinship care are less likely to change placements, benefiting from increased placement stability, compared with children in general foster care.[4,5] Placement stability is a common goal of child welfare systems and has consistently been shown to result in better outcomes for all

(REPRINTED) ARCH PEDIATR ADOLESC MED/VOL 162 (NO. 6), JUNE 2008    WWW.ARCHPEDIATRICS.COM
550
Downloaded from www.archpediatrics.com on June 10, 2008
©2008 American Medical Association. All rights reserved.

children living in out-of-home care.[8,10] Children in kinship care are also more likely to remain in their same neighborhood, be placed with siblings, and have consistent contact with their parents than children in foster care, all of which might contribute to less disruptive transitions into out-of-home care.[8,11,13]

Other evidence raises concerns of safety for children in kinship arrangements given the greater risk of continued and often unsupervised access to abusive parents and a greater likelihood that the child's new relative caregivers share similar problems as offending parents.[15,16] Children in kinship care also have higher rates of behavioral and educational problems than other children living in poverty who are not involved with the child welfare system.[11,15,18] Long-term outcome studies have also failed to demonstrate a significant difference between children raised by kin and foster parents.[18-20] And finally, children in kinship care are known to face additional hardships because their caregivers tend to be single, older, of poorer health, and of lower economic status; have more mental health problems; receive less assistance and services from child welfare agencies; and have fewer supportive resources than foster parents.[2,18,21-24]

Given this conflicting evidence, there is a need to better understand the experiences and outcomes of children in kinship care compared with general foster care. The recent National Survey of Child and Adolescent Well-Being (NSCAW), mandated by Congress in 1996 and conducted for the Department of Health and Human Services, has provided a unique opportunity to capture the experiences and early outcomes of a nationally representative cohort of children placed in out-of-home care.[25] We therefore sought to estimate the association between placement into kinship care and the likelihood of behavioral problems after 18 and 36 months in out-of-home care.

## METHODS

NSCAW was a complex survey that sought to recruit a nationally representative sample of American children following substantiated maltreatment reports to child protective services from October 1999 to December 2000. Interviews were conducted with children, caregivers, birth parents, child welfare workers, and teachers at baseline, 18 months, and 36 months after enrollment, with the completion of the 36-month follow-up occurring by March 2004. Of the original 5501 children enrolled in NSCAW, we restricted our sample to those children residing at home at the time of the initial investigation for maltreatment and who entered out-of-home care between the date of investigation and baseline data collection. We excluded subjects who spent more than 9 of the first 18 months in restrictive settings like group homes or residential treatment facilities because we were principally interested in the movement of children across the less restrictive settings of kinship and foster care.[26] The response rate at baseline for the NSCAW sample was 61% (5501 of 8961; weighted, 64%). However, our target population of children in out-of-home care was easier to recruit and therefore had a response rate approaching 88%.[27]

The main exposures of interest were the placement setting, placement stability, and reunification status of the children. For placement setting, we divided children into 3 categories: (1)

early kinship care, if they had a placement in a kin home within 1 month of entry into out-of-home care; (2) if their placement with kin occurred beyond the first month of out-of-home care and (3) general foster care, if they had no subsequent placements into kinship care. For placement stability over the first 18 and 36 months in out-of-home care, we followed previous work[28,29] and divided children into 3 distinct categories of stability: (1) early stable, in which a sustained placement or reunification was achieved within 45 days of entry into out-of-home care and lasted through the end of the study period (18 or 36 months); (2) late stable, in which a sustained placement or reunification was achieved after 45 days, with a duration of at least half the study period; and (3) unstable, in which no long-lasting placement or reunification was achieved during the study period. A separate reunification variable was created to identify those children for whom a reunification to the birth family was attempted.

The primary outcome for this study was the child's behavioral well-being at 18 and 36 months, as measured by the Child Behavior Checklist (CBCL).[8] Scores for each item from this caregiver-reported survey are summed into a total behavioral problems scale, which is normalized by age to identify categories of normal, borderline (>83rd percentile), and clinical (>90th percentile) range behaviors. For the purposes of our study, we dichotomized the outcome variable at the 83rd percentile to denote normal vs abnormal behavior scores, a practice which has been used commonly in prior studies with this instrument.[21,30,31,35]

To encode a child's baseline risk, the major source of confounding in this study, we built on prior work using ordinal regression models to estimate the future risk of placement stability using baseline attributes of the children and their families.[29] Child-level factors for these models included sex, age (<2 years, 2-10 years, >10 years), race (white, black, or other), history of chronic health problems (yes/no), caregiver-reported mental health service use (yes/no), use of prescription medications (yes/no), and the child's behavioral well-being at baseline. The behavioral well-being variable was a composite variable using standardized CBCL scores for children 2 years and older and standardized temperament scores for younger children that were used in the National Longitudinal Survey of Youth.[8,32] Birth parent characteristics included histories of drug or alcohol abuse (yes/no), mental health problems (yes/no), and domestic violence or arrests (yes/no). Child maltreatment variables included the type of maltreatment (physical abuse, sexual abuse, neglect/abandonment, other) and prior reporting/foster care history (yes/no).

Poststimation probabilities of placement stability from the ordinal logistic regression models were reduced into 3 tertiles to represent low-, medium-, or high-risk groups. These tertiles were then added to logistic regression models for the outcome of any behavioral problem at 18 and 36 months. The other variables in these analyses were the child's placement setting, placement stability, and reunification status over the interval (either 18 or 36 months).

For the 18-month model, 392 children were younger than 2 years and just missed the cutoff for the CBCL. We used multiple imputation, with 5 imputed values per missing observation, to estimate the missing 18-month CBCL data[33] using 36-month CBCL scores, the caregiver's report of mental health service use by children between baseline and 18 months, and all other independent variables that were ultimately included in the final models. A similar approach permitted the imputation of CBCL scores for 159 children at 36 months whose CBCL scores were unmeasured.[8]

After fitting the final models, we estimated predictive margins for the probability of behavior problems had all children been assigned to kinship or general foster care.[34] These posti-

Downloaded from www.archpediatrics.com on June 10, 2008
©2008 American Medical Association. All rights reserved.

| Table 1. Characteristics of Children Entering Out-of-Home Care Within NSCAW[25, a] | | | |
|---|---|---|---|
| | Initial Placement Setting, No. (%) | | |
| Characteristic | Foster Care (50.3%) (n=710) | Kinship Care (49.7%) (n=599) | P Value |
| **Demographics** | | | |
| Child's age, y | | | |
| <2 | 29.8 (304) | 26 0 (230) | |
| 2-10 | 45.7 (260) | 54.6 (269) | .12 |
| >10 | 24 5 (145) | 19.4 (100) | |
| Child's sex | | | |
| F | 52.0 (354) | 55 9 (333) | |
| M | 48.0 (356) | 44.2 (266) | .42 |
| Child's race | | | |
| White | 52 1 (318) | 47.9 (259) | |
| Black | 35.0 (285) | 41.2 (268) | .37 |
| Other | 12.8 (107) | 10.9 (72) | |
| Hispanic ethnicity | 13.7 (103) | 12.9 (108) | .76 |
| Below poverty level[b] | 23.0 (129) | 44.0 (228) | <.001 |
| **Child baseline health** | | | |
| Abnormal behavior[c] | 42.1 (249) | 32.8 (179) | .04 |
| Health problems | 46.5 (354) | 42.1 (262) | .34 |
| Prescription medication use | 3.2 (19) | 0 6 (7) | .005 |
| Mental health service use | 35.4 (228) | 24.3 (137) | .003 |
| **Maltreatment history** | | | |
| Type of abuse reported | | | |
| Neglect/abandonment | 56 0 (392) | 58.6 (314) | |
| Physical abuse | 18.6 (112) | 18.6 (106) | |
| Sexual abuse | 9.5 (73) | 8.8 (50) | .90 |
| Other | 15.8 (72) | 13.9 (76) | |
| Prior child protective services involvement | 69.2 (478) | 61.9 (358) | .06 |
| **Birth parent characteristics** | | | |
| Mental health problems | 58.4 (414) | 46.6 (290) | .006 |
| Domestic violence or incarceration | 50.7 (354) | 52.6 (306) | .59 |
| Substance abuse | 45.3 (365) | 47.9 (311) | .54 |
| **Behavioral outcomes** | | | |
| Abnormal 18-mo CBCL[30] scores[d] | 47.1 (214) | 31 4 (169) | .001 |
| Abnormal 36-month CBCL scores[d] | 48.0 (250) | 29 1 (173) | <.001 |

Abbreviations: CBCL, Child Behavior Checklist; NSCAW, National Survey of Child and Adolescent Well-being.

[a] Percentages are based on survey weights (n = sample size; unweighted).

[b] For child's initial placement setting in out-of-home care. The poverty level is defined as household income less than $20 000/y for a family of 5 (median household size in NSCAW out-of-home sample = 5) and the weighted average poverty threshold for a household of 5 in 1999 was $20 127.[43]

[c] Defined as more than 1 SD from the mean using standardized infant temperament score if child is younger than 2 years or the CBCL score if the child is 2 years or older.

[d] Numbers and percentages presented in the table are based on nonimputed data. Estimates based on imputed data are as follows: abnormal 18-month CBCL scores, foster care (44.7%) and kinship care (29.8%); abnormal 36-month CBCL scores, foster care (46.4%) and kinship care (29.0%).

estimation methods allowed for standardized comparisons of outcomes across different classifications of children. Estimates report the probability of behavioral problems if all children in the sample shared the same experience while averaging over other covariates in the model. Reporting adjusted probabilities of behavioral outcomes was preferred to reporting risk ratios because the prevalence of behavioral problems was high in the population.

All variance estimates accounted for the stratification, clustering, and sampling weights in NSCAW. The extreme variability in weights (range, 1-6908) led us to mirror prior analyses and trim the design weights higher than the 95th percentile.[44] Separate analyses revealed that trimming weights in this manner reduced the variance of estimates without significantly affecting point estimates. In addition, variance estimates reflect the variability of using imputed data. Variances for the predictive margins within the imputed data set were estimated using bootstrap resampling at the primary sampling unit level (999 samples). Within- and among-imputation components of variance were then combined to form the final confidence intervals (CIs) for these marginally standardized probabilities.[41] Sensitivity analyses (not shown) comparing multiple imputation vs complete younger children did not appreciably change our results nor did constructing a model with adjustment for all covariates simultaneously or adding back into the model the covariates that were used initially to estimate the predicted probability of placement stability.

Analyses were conducted using Stata.[24] Permission to use the NSCAW data was granted by the National Data Archive for Child Abuse and Neglect. Approval for the study was obtained from the institutional review board at the Children's Hospital of Philadelphia.

## RESULTS

Among the NSCAW cohort, 1404 children entered out-of-home care between their maltreatment report and the subsequent baseline data collection. Of these children, 1309 met the inclusion and exclusion criteria of our study (93% of potential eligible children). At baseline, 28% of the children were younger than 2 years, 50% were 2 to 10 years, and 22% were older than 10 years old. Most children (57%) were reported because of neglect or abandonment (**Table 1**).

Our sample was evenly divided between children who entered kinship care at their initial placement (50%) and those who entered general foster care (50%). Among children who initially entered general foster care, 17% later moved to kinship care (late kinship care) after having spent at least 1 month in foster care. Thirty-five percent of children had an attempted reunification with birth families, with a greater proportion of attempts made for children in general foster care than kinship care (43% vs 28%). Children initially placed into general foster care were also more likely to have had an abnormal baseline behavior score, taken medications in the 12 months prior to the start of the study, used mental health services at the time of baseline data collection, and had a caregiver with serious mental health problems as compared with children who initially entered kinship care (Table 1).

After further delineating the onset of kinship care as early or late, children in early kinship care were more likely to be at lower risk for placement instability than both children in late kinship care and general foster care only (**Table 2**). Children in early kinship care were also more likely to achieve early stability; by 36 months, 58% of children in early kinship care were classified as early stable, compared with only 32% of children in general foster care. Although by definition unable to achieve early stability, 58% of late kinship care children still achieved

Downloaded from www.archpediatrics.com on June 10, 2008
©2008 American Medical Association. All rights reserved.

**Table 2. Baseline Risk for Placement Instability and Observed Placement Stability Over the First 36 Months of Out-of-Home Placement by Placement Setting[a]**

| | Placement Setting, No. (%) | | | |
| Characteristic | General Foster Care Only (n=584) | Late Kinship Care (n=126) | Early Kinship Care (n=599) | P Value |
|---|---|---|---|---|
| Risk for instability[b] | | | | |
| Low | 31.5 (155) | 34.0 (39) | 45.7 (240) | |
| Medium | 32.7 (230) | 34.9 (51) | 31.8 (210) | .01 |
| High | 35.8 (190) | 31.1 (36) | 22.6 (147) | |
| Actual placement stability | | | | |
| Early stable | 32.1 (171) | 3.9 (4) | 57.5 (299) | |
| Late stable | 39.5 (236) | 57.7 (76) | 24.9 (174) | < .001 |
| Unstable | 28.4 (137) | 38.4 (46) | 17.6 (126) | |

Abbreviations  See Table 1
[a] Percentages are based on survey weights (n = sample size, unweighted)
[b] Risk groups derived from a multivariate ordinal logistic regression model predicting log odds of placement instability using baseline attributes. Variables included in the model were baseline behavior score (temperament score if < 2 years; CBCL[35] if 2 years or older), child's age, reported mental health service use, prescription medication use within 1 year prior to entry into NSCAW,[25] history of prior child protective services involvement, and birth parent with behavioral health problems.

**Table 3. Adjusted Probabilities of Behavior Problems at 18 and 36 Months of Children Entering Out-of-Home Care in NSCAW[a]**

| | 18 Months | | 36 Months | |
| Variable | Probability (95% Confidence Interval) | P Value | Probability (95% Confidence Interval) | P Value |
|---|---|---|---|---|
| Placement setting | | | | |
| General foster care only | 0.44 (0.37-0.50) | | 0.46 (0.41-0.52) | |
| Late kinship care | 0.30 (0.19-0.41) | .13 | 0.39 (0.34-0.43) | .003 |
| Early kinship care | 0.32 (0.25-0.39) | .02 | 0.32 (0.25-0.38) | .003 |
| Actual placement stability | | | | |
| Early stable | 0.33 (0.26-0.40) | | 0.32 (0.25-0.39) | |
| Late stable | 0.35 (0.23-0.46) | .95 | 0.38 (0.27-0.48) | .52 |
| Unstable | 0.43 (0.35-0.51) | .14 | 0.49 (0.39-0.60) | .007 |
| Risk for instability[b] | | | | |
| Low | 0.25 (0.19-0.31) | | 0.33 (0.27-0.40) | |
| Medium | 0.37 (0.32-0.42) | < .001 | 0.39 (0.35-0.43) | .04 |
| High | 0.51 (0.43-0.60) | < .001 | 0.45 (0.38-0.52) | .04 |
| Reunification status | | | | |
| No | 0.31 (0.25-0.37) | | 0.37 (0.28-0.45) | |
| Yes | 0.56 (0.36-0.76) | .11 | 0.43 (0.25-0.62) | .62 |

Abbreviations  See Table 1
[a] Standardized estimates of predictive margins derived from survey-weighted logistic regression. Each probability was derived under the assumption that all children in the cohort were assigned to that category, adjusting for all other factors in the model.
[b] Risk groups derived from a multivariate ordinal logistic regression model predicting the likelihood of placement instability using baseline attributes. Variables included in the model were baseline behavior score (temperament score if < 2 years; CBCL[35] if 2 years or older), child's age, reported mental health service use, prescription medication use within 1 year prior to entry into NSCAW,[25] history of prior child protective services involvement, and birth parent with behavioral health problems.

later stability, compared with 40% of children in general foster care only.

Controlling for placement stability, baseline risk, and reunification status at 18 and 36 months, children in early kinship care had a lower marginal probability of behavioral problems by 36 months (**Table 3**). The estimate of **behavioral** problems was 46% (95% CI, 41%-52%) if all children had been assigned to general foster care only, compared with 32% (95% CI, 25%-38%) if the children had been assigned to early kinship care. If kinship care had occurred late, by contrast, the estimated risk of behavioral problems was 39% (95% CI, 34%-43%). With regard to placement stability, the probability of behavioral problems was 49% (95% CI, 39%-60%) if children had an unstable placement his-

tory, compared with 32% (95% CI, 25%-39%) if children were conferred early stability. Finally, in a 2-dimensional analysis across all categories of placement stability, there was a lower expected probability of behavior problems if children had entered early kinship care vs general foster care (**Figure**); the risk of behavioral problems if children had entered late kinship care fell between these 2 groups.

## COMMENT

Our study demonstrated a protective effect of kinship care on the early behavioral outcomes of a nationally representative cohort of children entering out-of-home care.

Downloaded from www.archpediatrics.com on June 10, 2008
©2008 American Medical Association. All rights reserved.



**Figure.** Standardized estimates of behavior problems at 18 and 36 months in out-of-home care stratified by a child's placement setting and placement stability. These data are marginally standardized using survey-weighted logistic regression, adjusting for the risk for instability and reunification status of the child. Probabilities presented with 95% confidence intervals

Compared with children entering foster care, children entering kinship care had a lower estimated risk of behavioral problems, even after accounting for their lower baseline risk and increased placement stability. Even children who moved to kinship care after sustained periods of foster care showed some benefit. The magnitude of this association between placement setting and later behavioral problems should reassure a child welfare community that has increasingly moved children toward kinship placements in recent years.

While this study provides evidence to encourage the placement of children with willing and available kin, we urge caution in interpreting the findings for 3 reasons. First, NSCAW did not collect sufficient information about extended families to clarify whether children placed into foster care had acceptable and safe alternatives within their own families. While the late kinship care group demonstrated that at least some of these children had available kin, for others kinship care will likely remain an unrealistic option. For these children, our secondary finding that placement stability improves behavioral outcomes for all children affirms prior findings[24] and provides an appealing option for intervention to improve outcomes over time, regardless of placement into kinship care or general foster care. Second, reporter bias might have contributed to some of our findings. Prior studies have demonstrated that kin caregivers might be less likely to report behavioral problems among children in their care

than foster parents or teachers.[4,42] Our analyses did, however, adjust for baseline behavioral assessments, and many of these assessments were provided by the same kin caregivers who later reported outcome data. Finally, the results are not the product of a randomized study and it remains possible that unobserved confounding might explain both the assignment of placement setting and differences in behavioral outcomes.

Beyond these limitations and the need for further research to confirm and elaborate on these findings are further concerns about generalizability because these data, although broad, cannot incorporate local variations and may not reach the entire universe of children in kinship care. The decision to place a child in kinship care often involves appraising the trade-offs of granting prompt access to kin, delaying access to permit time for certification, or, increasingly in recent years, moving children away from the system to temporary legal custody arrangements. Many of these latter circumstances, in which an open case to child welfare is quickly closed after the child is placed with a kin caregiver, involve caregivers who would have a difficult time achieving certification as a foster parent within the child welfare system, whether because of specific income or health criteria or simply scheduling compliance with the training necessary for certification. For these families, temporary custody arrangements have become an expedient alternative that might also shield them from continued scrutiny. Unfortunately, children in these more informal kinship arrangements would not have been easily identified within the NSCAW cohort. As such, their outcomes were likely unmeasured in this analysis and will require further study.

These generalizability concerns aside, it is still hard to overlook the magnitude of the protective effect observed for children in kinship care. At the same time, family members who provide kinship care (often to several siblings) are not without needs themselves, given health problems and poverty stemming from intergenerational cycles of maltreatment. Although children in kinship care fared better than children in foster care in this study, overall rates of behavioral problems in both groups exceed rates observed in other children who are raised in-home without involvement of the child welfare system.[25] Furthermore, even in comparison with a foster care population whose needs are systematically unaddressed,[21,46-48] the literature suggests that the unmet needs for kinship families are even greater, given the barriers to accessing public programs, which are magnified when families lack the support of the child welfare system. Although the longitudinal impact of poverty could not be measured accurately among children in out-of-home care with the NSCAW data, at baseline we estimated that 44% of children entering kinship care resided with families whose income was lower than the federal poverty level, as compared with 23% of their peers who entered foster care. In addition, an Urban Institute report in 2002 found that only one-third of informal kinship families even obtained the cash assistance benefits from Temporary Assistance to Needy Families for which their children were eligible.[49] Access to education, Medicaid, mental health services, and

Downloaded from www.archpediatrics.com on June 10, 2008
©2008 American Medical Association. All rights reserved.

other benefits also poses barriers difficult for kin to overcome.[48,49]

These concerns about the support provided to kinship families have risen to the federal level of policy. Legislation has been introduced in the 110th Congress that would provide funding for states to provide guardianship benefits to kinship caregivers and to develop navigator programs that would link these caregivers to appropriate services and funding streams for children under their care.[51,52] This legislation would also require notification to kin on the placement of a relative child in protective custody to facilitate early placement with relatives, potentially increasing the number of children who will enter kinship care early. Our findings suggest that more timely entry into kinship care will be beneficial. When kinship care is a realistic option and appropriate safeguards have been met, children in kinship care might have an advantage over children in foster care in achieving permanency and improved well-being, albeit with the recognition that their needs will remain great, exceeding those of children who have not experienced child maltreatment.

Accepted for Publication: November 2, 2007.

Correspondence: David M. Rubin, MD, MSCE, Children's Hospital of Philadelphia, 34th Street and Civic Center Boulevard, Attn: CHOP North—3535 Market, Room 1533, Philadelphia, PA 19104 (rubin@email.chop.edu).

Author Contributions: Dr Rubin had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis. *Study concept and design:* Rubin, Downes, O'Reilly, Luan, and Localio. *Acquisition of data:* Rubin and Luan. *Analysis and interpretation of data:* Rubin, Downes, O'Reilly, Mekonnen, Luan, and Localio. *Drafting of the manuscript:* Rubin, Downes, O'Reilly, Mekonnen, and Localio. *Critical revision of the manuscript for important intellectual content:* Rubin, Downes, O'Reilly, Mekonnen, Luan, and Localio. *Statistical analysis:* Rubin, Downes, O'Reilly, Luan, and Localio. *Obtained funding:* Rubin. *Administrative, technical, and material support:* Rubin, O'Reilly, Mekonnen, and Luan. *Study supervision:* Rubin, O'Reilly, and Localio.

Financial Disclosure: None reported.

Funding/Support: This study is supported by Career Development Award 5K23HD045748 from National Institute of Child Health and Human Development (Dr Rubin) and by supplemental grant DHHS 90PH0003-01 from the Office of Research, Planning, and Evaluation for the Administration of Children and Families at the Department of Health and Human Services. Additional support was also provided by the Doris Duke Charitable Foundation (Dr Downes).

Role of the Sponsor: The sponsors had no role in the design and conduct of the study; the collection, management, analysis, or interpretation of data; or the preparation, review, or approval of the manuscript.

## REFERENCES

1  US Census Bureau. Table CH-1. Living arrangements of children under 18 years old: 1960 to present. http://www.census.gov/population/www/socdemo/hh-fam.html. Accessed April 6, 2007.

2  Ehrle J, Geen R, Main R. *Kinship Foster Care: Custody, Hardships, and Services.* Washington, DC: The Urban Institute; 2003.

3  Adoption and Safe Families Act of 1997. Pub L No. 105-89.

4  Chamberlain P, Price JM, Reid JB, Landsverk J, Fisher PA, Stoolmiller M. Who disrupts from placement in foster and kinship care? *Child Abuse Negl.* 2006; 30(4):409-424.

5  Courtney M, Needell B. Outcomes of kinship care: lessons from California. In: Berrick J, Barth R, Gilbert N, eds. *Child Welfare Research Review.* Vol 2. New York, NY: Columbia University Press; 1997:130-150.

6  Iglehart A. Kinship foster care: placement, service, and outcome issues. *Child Youth Serv Rev.* 1994;16(1-2):107-122.

7  Leslie LK, Landsverk J, Horton MB, Ganger W, Newton RR. The heterogeneity of children and their experiences in kinship care. *Child Welfare.* 2000;79(3):315-334.

8  Berrick J, Barth R, Needell B. A comparison of kinship foster homes and foster family homes: implications for kinship foster care as family preservation. *Child Youth Serv Rev.* 1994;16(1-2):33-64.

9  Brown S, Cohon D, Wheeler R. African American extended families and kinship care: how relevant is the foster care model for kinship care? *Child Youth Serv Rev.* 2002;24(1-2):53-77.

10  Testa M. Kinship care in Illinois. In: Berrick J, Barth R, Gilbert N, eds. *Child Welfare Research Review.* Vol 2. New York, NY: Columbia University Press; 1997: 101-129.

11  Beeman S, Boisen L. Child welfare professionals' attitudes toward kinship foster care. *Child Welfare.* 1999;78(3):315-337.

12  Chapman MV, Wall A, Barth RP. Children's voices: the perceptions of children in foster care. *Am J Orthopsychiatry.* 2004;74(3):293-304.

13  Dubowitz H, Feigelman S, Harrington D, Starr R, Zuravin S, Sawyer RJ. Children in kinship care: how do they fare? *Child Youth Serv Rev.* 1994;16(1-2):85-106.

14  Messing JT. From the child's perspective, a qualitative analysis of kinship care placements. *Child Youth Serv Rev.* 2006;28(12):1415-1434.

15  US General Accounting Office. *Kinship Care Quality and Permanency Issues (Report to the Chairman, Subcommittee on Human Resources, Committee on Ways and Means, House of Representatives).* Washington, DC: GAO; 1999.

16  Peters J. True ambivalence: child welfare workers' thoughts, feelings, and beliefs about kinship foster care. *Child Youth Serv Rev.* 2005;27(6):595-614.

17  Sawyer RJ, Dubowitz H. School performance of children in kinship care. *Child Abuse Negl.* 1994;18(7):587-597.

18  Brooks D, Barth R. Characteristics and outcomes of drug-exposed and non drug-exposed children in kinship and non-relative foster care. *Child Youth Serv Rev.* 1998;20(6):475-501.

19  Benedict MI, Zuravin S, Stallings RY. Adult functioning of children who lived in kin versus nonrelative family foster homes. *Child Welfare.* 1996;75(5):529-549.

20  Iglehart A. Readiness for independence: comparison of foster care, kinship care, and nonfoster care adolescents. *Child Youth Serv Rev.* 1995;17(3):417-432.

21  Burns BJ, Phillips S, Wagner H, et al. Mental health need and access to mental health services by youths involved with child welfare: a national survey. *J Am Acad Child Adolesc Psychiatry.* 2004;43(8):960-970.

22  Ehrle J, Geen R. Kin and non-kin foster care—findings from a national survey. *Child Youth Serv Rev.* 2002;24(1):15-35.

23  Gebel T. Kinship care and nonrelative family foster care: a comparison of caregiver attributes and attitudes. *Child Welfare.* 1996;75(1):5-18.

24  Timmer SG, Sedlar G, Urquiza AJ. Challenging children in kin versus nonkin foster care: perceived costs and benefits to caregivers. *Child Maltreat.* 2004;9(3):251-262.

25  Dubowitz H, Zuravin S, Starr RH Jr, Feigelman S, Harrington D. Behavior problems of children in kinship care. *J Dev Behav Pediatr.* 1993;14(6):386-393.

26  Hawkins RP, Almeida MC, Fabry B, Reitz AL. A scale to measure restrictiveness of living environments for troubled children and youths. *Hosp Community Psychiatry.* 1992;43(1):54-58.

27  *National Survey of Child and Adolescent Well-Being. Combined Waves 1-4 User's Manual—Restricted Release.* Ithaca, NY: National Data Archive on Child Abuse and Neglect; 2004:114-116.

28  James S, Landsverk JA, Slymen DJ. Placement movement in out-of-home care: patterns and predictors. *Child Youth Serv Rev.* 2004;26(2):185-206.

29  Rubin DM, O'Reilly A, Luan X, Localio A. The impact of placement stability on behavioral well-being for children in foster care. *Pediatrics.* 2007;119(2):336-344.

30  Achenbach T, Edelbrock C. *Manual for the Child Behavior Checklist and 1991 Profile.* Burlington: University of Vermont Department of Psychiatry; 1991.

31  James S, Landsverk J, Slymen DJ, Leslie LK. Predictors of outpatient mental health service use-the role of foster care placement change. *Ment Health Serv Res.* 2004; 6(3):127-141.

Downloaded from www.archpediatrics.com on June 10, 2008.
©2008 American Medical Association. All rights reserved.

32. Landsverk J, Davis I, Ganger W, Newton R. Impact of child psychosocial functioning on reunification from out-of-home placement. Child Youth Serv Rev. 1996; 18(4-5):447-462

33. Landsverk J, Garland AF. Foster care and pathways to mental health services. In: Curtis PA, Dale GJ, eds. The Foster Care Crisis: Translating Research Into Policy and Practice. Child, Youth, and Family Services. Lincoln, University of Nebraska Press; 1999:193-210

34. Landsverk JA, Garland AF, Leslie LK. Mental Health Services for Children Reported to Child Protective Services. Vol 2. Thousand Oaks, CA: Sage Publications; 2002

35. Hurlburt MS, Leslie L, Landsverk J, et al. Contextual predictors of mental health service use among children open to child welfare. Arch Gen Psychiatry. 2004; 61(12):1217-1224

36. Mott F, Baker P, Ball D, Keck C. The NLSY Children 1992. Columbus, Center for Human Resource Research, Ohio State University; 1998

37. van Buuren S, Boshuizen H, Knook D. Multiple imputation of missing blood pressure covariates in survival analysis. Stat Med. 1999;18(6):681-694

38. Royston P. Multiple imputation of missing values. Stata J. 2004;4(3):227-241

39. Korn E, Graubard B. Analysis of Large Health Surveys. New York, NY: John Wiley & Sons; 1999

40. Korn E, Graubard B. Analysis of large health surveys: accounting for the sampling design. J R Stat Soc Ser A Stat Soc. 1995;158(2):263-295

41. Rubin D. Multiple Imputation for Nonresponse in Surveys. New York, NY: John Wiley & Sons; 1987

42. StataCorp. Stata Statistical Software: Release 9.2. College Station, TX: StataCorp LP; 2006

43. Poverty thresholds 1999. US Census Bureau Web site. http://www.census.gov/hhes/www/poverty/threshld/thresh99.html. Accessed March 11, 2006

44. Shore N, Sim K, Keller T. Foster parent and teacher assessments of youth in kinship and non-kinship foster care placements: are behaviors perceived differently across settings? Child Youth Serv Rev. 2002;24(1-2):109-134

45. Keller T, Wetherbee K, Le Prohn N, Payne V, Sim K, Lamont E. Competencies and problem behaviors of children in family foster care: variations by kinship placement status and race. Child Youth Serv Rev. 2001;23(12):915-940

46. Simms MD, Halfon N. The health care needs of children in foster care: a research agenda. Child Welfare. 1994;73(5):505-524

47. American Academy of Pediatrics Committee on early childhood and adoption and dependent care: health care of young children in foster care. Pediatrics. 2002; 109(3):536-541

48. Halfon N, Mendonca A, Berkowitz G. Health status of children in foster care: the experience of the Center for the Vulnerable Child. Arch Pediatr Adolesc Med. 1995; 149(4):386-392

49. Main R, Macomber J, Geen R. Trends in Service Receipt: Children in Kinship Care Gaining Ground. Assessing the New Federalism. Policy Brief B-68. Washington, DC: The Urban Institute; 2006

50. Leslie LK, Landsverk J, Ezzel-Lofstrom R, Tschann JM, Slymen DJ, Garland AF. Children in foster care: factors influencing outpatient mental health service use. Child Abuse Negl. 2000;24(4):465-476

51. The Kinship Caregiver Support Act. S 661, 110th Congress, 1st Sess (2007)

52. The Kinship Caregiver Support Act. HR 2188, 110th Congress, 1st Sess (2007)

**Announcement**

Topic Collections. The Archives offers collections of articles in specific topic areas to make it easier for physicians to find the most recent publications in a field. These are available by subspecialty, study type, disease, or problem. In addition, you can sign up to receive a Collection E-Mail Alert when new articles on specific topics are published. Go to http://archpedi.ama-assn.org /collections to see these collections of articles.

Downloaded from www.archpediatrics.com on June 10, 2008
©2008 American Medical Association. All rights reserved.



# CLASP

## CENTER FOR LAW AND SOCIAL POLICY

## Is Kinship Care Good for Kids?

by Tiffany Conway and Rutledge Q. Hutson
*March 2, 2007*

*More than 2.5 million children are being raised by grandparents and other relatives because their parents are unable—for a variety of reasons—to care for them.[1] These relative caregivers are willing to care for the children—but they may require financial help in order to meet the children's needs. A number of states have utilized subsidized guardianship programs as a way of supporting such families, often called "kinship families." Such placements help the child to, among other things, maintain family—and oftentimes community—connections. These programs provide subsidies to relatives and, in some cases, other interested, non-relative adults who are caring for and have a close emotional bond with children who are not biologically their own.*

*Subsidized guardianship is consistent with national policy preferences espoused in both the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and the Adoption and Safe Families Act of 1997,[2] and there is considerable evidence of the value of subsidized guardianship programs. Still, some wonder whether kinship care is a good thing—and how we know this. This fact sheet addresses these often unasked but crucial questions.*

### Children in kinship care experience greater stability.

➢ Children in kinship foster care have been found to experience fewer placement changes than children placed with non-kin foster parents do.[3]

➢ Multiple studies indicate the value of placing siblings together, when safe and appropriate.[4] Perhaps equally as important, children in foster care consistently express the desire to be with their siblings. Research has shown that children in foster care are more likely to live with their siblings if they are placed with kin.[5]

➢ Fewer children in kinship care report having changed schools (63 percent) than do children in non-relative foster care (80 percent) or those in group care (93 percent).[6]

➢ Children who reunify with their birth parent(s) after kinship care are less likely to re-enter foster care than those who had been in non-relative foster placements or in group care facilities.[7]

➢ The Child and Family Services Reviews (CFSR) are designed to ensure that states are achieving safety, permanency, and child and family well-being. Kinship care bolsters states' ability to comply with federal requirements by providing children with stability and permanency.[8]

### Children in kinship care report more positive perceptions of their placements and have fewer behavioral problems.

➢ Compared to children in non-relative foster care and those in group care, children in kinship care are:

✓ More likely to report liking those with whom they live (93 percent vs. 79 percent [non-relative foster care] and 51 percent [group care])

✓ More likely to report wanting their current placement to be their permanent home (61 percent vs. 27 percent and 2 percent)[9]

✓ Less likely to report having tried to leave or run away (6 percent vs. 16 percent and 35 percent)[10]

✓ More likely to report that they "always felt loved" (94 percent vs. 82 percent [non-relative foster care])[11]

- In terms of scores in physical, cognitive, emotional, and skill-based domains, children in kinship care have scores more like those of children who are able to remain at home following a child abuse and neglect investigation than do children in foster or group care.[12]

- Both teachers and caregivers tend to rate children in kinship care as having fewer behavioral problems than do their peers in other out-of-home placement settings.[13]

**Kinship care respects cultural traditions and may reduce racial disparities in a variety of outcomes.**

In a number of cultures—including many communities of color—the family and home are understood to include the extended family, and in some cases the community. Kinship care represents an opportunity for states to provide federally required safety and permanency to a greater number of children who come into contact with the child welfare system, while enhancing their well-being by providing them with access to their ethnic, racial, and cultural traditions.[14]

**Kinship caregivers provide stability to children and youth with incarcerated parents.**

According to a 2000 report from the Bureau of Justice Statistics, over 75 percent of mothers and about 18 percent of fathers incarcerated in state prisons in 1997 reported that their children were being cared for by a grandparent or other relative.[15] The incarceration of a parent is often traumatic on a variety of levels for children, and living with family members can provide some measure of stability.

**In spite of the numerous benefits associated with kinship care, myths remain.**

**Myth: "The apple doesn't fall far from the tree."**
In fact, research shows that children living with relatives are no more likely—and are perhaps less likely—than children living with non-kin foster parents to experience abuse or neglect after being removed from their homes. A 1997 study found that non-kin foster parents were twice as likely as licensed kinship foster parents to have a confirmed report of maltreatment.[16] Furthermore, Illinois found that children in kinship foster care are at lower risk for maltreatment than are children in either specialized or non-relative foster care.[17]

**Myth: "It's your moral responsibility."**
Clearly, kinship caregivers agree. They take the responsibility of raising their grandchildren, nieces, and nephews when the children's parents, for a variety of reasons, cannot. These caregivers lack neither morals nor a sense of responsibility; they do, however, lack resources. They may be living on a fixed income or be retired; whatever the reason, it is highly unlikely that they planned financially for raising a relative's child.[18]

- The United States Department of Agriculture estimates that it costs at least $7,000 per year to raise a child.[19]

- The vast majority of children living with relative caregivers are eligible for the Temporary Assistance for Needy Families (TANF) child-only grant. However, 70 percent of relative caregivers do not access TANF or any other public financial assistance.

- Even when caregivers access TANF child-only grants, this assistance amounts to, on average, just over $4,000 per year—or about 57 percent of the anticipated cost of raising a child.[20]

**Research debunks these old fears about the risk of placing children with kin.**

In fact, the research tells us that *many children who cannot live with their parents benefit from living with grandparents and other family members.* Supporting kinship caregivers in their efforts to address the needs of these children thus provides an opportunity to improve the lives of many children who have already experienced trauma.

*Center for Law and Social Policy* • www.clasp.org

[1] U.S. Department of Commerce, Bureau of the Census, *2000 Census American Fact Finder Advanced Query*. Calculations by Children's Defense Fund of the number of children living in relative-headed households without either parent present.

[2] The Personal Responsibility and Work Opportunity Reconciliation Act (P.L. 104-193) requires states to consider giving preference to relatives over non-related caregivers when determining a placement for a child, assuming that relative meets all relevant state child protection standards. The Adoption and Safe Families Act (P.L. 105-89) clearly establishes legal guardianship as an acceptable and appropriate permanency plan.

[3] Testa, M. 2001. *Kinship care and permanency*. Journal of Social Service Research, Vol. 28 (1) pp. 25 – 43.; Chamberlain, P., et al. 2006. *Who disrupts from placement in foster and kinship care?* Child Abuse & Neglect, Vol. 30, pp. 409 – 424.

[4] Herrick, M. & Piccus, W. 2005. *Sibling Connections: The importance of nurturing sibling bonds in the foster care system.*

[5] Shlonsky, A., Webster, D., & Needell, B. 2003. *The ties that bind: A cross-sectional analysis of siblings in foster care.* Journal of Social Service Research, Vol. 29 (3) pp. 27 – 52.; Wulczyn, F. & Zimmerman, E. 2005. *Sibling placements in longitudinal perspective.* Children and Youth Services Review, Vol. 27, pp. 741-763.

[6] National Survey of Child and Adolescent Well-Being (NSCAW) CPS Sample Component Wave 1 Data Analysis Report, April 2005. (Washington, D.C.: U.S. Department of Health & Human Services, Administration for Children & Families, 2005).

[7] Courtney, M. & Needell, B. "Outcomes of kinship care: Lessons from California." In *Child welfare research review*. Vol. 2. J.D. Berrick, R.P. Barth and N. Gilbert, eds. New York: Columbia University Press, 1997, pp. 130 – 149.

[8] Outcome P1: Children have permanency and stability in their living situations; and, Outcome P2: The continuity of family relationships and connections is preserved for children.

[9] NSCAW 2005.

[10] NSCAW 2005.

[11] Wilson, L. Satisfaction of 1,100 Children in Out-of-Home Care, Primarily Family Foster Care, in Illinois' Child Welfare System. Tallahassee, FL: Wilson Resources, 1996.

[12] NSCAW 2005.

[13] NSCAW 2005.

[14] Casey Family Programs. *Commitment to Kin: Elements of a support and service system for kinship care.* 2004; CFSR Outcome S2: Children are safely maintained in their homes whenever possible and appropriate.

[15] Mumola, C. *Bureau of Justice Statistics Special Report: Incarcerated Parents and Their Children.* (Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, 2000).

[16] Zuravin, S.J., et al. "Child Maltreatment in family foster care: Foster home correlates." In *Child welfare research review*. Vol. 2 J.D. Berrick, R.P. Barth. And N. Gilbert, eds. New York: Columbia University Press, 1997, pp. 189-200.

[17] *A Child Welfare Research Agenda for the State of Illinois.* 1999. Urbana, IL: The Children and Family Research Center, University of Illinois at Urbana-Champaign.

[18] Some question whether relatives who cannot afford to care for a child without assistance are appropriate placements. CLASP believes that placements with relatives, like all placements, should be made on a case-by-case basis and that when relatives offer benefits, like greater stability and less trauma, they should be supported in caring for a child.

[19] This calculation is based on the cost of raising the younger of two children in a single-parent, two-child household with a before-tax income of less than $41,700. Lino, Mark. 2005. *Expenditures on Children by Families, 2004.* U.S. Department of Agriculture, Center for Nutrition Policy and Promotion. Miscellaneous Publication No. 1528-2004. Retrieved 12/7/06 from http://www.cnpp.usda.gov/Publications/CRC/crc2004.pdf

[20] *Table 42, Temporary Assistance for Needy Families- Active Cases, TANF Families with no adult recipients receiving cash assistance October 2003 – September 2004.* Administration for Children and Families, Office of Family Assistance. Retrieved 12/6/06 from http://www.acf.hhs.gov//programs/ofa/character/FY2004/tab42.htm.

Secs. 1012, 1031 F.C̄ $\quad$ SP̄NT Pt 11 PGM (Child Protective)

## FAMILY COURT OF THE STATE OF NEW YORK
### CITY OF NEW YORK, COUNTY OF NEW YORK

Attorney: HARTLEY, P
Judge:

-------------------------------------x
$\quad$ In the Matter of $\qquad$ :
$\qquad$ :   Docket No: N-00330/08
A█████ █████████ :
$\qquad$ :
$\qquad$ :   PETITION
A Child Under Eighteen Years :   NEGLECT CASE
of Age Alleged to be Neglected by :

ZOILA IGLESIAS :
ANUBUS RIVAS :
$\qquad$ :
$\qquad$ :   Child Protective Specialist:
$\qquad$ :     HELEN COLON
$\qquad$ :   ACS #: 5247005
$\qquad$ :   Unit #: 430-1
$\qquad$ :   Telephone: 212-676-6865
$\qquad$ :
$\qquad$ Respondent (s) :
-------------------------------------x

**NOTICE: IF YOUR CHILD REMAINS IN FOSTER CARE FOR FIFTEEN (15) OF THE MOST RECENT TWENTY-TWO (22) MONTHS THE AGENCY MAY BE REQUIRED BY LAW TO FILE A PETITION TO TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF THE 15-MONTH PERIOD.**

$\qquad$ TO THE FAMILY COURT:

$\qquad$ The undersigned petitioner respectfully shows that:

(1) $\quad$ Petitioner HELEN COLON employed by Administration for Children's Services, a Child Protective Agency with offices at 150 William Street, New York, New York, is authorized to file a petition under Article 10 of the Family Court Act.

(2) $\quad$ A█████ R████████ is a male child under the age of eighteen years, having been born on 08/28/2004.

(3) $\quad$ Said child resides at 45 JACKSON AVENUE #3E, NEW YORK, NY, 10002. Child is presently at 492 1st Avenue, New York, NY 10016

(4) $\quad$ The father of said child is or is alleged to be JOSELITO R██████ who resides at UNKNOWN. The father's date of birth is 11/07/1975.The father is currently incarcerated at UNKNOWN
The mother of said child is KIM Q███████, who resides at UNKNOWN, The mother's date of birth is 04/07/1977.
The other persons legally responsible for the care of said child are

ZOILA IGLESIAS, Maternal Grandparent, who resides at 45 JACKSON AVENUE #3E, NEW YORK, NY, 10002.
ANUBUS RIVAS, Paternal Uncle, who resides at 45 JACKSON AVENUE #3E, NEW YORK, NY, 10002.

(5)  Prior to the filing of this petition, pursuant to Family Court Act Section (1024) said child was removed from the custody of the parent(s) or other person(s) legally responsible for the care of said child without court order on the 6th day of February, 2008, at  12:00 pm.

(6)  There was not sufficient time to obtain a court order pursuant to Family Court Act Section 1022, because

See Addendum II.

(7)  The removal of the child was necessary because

See Addendum III.

(8)  (Upon information and belief), said child is a neglected child in that: (Specify grounds of neglect under Section 1012 of the Family Court Act.)

See Addendum I.

(9)  (Upon information and belief),

ZOILA IGLESIAS, the Paternal Grandparent of said child
ANUBUS RIVAS, the Paternal Uncle of said child

are the person's who are responsible for neglect of said child.

Petitioner is required to obtain education information and to provide that information to foster care providers and other parties to this proceeding. Unless otherwise obtained by release, Petitioner thus seeks a court order to obtain the education records (including special education records) of each child named in this petition who is not placed with a parent(s)/legal guardian(s), and a court order to provide such records to service providers where such records are necessary to enable the service provider to establish and implement a plan of service.

WHEREFORE, Petitioner prays that an order be made determining the said A████████████ to be a neglected child, otherwise dealing with said child in accordance with the provisions of Article 10 of the Family Court Act.

Dated: 02/07/2008

_____
Petitioner

VERIFICATION

STATE OF NEW YORK    )
COUNTY OF NEW YORK   ) SS.:


HELEN COLON, being duly sworn, deposes and says that (s)he is employed by
Administration for Children's Services, a Child Protective Agency; and is
acquainted with the facts and circumstances of the above-entitled proceeding;
that (s)he has read the foregoing petition and knows the contents thereof;
that the same is true to (his) (her) own knowledge except as to those matters
therein stated to be alleged upon information and belief, and that as to
those matters (s)he believes it to be true.


_Helen Colon_
Petitioner
JOHN B. MATTINGLY, Commissioner
Administration for Children's Services
By: HELEN COLON
Child Protective Specialist


Sworn to before me, this
7th    day of FEBRUARY, 2008

_Larry B. Steptoe_
Notary Public
(Deputy) Clerk of the court

LARRY B. STEPTOE
Commissioner of Deeds
City of New York No. 1-8752
Certificate Filed in New York County
Commission Expires Dec. 1, 2008

ADDENDUM I

CASE NAME:       KATHRYN ZELENY
CHILD NAME:      ████ R████
CASE NUMBER:     5247005
DATE PET FILED:  02/07/2008

THE CHILDREN:                        THE RESPONDENTS:
████ R████ (DOB 10/28/1994)          ZOILA IGLESIAS
A████ ████ (DOB 08/28/2004)          ANUBUS RIVAS

████ R████ born 10/28/94, and A████ ████, born 8/28/04, are children
less than eighteen years of age whose physical, mental or emotional
conditions have been impaired or are in imminent danger of becoming impaired
as a result of the failure of the respondent paternal grandmother, ZOILA
IGLESIAS, and the respondent paternal uncle, ANUBUS RIVAS, persons legally
responsible for their care, to exercise a minimum degree of care in that:

1.    The respondent paternal uncle, ANUBUS RIVAS, fails to provide the
subject children with proper supervision and guardianship in that:
a.    According to a police officer with the NYPD, on or about 2/6/08, the
police raided the home of the respondent paternal grandmother, ZOILA
IGLESIAS, and the respondent RIVAS pursuant to a search warrant.  The police
officer further stated that during the raid, members of the NYPD recovered
one bag of marijuana, one bag of cocaine, and 806 U.S. dollars.  The police
officer stated that the subject children were in the home at the time of the
raid and the drugs were accessible to them.  The respondents IGLESIAS and
RIVAS were subsequently arrested.  The respondent RIVAS was charged with
criminal possession of a controlled substance. The police officer further
stated that the police had purchased controlled substances from the
respondent RIVAS within the two weeks prior to the raid.

2.    The respondent paternal uncle, ANUBUS RIVAS, misuses a drug or drugs,
including but not limited cocaine, and is not voluntarily and regularly
participating in a rehabilitative program in that:
a.    The respondent RIVAS admitted to the ACS caseworker that the bag of
cocaine recovered during the above described raid was for his own personal
use.
b.    The respondent RIVAS further admitted to the ACS caseworker that he uses
drugs once per week.
c.    Upon information and belief, the respondent RIVAS is not currently
enrolled in a drug rehabilitative program.

3.    The respondent paternal grandmother, ZOILA IGLESIAS, fails to provide
the subject children with proper supervision and guardianship in that the
respondent IGLESIAS knew or should have known that the respondent RIVAS fails
to provide the subject children with adequate supervision and guardianship
and misuses a drug or drugs and is not voluntarily and regularly
participating in a rehabilitative program, which is impairs his ability to
care for the subject children in that:

a.    The subject child, A██████████, is in the respondent IGLESIAS'S care pursuant to docket number V-06174/98, and the subject child, ██████ R██████, is in the respondent IGLESIAS'S care pursuant to docket number V-28171/04.

b.    According to a police officer with the NYPD, while the police conducted the above described raid on the respondents' home, the home smelled of marijuana, and the respondent IGLESIAS and the subject children were present in the home at the time.

c.    The respondent IGLESIAS admitted to the ACS caseworker that she knows the respondent      RIVAS uses marijuana.

d.    The respondent RIVAS stated to the ACS caseworker that the respondent IGLESIAS "knows that he smokes."

e.    The subject child stated to the ACS caseworker that he knew the respondent RIVAS possessed drugs and that he had expected the respondent RIVAS to be arrested.

WHEREFORE, the subject children, ██████ and A██ B ██████, are neglected children, or are in danger of becoming neglected children.

### ADDENDUM II

PURSUANT TO FAMILY COURT ACT SECTION 1031 (a) Petitioner states:

1.  A████ ████████ was removed prior to filing this petition on

    6th day of February, 2008 at 12:00 pm.

2. The circumstances necessitating the removal of the child prior to filing a
   neglect or abuse petition are as follows:

   [ X ] See allegation(s) in the petition;

   [  ] Petitioner assessed the child to be in such circumstances that the
   child's continuing in said place or residence or in the care and custody
   of the parent or other person legally responsible presented an imminent
   danger to the child's life and/or health if not immediately removed;

   [  ] Continuation in the home would be contrary to the child's best
   interests and under the circumstances, efforts to prevent or eliminate the
   need for removal were determined to be inappropriate;

   [  ] Other, explain:

3. This child was removed pursuant to:

   [  ] PCA 1021 (parental consent to temporary removal attached);
   [  ] FCA 1022 (court authorized removal);
   [ X ] FCA 1024 (emergency removal without prior court authorization);

4. This was an emergency removal under FCA 1024 because the parents or other
   persons legally responsible refused to consent or were unavailable and
   there was insufficient time to obtain a court order pursuant to FCA 1022
   because:

   [  ] Removal occurred outside of court hours, i.e. evening, weekend or
   holiday;

   [  ] Court was unavailable to entertain removal application;

   [  ] Child was in need of immediate protective action based upon
   assessment of imminent danger;

   [ X ] Other, explain: Both caretakers for the children were arrested and
   unavailable at all relevant times.

ADDENDUM III

## REASONABLE EFFORTS TO PREVENT OR ELIMINATE THE NEED FOR REMOVAL OF CHILD FROM HOME

1. The child A█████ ████████ was or should be removed pursuant to the provisions of the Family Court Act and applicable law.

2. The continuation of residence by the child in the child's home is or would be contrary to the welfare and best interests of the child and the temporary removal of said child from the child's place of residence is necessary to avoid imminent risk to the child's life or health. Continued placement of the child in the child's home would be contrary to the welfare and best interests of the child because:

Both caretakers for the children were arrested. The respondent RIVAS sells and uses drugs in the home, and the respondent IGLESIAS knows about it.

3. [ x ] Reasonable efforts to prevent or eliminate the need for the above-described removal, were not made prior to the date of the hearing, but the lack of such efforts was reasonable and appropriate under the circumstances (see allegations in petition) for the following reason(s):

a. [  ] The circumstances (see allegations in petition) posed such a risk to the child's life, health or safety that services could not eliminate or avoid the need for removal; explain:

b. [ X ] The parent was incarcerated or in police custody at all relevant times, precluding the provisions of any services to eliminate or avoid the need for removal,

c. [  ] The parent's whereabouts were unknown at all relevant times, precluding the provision of any services to eliminate or avoid the need for removal, ACS made the following efforts to locate the parent; explain:

d: [  ] Other: explain:

4. Imminent risk to the child would not be eliminated by the issuance of a temporary order of protection.

Secs. 1012, 1031 F.C.                                    (Child Protective)

FAMILY COURT OF THE STATE OF NEW YORK
CITY OF NEW YORK, COUNTY OF NEW YORK

Attorney: HARTLEY, P
Judge:

---------------------------------x
   In the Matter of            :      Docket No: <u>N-00331/08</u>

   ████ R█████              :

                               :       PETITION
A Child Under Eighteen Years     :       NEGLECT CASE
of Age Alleged to be Neglected by  :

ZOILA IGLESIAS                    :
ANUBUS RIVAS                     :

                               :      Child Protective Specialist:
                               :        HELEN COLON
                               :      ACS #: 5247005
                               :      Unit #: 430-1
                               :      Telephone: 212-676-6865
                               :

_____      :
    Respondent (s)             :
---------------------------------x

**NOTICE: IF YOUR CHILD REMAINS IN FOSTER CARE FOR FIFTEEN (15) OF THE MOST RECENT TWENTY-TWO (22) MONTHS THE AGENCY MAY BE REQUIRED BY LAW TO FILE A PETITION TO TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF THE 15-MONTH PERIOD.**

         TO THE FAMILY COURT:

         The undersigned petitioner respectfully shows that:

(1)    Petitioner HELEN COLON employed by Administration for Children's Services, a Child Protective Agency with offices at 150 William Street, New York, New York, is authorized to file a petition under Article 10 of the Family Court Act.

(2)    ████ R█████ is a male child under the age of eighteen years, having been born on 10/28/1994.

(3)    Said child resides at 45 JACKSON AVENUE #3E, NEW YORK, NY, 10002.

(4)    The father of said child is or is alleged to be JORGE ███████████ who resides at 45 JACKSON AVENUE #3E, NEW YORK, NY, 10002 (LXA). The father's date of birth is 02/24/1972.
     The mother of said child is KATHRYN ZELENY who resides at UNKNOWN. The mother's date of birth is 09/11/1976.
     The other persons legally responsible for the care of said child are ZOILA IGLESIAS, Paternal Grandparent, who resides at 45 JACKSON AVENUE #3E, NEW YORK, NY, 10002.

ANUBUS RIVAS, Pa    rnal Uncle, who resides at  5 JACKSON AVENUE #3E, NEW YORK, NY, 10002.

(5)    Prior to the filing of this petition, pursuant to Family Court Act Section (1024) said child was removed from the custody of the parent(s) or other person(s) legally responsible for the care of said child without court order on the 6th day of February, 2008, at  12:00 pm.

(6)    There was not sufficient time to obtain a court order pursuant to Family Court Act Section 1022, because

See Addendum II.

(7)    The removal of the child was necessary because

See Addendum III.

(8)    (Upon information and belief), said child is a neglected child in that: (Specify grounds of neglect under Section 1012 of the Family Court Act.)

See Addendum I.

(9)    (Upon information and belief),

ZOILA IGLESIAS, the Paternal Grandparent of said child
ANUBUS RIVAS, the Paternal Uncle of said child

are the person's who are responsible for neglect of said child.

Petitioner is required to obtain education information and to provide that information to foster care providers and other parties to this proceeding. Unless otherwise obtained by release, Petitioner thus seeks a court order to obtain the education records (including special education records) of each child named in this petition who is not placed with a parent(s)/legal guardian(s), and a court order to provide such records to service providers where such records are necessary to enable the service provider to establish and implement a plan of service.

WHEREFORE, Petitioner prays that an order be made determining the said ▓▓▓ R▓▓▓ to be a neglected child, otherwise dealing with said child in accordance with the provisions of Article 10 of the Family Court Act.

Dated: 02/07/2008

_Helen Cole_
_____
                        Petitioner

## VERIFICATION

STATE OF NEW YORK      )
COUNTY OF NEW YORK     ) SS.:

HELEN COLON, being duly sworn, deposes and says that (s)he is employed by Administration for Children's Services, a Child Protective Agency; and is acquainted with the facts and circumstances of the above-entitled proceeding; that (s)he has read the foregoing petition and knows the contents thereof; that the same is true to (his) (her) own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters (s)he believes it to be true.

_____
Petitioner
JOHN B. MATTINGLY, Commissioner
Administration for Children's Services
By: HELEN COLON
Child Protective Specialist

Sworn to before me, this
7th day of FEBRUARY, 2008

_____
Notary Public
(Deputy) Clerk of the court

LARRY B. STEPTOE
Commissioner of Deeds
City of New York No. 1-6782
Certificate Filed in New York County
Commission Expires Dec. 1, 2008

ADDENDUM I

CASE NAME:        KATHRYN ZELENY
CHILD NAME:       ███████ R████████
CASE NUMBER:      5247005
DATE PET FILED:   02/07/2008

THE CHILDREN:                    THE RESPONDENTS:
████ R████████  (DOB 10/28/1994)  ZOILA IGLESIAS
A███ ██████     (DOB 08/28/2004)  ANUBUS RIVAS

████ R████████ born 10/28/94, and A███ ██████, born 8/28/04, are children less than eighteen years of age whose physical, mental or emotional conditions have been impaired or are in imminent danger of becoming impaired as a result of the failure of the respondent paternal grandmother, ZOILA IGLESIAS, and the respondent paternal uncle, ANUBUS RIVAS, persons legally responsible for their care, to exercise a minimum degree of care in that:

1.    The respondent paternal uncle, ANUBUS RIVAS, fails to provide the subject children with proper supervision and guardianship in that:
a.    According to a police officer with the NYPD, on or about 2/6/08, the police raided the home of the respondent paternal grandmother, ZOILA IGLESIAS, and the respondent RIVAS pursuant to a search warrant. The police officer further stated that during the raid, members of the NYPD recovered one bag of marijuana, one bag of cocaine, and 806 U.S. dollars. The police officer stated that the subject children were in the home at the time of the raid and the drugs were accessible to them. The respondents IGLESIAS and RIVAS were subsequently arrested. The respondent RIVAS was charged with criminal possession of a controlled substance. The police officer further stated that the police had purchased controlled substances from the respondent RIVAS within the two weeks prior to the raid.

2.    The respondent paternal uncle, ANUBUS RIVAS, misuses a drug or drugs, including but not limited cocaine, and is not voluntarily and regularly participating in a rehabilitative program in that:
a.    The respondent RIVAS admitted to the ACS caseworker that the bag of cocaine recovered during the above described raid was for his own personal use.
b.    The respondent RIVAS further admitted to the ACS caseworker that he uses drugs once per week.
c.    Upon information and belief, the respondent RIVAS is not currently enrolled in a drug rehabilitative program.

3.    The respondent paternal grandmother, ZOILA IGLESIAS, fails to provide the subject children with proper supervision and guardianship in that the respondent IGLESIAS knew or should have known that the respondent RIVAS fails to provide the subject children with adequate supervision and guardianship and misuses a drug or drugs and is not voluntarily and regularly participating in a rehabilitative program, which is impairs his ability to care for the subject children in that:

a.    The subject chil    A▓▓▓ ▓▓▓▓▓▓, is in the  spondent IGLESIAS'S care pursuant to docket number V-06174/98, and the subject child, ▓▓▓ R▓▓▓▓ is in the respondent IGLESIAS'S care pursuant to docket number V-28171/04.

b.    According to a police officer with the NYPD, while the police conducted the above described raid on the respondents' home, the home smelled of marijuana, and the respondent IGLESIAS and the subject children were present in the home at the time.

c.    The respondent IGLESIAS admitted to the ACS caseworker that she knows the respondent        RIVAS uses marijuana.

d.    The respondent RIVAS stated to the ACS caseworker that the respondent IGLESIAS "knows that he smokes."

e.    The subject child stated to the ACS caseworker that he knew the respondent RIVAS possessed drugs and that he had expected the respondent RIVAS to be arrested.

WHEREFORE, the subject children, ▓▓R▓▓ and A▓▓▓ ▓▓▓▓▓▓ are neglected children, or are in danger of becoming neglected children.

### ADDENDUM II

PURSUANT TO FAMILY COURT ACT SECTION 1031 (e) Petitioner states:

1.    ████ R█████ was removed prior to filing this petition on

   6th day of February, 2008 at 12:00 pm.

2. The circumstances necessitating the removal of the child prior to filing a neglect or abuse petition are as follows:

   [ X ] See allegation(s) in the petition;

   [ ] Petitioner assessed the child to be in such circumstances that the child's continuing in said place or residence or in the care and custody of the parent or other person legally responsible presented an imminent danger to the child's life and/or health if not immediately removed;

   [ ] Continuation in the home would be contrary to the child's best interests and under the circumstances, efforts to prevent or eliminate the need for removal were determined to be inappropriate;

   [ ] Other, explain:

3. This child was removed pursuant to:

   [ ] FCA 1021 (parental consent to temporary removal attached);
   [ ] FCA 1022 (court authorized removal);
   [ X ] FCA 1024 (emergency removal without prior court authorization);

4. This was an emergency removal under PCA 1024 because the parents or other persons legally responsible refused to consent or were unavailable and there was insufficient time to obtain a court order pursuant to FCA 1022 because:

   [ ] Removal occurred outside of court hours, i.e. evening, weekend or holiday;

   [ ] Court was unavailable to entertain removal application;

   [ ] Child was in need of immediate protective action based upon assessment of imminent danger;

   [ X ] Other, explain: Both caretakers for the children were arrested and unavailable at all relevant times.

**ADDENDUM III**

## REASONABLE EFFORTS TO PREVENT OR ELIMINATE THE NEED FOR REMOVAL OF CHILD FROM HOME

1. The child ~~[redacted]~~ was or should be removed pursuant to the provisions of the Family Court Act and applicable law.

2. The continuation of residence by the child in the child's home is or would be contrary to the welfare and best interests of the child and the temporary removal of said child from the child's place of residence is necessary to avoid imminent risk to the child's life or health. Continued placement of the child in the child's home would be contrary to the welfare and best interests of the child because:

   Both caretakers for the children were arrested. The respondent RIVAS sells and uses drugs in the home, and the respondent IGLESIAS knows about it.

3. [ x ] Reasonable efforts to prevent or eliminate the need for the above-described removal, were not made prior to the date of the hearing, but the lack of such efforts was reasonable and appropriate under the circumstances (see allegations in petition) for the following reason(s):

   a. [ ] The circumstances (see allegations in petition) posed such a risk to the child's life, health or safety that services could not eliminate or avoid the need for removal; explain:

   b. [ X ] The parent was incarcerated or in police custody at all relevant times, precluding the provisions of any services to eliminate or avoid the need for removal,

   c. [ ] The parent's whereabouts were unknown at all relevant times, precluding the provision of any services to eliminate or avoid the need for removal, ACS made the following efforts to locate the parent; explain:

   d: [ ] Other: explain:

4. Imminent risk to the child would not be eliminated by the issuance of a temporary order of protection.

Page 1 of 2

At a term of the Family Court of the State

of New York, County of New York

at 60 Lafayette St

on 2/7/08

PRESENT:

HON. Karen Lupuloff
JUDGE

IN THE MATTER OF

Administration for
Childrens Services
Petitioner

NN-00330 ██/08

Docket No. NN-00331█/08

vs.

Zoila Iglesias

Anibus Rivas
Respondent

ALL PURPOSE SHORT ORDER

It is hereby ordered that the subject children, A████
█████ and ████ R█████ are paroled to the respondent
legal custodian, Zoila Iglesias, at the following
conditions:

1. The respondent, Anibus Rivas, is to be excluded from
   the home of the respondent, Zoila Iglesias, and the
   respondent Iglesias is not to allow the children to
   be in the respondent Rivas's presence.

2. The respondent Iglesias is to fully cooperate with
   ACS supervision.

It is further ordered that the
respondent Rivas and one Otoniel
Rocca are to stay away from the
subject children, A██ ███████ and
████ R████, and the home of the
subject children at 45 Jackson St., Apt. 3E, New York, N.Y. 10002

ENTER:

JUDGE OF THE FAMILY COURT

HON. KAREN I. LUPULOFF

Page 2 of 2

At a term of the Family Court of the State
of New York, County of New York
at 60 Lafayette St
on 2/7/08

PRESENT:

HON. Karen Lupuloff
JUDGE

Ariel Rosario; Jorge Rosario
IN THE MATTER OF
Administration for
Childrens Services
Petitioner

NN-CC330/08

Docket No. NN-CC331/08

vs.

ALL PURPOSE SHORT ORDER

Zoila Iglesias

Anubus Rivera
Respondent

Additionally, ~~the~~ four Temporary Orders of Protection
are issued:

1. Order No. 2008-004493 orders one Otoniel Roca to stay away
   from A███ █████ (NN-CC330/08) and A████ home at
   115 Jackson St, Apt. 3E, New York, NY 10002

2. Order No. 2008-004492 orders the same Otoniel Roca to stay away
   from ████ R████ (NN-CC331/08) and █████ home at
   115 Jackson St, Apt. 3E, New York, NY 10002

3. Order No. 2008-004494 orders the respondent Anubus Rivera to stay
   away from A████ █████ (NN-CC330/08) and A████ home at
   115 Jackson St, Apt. 3E, New York, NY 10002

4. Order No. 2008-004491 orders the respondent
   Anubus Rivera to stay away from ████
   ████ (NN-CC331/08) and ████ home
   at 115 Jackson ████ St, Apt 3E, New York,
   NY 10002

ENTER:

_[signature]_

JUDGE OF THE FAMILY COURT

HON. KAREN L. LUPULOFF



**ADMINISTRATION FOR CHILDREN'S SERVICES**
COMMISSIONER'S OFFICE
150 William Street – 18th Floor
New York, N.Y. 10038
Phone (212) 341-0958  Fax (212) 341-2946

WILLIAM C. BELL
*Commissioner*

ANNE WILLIAMS-ISOM
*Special Counsel/*
*Associate Commissioner*

# MEMORANDUM

DATE:    July 2, 2004

TO:       Executive Directors, Contract Foster Care Agencies
          ACS Staff

FROM:    Anne Williams-Isom

SUBJECT:  Independent Review Protocol

The purpose of this protocol is to provide information about the Independent Review process and clarify the roles of Independent Review participants. This protocol will specifically outline the process for: notifying foster parents of their right to an Independent Review; requesting an Independent Review; conducting an Independent Review; issuing the Independent Review decision; complying with the Independent Review decision; appealing the Independent Review decision.

## ACS ADMINISTRATION FOR CHILDREN'S SERVICES

Protocol for

### INDEPENDENT REVIEW
Date: 7/2/04

## I. Introduction

The mission of the ACS Office of Advocacy is to provide impartial resolutions to conflicts among parents, children, and foster parents and ACS offices or contract agencies. Within the Office of Advocacy, the Independent Review Unit has been designated by the Commissioner to implement Section 443.5 of the New York State Social Services Regulations (18 NYCRR § 443.5). Section 443.5 provides that foster family parents may request a conference with the social services official

or designee whenever a social services official or another authorized agency proposes to remove a child in foster family care from the foster family home. This conference is called an "Independent Review." At such conference, scheduled within 10 days of receipt of the request for the conference, the foster parents, with or without a representative, may appear to have the proposed action reviewed, be advised of the reasons for the removal, and be afforded an opportunity to submit reasons why the child(ren) should not be removed.

## II.   Removal from a Foster Home

### A.  Written Notification of Removal (Form CS-701D)

Foster parents must receive written notification of intent to remove a foster child from their home in all cases of removal, except removals due to a court order or State Fair Hearing Decision. Section 443.5 of the Social Services Regulations states that where a social services official or other authorized agency proposes to remove a child from a certified foster home, the foster parents must be notified in writing (via Form CS-701D). The Form CS-701D contains information explaining the reason for the removal and also provides information relating to the foster parents' right to contest the decision by requesting a review. The caseworker must leave a copy of the Form CS-701D in the case record to document that the form was given to the foster parents.

Section 443.5 also states that written notification must be given at least 10 days prior to the proposed effective date of the removal, except where the health or safety of the child requires that the child be removed immediately from the foster family home.

1.  **For planned removals**, the foster parent must receive the notice (Form CS-701D) at least ten days prior to the removal date. If the foster parent requests an Independent Review, the child may not be removed from the home until at least three days after the notice of decision is sent, or prior to the proposed effective date of removal, whichever occurs later (unless it is subsequently determined that the health or safety of the child requires that the child be removed immediately from the foster home).

2.  **For emergency removals**, Form CS-701D should be given at the time of the removal or as soon as is practicable thereafter (e.g., send by certified mail the next day). The foster parents may request an Independent Review. Note that the foster home cannot be closed until the Independent Review decision is rendered.

### B.  Contesting the Removal of a Foster Child

Certified foster parents or approved relative foster parents have the right to a review of any removal or plan for removal of a child in foster care unless it is ordered by the court or State Fair Hearing decision. These rights are described on the reverse side of the CS-701D, *Notice For Removal Of Child(ren) From A Foster Home.*

Foster parents who disagree with the removal of the child(ren) from their homes may request any or all of the following:

HPR-15-2003  18:54        LEGAL AID SOCIETY                    212 505 8755    P.05/32

1. A Foster Care Agency Conference (Note that a foster parent can request a Foster Care Agency Conference only if the removal has not yet occurred. In addition, if the foster parent also requests an Independent Review, the Agency Conference cannot delay ACS's holding the Independent Review in accordance with the timeframes in Section 443.5 of the Social Services Regulations); and/or

2. An Independent Review by calling the Office of Advocacy at ACS (212-676-9002) before the date of the proposed action or if an emergency removal, as soon as is practicable after the removal; and/or

3. A New York State Fair Hearing by writing to the Bureau of Special Hearings.

Foster parents who do not object to the removal of the child from their home may waive their right to a foster care agency or Independent Review by signing, dating and returning the Form CS-701D to the case planner.

## III.  Requesting an Independent Review

### A. Making the Request

Foster parents who are seeking to review the plan to remove or the removal of a foster child from their home may request an Independent Review by calling the ACS Office of Advocacy at (212) 676-9002. This request must be made before the date of the proposed action. In the case of an emergency removal, the request for an Independent Review must be made as soon as is practicable after the removal.

Before scheduling the Independent Review, the foster parent(s) are encouraged to request a meeting with the foster care agency to discuss their objections prior to the removal of the child. If the matter cannot be resolved at the Foster Care Agency Conference or if the foster parent chooses to bypass the Foster Care Agency Conference, the foster parents' request for an Independent Review will be honored. Once the request has been received and accepted by ACS, the Independent Review will be scheduled within ten days.

When foster parents have requested an Independent Review, the removal of a child is stopped except where the health or safety of the child(ren) requires immediate removal. **IMPORTANT:  If foster parents need an interpreter or choose to be accompanied by an attorney or a representative, they must state this at the time of scheduling.**

### B.  Requests for an Independent Review Can Be Denied For the Following Reasons:

- *A court order has been issued regarding the placement of the subject children. A court order takes precedence over all administrative remedies.*

- *The person making the request is not a certified or approved foster parent or the child is not in ACS custody.*

- *The foster parent signed the Notice of Removal, waiving his or her right to an Independent Review.*

- *The foster parent requested that the child be removed from his/her home.*

96

APR-15-2008  18:34    LEGAL AID SOCIETY                        212 509 8-98    P.04 02

- The foster parent making the request is a "second" foster parent. Note that the issue of an Independent Review for a second foster parent arises when the first foster parent, from whose home the child was removed, requests an Independent Review and the decision from that Independent Review directs that the child be returned to the first foster parent. The New York State Office of Children and Family Services has opined that Section 443.5 of the Social Services Regulations does not require that the second foster parent receive a ten-day notice and an Independent Review after a decision was made following an Independent Review to return the child to the first foster parent.

## IV. Conducting the Independent Review

### A. Scheduling/Postponements of Reviews

Under Section 443.5 of the Social Services Regulations, the Independent Review must be held within 10 days of receipt of the foster parent's request. Once an Independent Review is scheduled, the date of the Independent Review will not be changed unless the foster parent makes such a request (e.g., the foster parent cannot attend the Independent Review) or an issue related to the foster parent arises (e.g., foster parent asks for a translator for the first time the day of the Independent Review and one is not available, the foster parent's attorney is not available). In order to postpone an Independent Review, the foster parent must contact the Reviewer 24-48 hours before the Review date. If an emergency arises the day of the Independent Review, the foster parent must contact the Reviewer as soon as possible to reschedule the Independent Review. The number of postponements allowed will be at the discretion of the Review Officer.

The foster care agency must attend the Independent Review, and send a person who has knowledge of the case and is prepared to discuss the case and reasons for the (proposed) removal. The Independent Review will not be adjourned beyond ten days of receipt of the foster parent's request if the caseworker from the agency handling the case cannot attend. If the caseworker handling the case cannot attend, the foster care agency must send another representative with knowledge of the case.

Should an agency representative not be able to attend within the ten-day timeframe, the Reviewer will use his/her discretion about how to proceed in consultation with ACS Division of Legal Services.

If the ACS Office of Confidential Investigations (OCI) is investigating the foster parent as a result of a report to the State Central Register of suspected child abuse and maltreatment, the Reviewer will explain to the foster parent that the Independent Review must be held within ten days even though the OCI decision will remain outstanding until the investigation is complete. (Note that the Reviewer will further explain that OCI has, by statute, 60 days to conduct its investigation and make a determination regarding the allegations made.)

### C. Lateness

Foster parents and agencies are given the time and date of the Review. [NOTE: Section 443.5 states that the social services official shall send written notice of the time and place for the conference to the foster family parents and their representative, if any, and to the authorized agency, if any, at least five days prior to the date of the conference.] It is incumbent upon all the parties to make themselves available on the day and time that have

37

been allotted for them. If the foster parent does not appear within an hour of the Review appointment, the parties who are present will be released. It is at the Reviewer's discretion whether or not the Review can be rescheduled. If the agency does not appear within an hour of the allotted time to begin the Independent Review, the parties who are present will be released unless the Reviewer determines that the Independent Review can proceed without the agency. If the Review cannot proceed without the agency, it is at the Reviewer's discretion whether or not the Review can be rescheduled.

## C.  Attendance

• The foster parents must attend the Review and are entitled to be accompanied by a representative of their choice. The representative may be a friend, family member, community representative, foster parent advocate, or an attorney.

• A representative of the foster care agency, ACS Direct Foster Care Services (DFCS) or ACS Direct Care Adoption (DCA) office seeking removal must attend.

• If OCI is involved in the investigation of the foster home, the OCI worker must be present at the review.

• All other persons' attendance is at the discretion of the Reviewer.

Other Parties May be Notified and/or Invited to Participate:

• ACM

• OCACM

• the law guardian

## D. Format

The Independent Review is conducted as a social work conference at which the Review Officer (an ACS Child Welfare Specialist Supervisor II) interviews all participants regarding the reasons for the plan for removal or the actual removal.. The interviews, along with pertinent reports/documentation, will be used to inform the decision. Such decision will be issued in writing to the foster parents, their representative, if applicable, the ACS office, and the foster care agency within five days of the conference. At the time of decision the foster parents are notified of their right to appeal the decision by requesting a New York State Fair Hearing.

1. The Independent Review is not a legal proceeding and the Review Officer is not a Judge. The Rules of Evidence do not apply at an Independent Review.

2. If the foster parent chooses to bring an attorney, the role of the attorney is to assist the foster parent with responding to the questions posed by the Reviewer. The attorney is not permitted to question other participants at the table nor object to questions asked by the Reviewer. The Reviewer conducts all questioning. See section E below for more details about the role of the foster parents' representatives, which includes attorneys.

3. The Independent Review is tape-recorded.

4. The agency presents its information first, by oral statement and the introduction of supporting documentation, if any.

5. At any point during the review, the foster parent may ask to speak with his/her representative privately.

6. After the agency's presentation, the foster parent presents his/her information regarding the removal.

7. If OCI is involved, the Reviewer will use OCI's 7-day Assessment and the OCI worker will be present to provide information.

8. Input from any other necessary parties that are present at the Review will be at the Reviewer's discretion.

E.    Role of the Foster Parent's Representative at the Independent Review

1. The representative can provide the Review Officer with a statement or summary of the position of the foster parent.

2. Representatives will not be allowed to question any participant of the Review.

3. If the representative does have a question, it should be directed to the Review Officer who will decide if the answer to the question is needed for the decision or to apprise the foster parent of the reasons for the proposed action.

4. The representative can provide information pertaining to the removal of the subject child to the Review Officer that the foster parent or agency has not given to the Review Officer.

5. A representative has the right to consult with the foster parent whom he/she is representing.

7. If ACS and/or the foster care agency attend the Independent Review with a representative, these procedures will apply to all representatives.

F.    Documentation/Materials Presented at Review

All information to be considered by the Independent Reviewer must be submitted at the time of the conference (including but not limited to the agency case record, medical records, OCI/police/mental health or other reports, statements of the foster parent(s), agency representatives or other interested parties).  It is critical that all parties to the conference arrive at the conference prepared with all statements or documents that they wish to be considered by the Reviewer. Because the Independent Review is not a legal proceeding, the rules of discovery do not apply. Accordingly, the Reviewer will determine what documents, if any, the participants at the Independent Review are entitled to receive.  Whatever documents the Reviewer accepts for consideration as part of the decision-making process will be given to the participants except where confidentiality would prohibit disclosure.

## V. The Independent Review Decision

Under Section 443.5(c) of the Social Services Regulations, ACS must render a decision within five days of the Independent Review.

### A. Internal Review of the Independent Review Decision

If, after the Independent Review, the Office of Advocacy renders a decision that differs from OCI's recommendation (e.g., OCI recommends that the foster home be closed), the Office of Advocacy will review its decision with OCI. If OCI has obtained new information that was not discussed at the Independent Review, the foster care agency, DFCS, or DCA will issue another Form CS-701D, which will advise the foster parent of the right to request another Independent Review.

If OCI has not obtained any new information and its recommendation differs from the decision of the Independent Review, the Office of Advocacy and OCI will discuss their respective conclusions. If the conclusions of the Office of Advocacy and OCI still differ, the Deputy Commissioners who oversee the Office of Advocacy and OCI will review the Independent Review decision and the OCI recommendation. If necessary, they will consult with the Commissioner. They will then render a final decision, which will be sent to the parties.

### B. Implementing the Independent Review Decision

Foster care agencies must comply with the Independent Review decision, even if they do not agree with it. NOTE: Section 443.5 states that the child shall not be removed from the foster family home until at least three days after the notice of decision is sent, or prior to the proposed effective date of removal, whichever occurs later. If the child has already been removed, the agency must comply with the Independent Review decision within 72 hours. If a foster care agency has a question about the decision, the agency should contact the Office of Advocacy.

If the Office of Advocacy has rendered its decision not to remove or return the child to the foster home and OCI and/or the foster care agency, DFCS, or DCA subsequently learn new information about the case that warrants removing the child, the foster care agency, DFCS, or DCA must issue another Form CS-701D, which will advise the foster parent of the right to request another Foster Care Agency Conference and/or Independent Review and/or New York State Fair Hearing.

### C. Appealing the Decision of the Independent Review

The foster parent has the right to appeal the decision of the Independent Review by requesting a Fair Hearing with the New York State Office of Children and Family Services. It is important to note that if a Fair Hearing was requested at the same time an Independent Review was requested, the decision of the Independent Review must be implemented. Agencies cannot wait until the Fair Hearing is held and/or a decision is rendered. Information instructing a foster parent on the procedure to request a Fair Hearing will be provided at the time of the Independent Review. Note that the foster parent is informed of the right to request a Fair Hearing on Form CS-701D (Notice of Removal Form), at the Independent Review, and in the Independent Review Decision.

At a term of the Family Court of the
State of New York, held in and for
the County of Kings, at 330 Jay
Street, Brooklyn, NY 11201, on
February 13, 2008

**PRESENT:**   Edward W. Yuskevich, Referee

In the Matter of

K▓▓▓ ▓▓▓▓▓▓▓ (DOB: 12/26/2001),

A Child under Eighteen Years of Age
Alleged to be Neglected by

Kim Q▓▓▓▓▓▓

                    Respondent.

| | |
|---|---|
| **File #:** | 45851 |
| **Docket #:** | NN-37162-04 |
| **CPS #:** | 5339097 |
| | **ORDER** |

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS
ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT
IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY
THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW
GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

    IT IS ORDERED that the subject child, K▓▓▓ ▓▓▓▓▓▓ ▓, is to be returned to the foster care
restrictive placement with her paternal grandmother, Zoila Iglesias, within twenty-four (24) hours.
The paternal grandmother, Zoila Iglesias, may not permit her son, Anubis Rivas to visit her home
or have any contact with the subject child, K▓▓▓ ▓▓▓▓▓▓.

    This matter is hereby adjourned until February 25, 2008 in Part 48 at 12:00 P.M.

Dated: February 13, 2008

                    **ENTER**

                    Edward W. Yuskevich, Referee

**Check applicable box:**
☐ Order mailed on [specify date(s) and to whom mailed]: _____
☐ Order received in court on [specify date(s) and to whom given]: _____

65N5HAYA-53.txt

1

65N5HAYA                argument
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    ALICE HAYNES,
3
4                   Plaintiff,
4
5           v.                          06 Civ. 1383 (TPG)
5
6    JOHN MATTINGLY, et al.,
6
7                   Defendants.
7
8    ------------------------------x
8
9                                      May 23, 2006
9    Before:
10
10                      HON. THOMAS P. GRIESA,
11
11                                     District Judge
12
12                      APPEARANCES
13
13   LANSNER & KUBITSCHEK
14        Attorneys for Plaintiff
14   BY:  CAROLYN KUBITSCHEK
15        DARIUS CHARNEY
15        STACY CHARLAND
16
16   THE CHILDREN'S LAW CENTER
17        Attorneys for Ameena B.
17   BY:  JANET NEUSTAETTER
18
18   MICHAEL A. CARDOZO
19        Corporation Counsel for the City of New York
19   BY:  JESSIE LEVINE
20        Assistant Corporation Counsel
20
21   ELIOT SPITZER
21        Attorney General of the State of New York
22   BY:  ROBERT KRAFT
22        Assistant Attorney General
23
24
25

               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

2

65N5HAYA                argument
1         (Case called)
2         THE COURT:  What is the motion before the Court?
3         MS. KUBITSCHEK:  Your Honor, my name is Carolyn
4    Kubitschek.  I represent plaintiff Alice Haynes who is the
5    movant.
6         This is a motion to reargue, reconsider and renew the
7    motion for the preliminary injunction which was argued on April
8    11th in front of this Court and the Court at the time denied
9    the preliminary injunction.
10        We filed the motion to reargue because we felt there
                        Page 1

65N5HAYA-53.txt

```
11    were legal issues that should be reconsidered.  But, during the
12    passage of time, the factual picture has also changed and so,
13    we are seeking to renew the motion based upon the fact that
14    there are factual statements which were made in oral argument
15    which turned out to be inaccurate, specifically both the
16    intervenors, the Children's Law Center and the City of New York
17    stated repeatedly and have stated both orally and in writing
18    that Ms. Haynes belongs in some state court or state
19    administrative proceeding where she can be heard.
20              Specifically, both the intervenors and the City of New
21    York said that if Ms. Haynes were to go to the family Court
22    when Ameena's case was on they -- that is intervenors and the
23    City -- would not object to her participating.
24              In fact, the case was on in the family Court on May
25    10th and Ms. Haynes and her lawyers went to the family court
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                  3
65N5HAYA                    argument
```
1     and both the intervenors and the City of New York objected and
2     said Ms. Haynes -- argued that Ms. Haynes not be permitted to
3     participate or to be heard in any capacity, and they argued
4     that she lacked standing.  And the family court judge agreed
5     and said that Ms. Haynes lacked standing and therefore could
6     not be heard in the family court not as a party, not as an
7     intervenor, not as a friend of the Court.  Not at all.
8               Then, the City of New York, the lawyer for the City of
9     New York said that Ms. Haynes and her lawyer should not even be
10    allowed to watch the goings on in the family court.
11              Now, your Honor, normally the courts of the State of
12    New York are open to all spectators just as the federal courts
13    are, but in this particular case the family court judge said to
14    Ms. Haynes and to us, her lawyers, that we would have to leave
15    the courtroom immediately, we could not even watch.
16              THE COURT:  Was Ms. Haynes there?
17              MS. KUBITSCHEK:  Ms. Haynes was there, yes.  But she
18    was ordered to leave, as was my law firm.  And she and the
19    lawyers did leave, complied with the order.
20              The family court judge said that Ms. Haynes could
21    order the transcript and she has done so.  We are waiting for
22    the court reporters to produce the transcript of what happened.
23              THE COURT:  What was the proceeding in the family
24    court?
25              MS. KUBITSCHEK:  There were two proceedings on at the
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                  4
65N5HAYA                    argument
```
1     same time.  One was a proceeding to terminate the parental
2     rights of Ameena's mother.  And I should add that Ameena's
3     mother was represented by counsel at that proceeding and
4     Ameena's mother's attorney said that Ameena's mother Charia had
5     no objection to our being in the court but the Judge -- as I
6     said, the judge said we could not be in court.
7               The other proceeding was a review of the placement of
8     Ameena which is known as a permanency hearing, at which point
9     during a permanency hearing the family court judge has the
10    jurisdiction to make various orders as to what will happen to
11    the child.
12              We don't know what orders the judge made because we
13    weren't even permitted to be present in the court.
14              It was an opportunity, had the Court permitted
15    Ms. Haynes to intervene and permitted Ms. Haynes to raise her
```
                              Page 2

65N5HAYA-53.txt

16    claims the family court could have, at that time, made some
17    kind of an order including an order that Ameena should reside
18    with Ms. Haynes.
19              THE COURT:  So, the second proceeding you described
20    was about foster care, right?
21              MS. KUBITSCHEK:  Correct.  The foster care of Ameena.
22    What will happen to Ameena in the immediate future while the
23    case determining Ameena's mother's parental rights continues.
24              THE COURT:  If the parental rights are terminated
25    then -- because I have a vague memory, then there is an issue

5

65N5HAYA                    argument
1     about adoption, right?
2               MS. KUBITSCHEK:  That's correct.
3               If the parental rights are terminated and -- by the
4     way, we have spoken with Ameena's mother's lawyer and Ameena's
5     mother's lawyer says that Ameena's mother does not want her
6     parental rights to be terminated and she will defend the
7     case -- Ameena's mother will defend the case and the attorney
8     will defend the case zealously.
9               So, it is not clear that the mother's rights will be
10    terminated.
11              If the mother's rights are terminated, then Ameena
12    will be available for adoption and the person who will have
13    preference in filing an adoption petition is the foster parent
14    who has had Ameena for one year.  That's a statutory
15    preference.
16              THE COURT:  Well, just review the.  The child was
17    removed from Ms. Haynes when?
18              MS. KUBITSCHEK:  June 20th, I believe, 2005.  June
19    10th, 2005.  Not quite one year ago.
20              THE COURT:  And you came to the federal court when?
21              MS. KUBITSCHEK:  We came to the federal court in
22    February of 2006 after Ms. Haynes had attempted to exhaust her
23    administrative remedies.
24              THE COURT:  The federal action was started again,
25    please?

6

65N5HAYA                    argument
1               MS. KUBITSCHEK:  February 2006.
2               THE COURT:  February 2006.
3               MS. KUBITSCHEK:  In between the removal and the
4     federal court Ms. Haynes initially challenged the removal and
5     she was --
6               THE COURT:  Challenged it where?
7               MS. KUBITSCHEK:  With the City.  That was the first
8     step in the procedure set up by the state.
9               She had a meeting which was characterized as an
10    independent review where an employee of the City allowed
11    Ms. Haynes to say her peace but not to cross-examine any other
12    witnesses and then determined that Ameena should not return to
13    Ms. Haynes.
14              Ms. Haynes then had the right to an administrative
15    hearing before the State Office of Children and Family
16    Services.  She immediately availed herself of that right
17    however the state did not schedule a hearing until November
18    30th of 2005.  Ms. Haynes participated in that hearing.  She
19    won the hearing to the extent that the --
20              THE COURT:  She what?

```
                              65N5HAYA-53.txt
21              MS. KUBITSCHEK:  She won.  She prevailed, to the
22       extent --
23              THE COURT:  The hearing was held in November?
24              MS. KUBITSCHEK:  November 30th, 2005.
25              THE COURT:  Was there a decision from that hearing?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                       7

```
         65N5HAYA            argument
1               MS. KUBITSCHEK:  Not until February 7th of 2006.
2               THE COURT:  That decision came from whom?
3               MS. KUBITSCHEK:  The State Office of Children and
4        Family Services, the commissioner is John Johnson, who is a
5        defendant in this case.
6               THE COURT:  I'm sorry.  I was making a note.  The
7        decision was by whom?
8               MS. KUBITSCHEK:  John Johnson's designee, whose name
9        was John Udochi.  U-D-O-C-H-I.
10              THE COURT:  Is John Johnson an administrative judge of
11       some kind?
12              MS. KUBITSCHEK:  Johnson is the Commissioner of
13       Children and Families of the State of New York.  He is --
14              THE COURT:  Who actually held the hearing?
15              MS. KUBITSCHEK:  The hearing was held before an
16       administrative law judge named Judge Farrow.  F-A-R-R-O-W.
17              THE COURT:  Did Judge Farrow issue some kind of a
18       ruling?
19              MS. KUBITSCHEK:  Judge Farrow issued a recommended
20       decision which we have not been permitted to see.  She issued
21       that decision to John Udochi, who is the Commissioner of
22       Commissioner Johnson --
23              THE COURT:  How do you spell Udochi?
24              MS. KUBITSCHEK:  U-D-O-C-H-I.
25              THE COURT:  And Udochi is male or female?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                       8

```
         65N5HAYA            argument
1               MS. KUBITSCHEK:  Farrow is female.
2               THE COURT:  Udochi.
3               MS. KUBITSCHEK:  Udochi issued decision on February
4        7th.
5               THE COURT:  What is his or her title?
6               MS. KUBITSCHEK:  His title, special hearing officer, I
7        believe.  He is in fact -- he stands in the shoes of the
8        commissioner who is -- the commissioner is equivalent of a
9        cabinet member for the State of New York.
10              THE COURT:  The commissioner's name again?
11              MS. KUBITSCHEK:  John Johnson.
12              THE COURT:  So what was the outcome of the state
13       proceeding?
14              MS. KUBITSCHEK:  The outcome of the state
15       administrative hearing was that the state commissioner
16       determined that it was arbitrary, capricious and wrong to
17       remove Ameena from Ms. Haynes.
18              THE COURT:  Who determined that, Udochi?
19              MS. KUBITSCHEK:  Udochi's determination.
20              THE COURT:  Wrong to remove.
21              MS. KUBITSCHEK:  And in fact arbitrary.  That there
22       was no reason whatsoever to remove her.
23              THE COURT:  All right.
24              MS. KUBITSCHEK:  The commissioner stopped short of
25       ordering the wrong to be corrected and said that the City of
                                Page 4
```

65N5HAYA-53.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

65N5HAYA                    argument
1   New York must do an independent evaluation, underlined the term
2   "independent," and to determine what should happen to Ameena
3   now because so much time has elapsed from the removal on June
4   10th up until the decision on February 7th of 2006.
5             THE COURT:  And did the City do that?
6             MS. KUBITSCHEK:  The City did not do that.  The City
7   did a new evaluation but it was by no means independent, it was
8   the same people who had decided to remove Ameena who then
9   submitted a report on April 4th of 2006, which this Court has a
10  copy of.
11            THE COURT:  I'm sure I do.  Just refresh my memory.
12  The report was April what?
13            MS. KUBITSCHEK:  April 4th of 2006, just before oral
14  argument.
15            The report was basically --
16            THE COURT:  Who issued the report?
17            MS. KUBITSCHEK:  The City of New York Administration
18  for Children's Services, again a defendant in this case, and
19  they were defendants in the case at the time they prepared the
20  report and at the time they issued the report.
21            THE COURT:  Then the report said what again?
22            MS. KUBITSCHEK:  The report says that Ameena should
23  remain where she is, that is, in the foster home of a stranger
24  who is referred to in the report as Ms. T.  That's her initial.
25            And the report purports to compare the relative
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

65N5HAYA                    argument
1   abilities of Ms. T and Alice Haynes to care for 4-year-old
2   Ameena.  The report does not mention at all the fact that
3   Ms. Haynes is family, that Ms. Haynes has a strong bond with
4   Ameena, that Ameena has said that she wants to return to live
5   with Ms. Haynes.
6             The report does not consider the family relationship
7   at all.  The report does not consider the constitutional
8   relationship at all.  It is pretty much essentially a beauty
9   contest between Ms. T, who they say is better, physically able
10  to care for Ameena and Ms. Haynes, who they say is less well
11  able to care for Ameena physically.
12            THE COURT:  Well, I relied on that report, did I not?
13            MS. KUBITSCHEK:  Yes, your Honor, you did rely on that
14  report.  And we think that and the one -- the primary reason
15  that we made the motion to reargue was that Ms. Haynes disputes
16  more than two dozen statements in this report.  Ms. Haynes
17  submits that they are either untrue or misleading or
18  insufficient.
19            For example, the social worker who wrote the report
20  spent hours and hours observing Ameena in the home of the other
21  foster mother, Ms. T.  That same social worker didn't observe
22  Ms. Haynes with Ameena not even once.  So, to say that Ameena
23  is bonded to Ms. T and imply that Ameena is not bonded to
24  Ms. Haynes is simply incorrect.
25            Secondly, the report which says that Ms. Haynes
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

65N5HAYA                    argument
1   cannot -- has physical difficulties, that report is based upon
Page 5

65N5HAYA-53.txt
```
 2    a report which we don't have which we are not permitted to see,
 3    by a physician named Jonathan Horwitz.  H-O-R-W-I-T-Z.
 4             Dr. Horwitz, we have learned, is a pediatrician.  He
 5    has never seen or examined Ms. Haynes yet he, apparently,
 6    according to the City of New York, he felt capable of drawing
 7    conclusions as to her ability to function as a caretaker.  In
 8    fact, he said she would have difficulty functioning as a
 9    caretaker based upon the medical records which he had reviewed
10    not based on any examination.
11             THE COURT:  How old is Ms. Haynes?
12             MS. KUBITSCHEK:  Ms. Haynes is 66.  The other foster
13    mother is 58.  They are not that far apart in age.  Roughly the
14    same age.
15             The Dr. Horwitz --
16             THE COURT:  Does anybody have a transcript of the
17    decision I dictated?
18             MS. KUBITSCHEK:  Yes, your Honor.  I have a transcript
19    right here.
20             Your Honor, as your Honor may recall, Ms. Haynes had
21    leg surgery and Dr. Horwitz makes a lot of this leg surgery, as
22    did the City, that this leg surgery would somehow be
23    incapacitating.  We provided a report from the surgeon who said
24    that Ms. Haynes would be fine.  And, as soon as Ms. Haynes was
25    back on her feet, we got a report from Ms. Haynes' own doctor
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    12
65N5HAYA                    argument
```
 1    which we presented to this Court in the motion to reargue that
 2    Ms. Haynes is in fact quite capable of taking care of Ameena,
 3    of taking care of a 4-year-old.
 4             THE COURT:  Just a minute, please.
 5             (Pause)
 6             THE COURT:  All right, I have reviewed that ruling I
 7    made.  Mr. Charney said there would be an appeal.  I take it
 8    there wasn't any appeal?
 9             MS. KUBITSCHEK:  Your Honor, we discussed it in the
10    office and thought that it was more appropriate to make motion
11    for reargument rather than to appeal immediately.  And as the
12    Court is aware, filing a motion for reargument stops the clock
13    for motions.
14             THE COURT:  And this is your motion for reargument.
15             MS. KUBITSCHEK:  This is our motion for reargument.
16             The subsequent events only reinforced that reargument
17    or renewal was necessary in that Ms. Haynes, despite the fact
18    that the defendants said that they would let Ms. Haynes -- they
19    would agree to Ms. Haynes being heard in the family court; when
20    she actually went to the family court they wouldn't agree and
21    the family court says you have no right --
22             THE COURT:  I don't refer to that in my ruling.  It
23    doesn't mean there weren't the assurances you're talking about
24    but.
25             MS. KUBITSCHEK:  That's correct, your Honor.  The
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    13
65N5HAYA                    argument
```
 1    assurance, the fact is that Ms. Haynes now has no other
 2    remedies.  Because the other thing that the defendants said
 3    were, well, if Ms. Haynes is upset with the report of April
 4    4th, which is what the City was ordered to produce on February
 5    2nd, the State ordered the City to produce the report; if
 6    Ms. Haynes was upset with the report and disagreed --
```
                            Page 6

65N5HAYA-53.txt
```
 7          THE COURT:  The ACS report.
 8          MS. KUBITSCHEK:  -- the ACS report, if she disagreed
 9   with the factual statements in the report she could be heard.
10   And so Ms. Haynes said, okay, I will try to be heard.  We
11   requested an administrative hearing with the state which is the
12   remedy that the state provides for former foster parents who
13   are aggrieved by actions of the City.  This was an action of
14   the City refusing to return Ameena to Ms. Haynes on February
15   7th of 2006, as I said.
16          As I said, the state said it was wrong to remove
17   Ameena from Ms. Haynes and we want a report from the City.  On
18   April 4th of 2006 they got the report from the City and the
19   City says we have decided not to return Ameena to Ms. Haynes.
20   Ms. Haynes said I need to be able to challenge this somehow and
21   so, she sought an administrative review.  She sought to take
22   advantage of administrative remedies which the state provides
23   and yesterday afternoon we received a letter from the state
24   which this Court has a copy of saying there will be no
25   administrative hearing.
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              14
     65N5HAYA                      argument
```
 1          So that Ms. Haynes now is in the situation where --
 2          THE COURT:  It seemed to me that, frankly, that that
 3   is a problem.  Ms. Haynes had a right to go to the state,
 4   correct?
 5          MS. KUBITSCHEK:  Ms. Haynes, when Ameena was removed
 6   Ms. Haynes had a right to go to the State after she had gone to
 7   the City.
 8          THE COURT:  All right, but she had a right to go to
 9   the State.
10          MS. KUBITSCHEK:  Correct.  She went to the State.
11          THE COURT:  And I take it Mr. Kraft, you agree, she
12   had a right at that time to go to the state, right?
13          MR. KRAFT:  At the time of the removal; yes, Judge.
14          THE COURT:  Now, the problem I have is that the state
15   did not really resolve the matter.  The State left an open
16   question and the State said that there should be a review, an
17   evaluation by the ACS, all right?  The ACS made a report and it
18   seems to me the State should have finished its work, that the
19   City should not be in this process the final word.  And I don't
20   understand the State not completing its job.
21          MR. KRAFT:  Well, with all due respect, Judge, I can
22   explain that.
23          The letter that was sent to Ms. Haynes' counsel and
24   also to other counsel in this case explained that the State was
25   doing what good administrative law agencies are supposed to do
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              15
     65N5HAYA                      argument
```
 1   which is look to what their jurisdiction is.  They're not in
 2   the nisi prius court.
 3          THE COURT:  Nobody says that.  They undertook to
 4   review the removal, right?
 5          MR. KRAFT:  Yes, and they resolved that.
 6          THE COURT:  And they didn't have a hearing until
 7   November 30 which is, you know, it is arguably not really very
 8   good due process to wait that long, but they did and they had
 9   this hearing and they found it was wrong to remove.
10          Now, any kind of due process would involve a
11   consideration of what the remedies should be.  I mean, that is
```
                            Page 7

65N5HAYA-53.txt

```
12  so obvious it is so obvious it is unarguable.  And so, the
13  State issued this statement saying it was wrong to remove.
14  Very nice.  Is it an academic statement?  Is it a statement of
15  theory?  Is it a statement of history?
16          Ms. Haynes was not up there to get a historical
17  analysis.  She was up there to get a remedy.  I assume the
18  State would have had the power -- maybe I'm wrong, would the
19  State have had the power to say she should be returned to
20  Ms. Haynes?
21          MR. KRAFT:  The State can say in its decision that the
22  removal is wrong.
23          THE COURT:  They can do that.
24          MR. KRAFT:  Yes, but the State does not have custody
25  of the child., the City does.  The difference between the State
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                16
```
    65N5HAYA            argument
1   administrative remedy and the family court is the family court
2   can order the City where to place the child.  The State can
3   make a decision --
4           THE COURT:  Wait a minute.  Wait a minute.
5           MR. KRAFT:  -- but it can't order the City where to
6   place the child.
7           THE COURT:  It doesn't help to get off onto the family
8   court right now.
9           Let's just suppose that the State had done a good job
10  and had its hearing, let's say, in late June of last year,
11  okay?  Assume that, and let's assume that the State had
12  found -- I'm just asking you if the, does the State have
13  jurisdiction?  If they find that the removal is wrong does the
14  State have jurisdiction to deliver any remedy at all?
15          MR. KRAFT:  As my client understands its jurisdiction,
16  it has the right to determine that a removal was either correct
17  or incorrect and the City, after receiving a decision of an
18  incorrect removal, would then have the option of putting the
19  child back or not.  The State does not believe it can order the
20  placement of a child in City custody in any particular
21  location.
22          THE COURT:  Let me just follow that.  The State has
23  jurisdiction to review what the City has done, right?
24          MR. KRAFT:  What the City or sometimes an authorized
25  agency on the City's behalf has done, yes.
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                17
```
    65N5HAYA            argument
1           THE COURT:  And this time it is the City, right?
2           MR. KRAFT:  Correct.  Correct.
3           THE COURT:  The reason for going to the State, why
4   does the State even have this jurisdiction?  What is the
5   purpose?
6           MR. KRAFT:  Because when a child is removed from
7   foster care, the foster parent is losing an income stream and
8   the Section 400 hearing is a chance for a foster parent to try
9   to convince the State that she should keep her job, which is
10  the job of raising a child as foster parent.
11          That's the purpose of a Section 400 hearing.
12          THE COURT:  Well, and you are telling me that, I
13  assume, that there have been many hearings of this kind, right?
14          MR. KRAFT:  I don't know how many there have actually
15  been, Judge.  There certainly have been a few.  A few of them
16  have been in front of your Honor, so.
```
                          Page 8

65N5HAYA-53.txt

```
17          THE COURT: No, I'm not talking about court hearings,
18  I'm talking about hearings before --
19          MR. KRAFT: Yes, there have been hearings about this
20  section, Judge.
21          THE COURT: By the State agency?
22          MR. KRAFT: Yes.
23          THE COURT: Are you telling me that in no instance has
24  this state agency, in one way or another, affected the return
25  to the person who is claiming that their livelihood has been
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

65N5HAYA                     argument

```
 1  interfered with?
 2          MR. KRAFT: There was one that I know of, not
 3  personally, but I know of because of a reported case where the
 4  State ordered the return of a foster parent.  It wound up being
 5  the matter of Shanice H. I think it was.  It is an appellate
 6  division case.  I can get you the cite if you need it.
 7          It is an instructive case, actually, because the State
 8  ordered the return of a foster child to a foster parent after
 9  determining that a removal was wrong.  The law guardian
10  objected.  The law guardian didn't want this child going back
11  to the foster parent so the law guardian went to family court.
12  The family court said, well, I can't overturn a decision after
13  fair hearing.
14          The decision said to put the child back with this
15  foster parent so we are going to do that.  The law guardian
16  appealed and the appellate division scolded the family court
17  and said, shame on you.  The State decision after fair hearing
18  doesn't place the child, you do.  The family court has the
19  ultimate power to place children.  The State can determine
20  whether a removal was wrong but the State is not, cannot place
21  children, the family court does.
22          That's why I referred to the family court earlier,
23  Judge.
24          THE COURT: All right, but let's then take that and
25  apply that to this case.  I can surely understand why you
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

65N5HAYA                     argument

```
 1  referred to the family court.  Here, of course, the State
 2  didn't say to Ms. Haynes go to the family court.
 3          Right?
 4          MR. KRAFT: Correct.  The state did not say that.
 5          THE COURT: The state sent it back to the City for an
 6  independent determination based on current circumstances,
 7  right?
 8          MR. KRAFT: Correct.
 9          THE COURT: Okay.
10          Now, should the state have sent it to the family
11  court?
12          MR. KRAFT: I don't believe the state is authorized to
13  do that.  I believe the Section 400 of the Social Services Law
14  only authorizes the State to determine whether the removal is
15  right or wrong.  And it did that.
16          THE COURT: But it did more than that, it sent it back
17  to the City to do something, right?
18          MR. KRAFT: Yes, it did.
19          THE COURT: And, obviously, it would have been quite
20  out of order for Ms. Haynes to go into the family court to
21  seek -- it would be nonsense for her to go into family court at
```

Page 9

65N5HAYA-53.txt
```
22    that time to seek some remedy, right?
23              MR. KRAFT:  I don't think she would have had success
24    in family court had she done that.
25              THE COURT:  It would have been out of order so she --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
```
      65N5HAYA                      argument
 1    there was this so-called independent review by the ACS,
 2    something done at the request of the state, right?
 3              MR. KRAFT:  Correct.
 4              THE COURT:  Now, the ACS report states that the child
 5    should be with the new foster parents and not go back to
 6    Ms. Haynes, right?
 7              MR. KRAFT:  Correct, that's what it says.
 8              THE COURT:  Now, does the City have the power, at this
 9    juncture, to make that determination?
10              MR. KRAFT:  Yes, it does.
11              THE COURT:  Is that determination final without any
12    right of review by anybody?
13              MR. KRAFT:  No.  It is plaintiff asked for a hearing
14    which decision was, request was denied, as Ms. Kubitschek said.
15    So that, under New York Law, makes the City's determination a
16    final determination.  There is no administrative review of that
17    and so Ms. Haynes' remedy is an Article 78 proceeding in State
18    Supreme Court and the State Supreme Court would have the power
19    to order the City to do something different if it believes that
20    the report is arbitrary or capricious.
21              THE COURT:  Well, I'm wondering if, according to what
22    you said earlier in bringing up the family court, I wonder if
23    the remedy would not be in the family court.
24              MR. KRAFT:  Judge, I have to say, this law, the law in
25    this area is not very neat.  But right now Ms. Haynes' remedy
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
```
      65N5HAYA                      argument
 1    as the former foster parent, a person who feels aggrieved by
 2    the City's determination, is in the Supreme Court.
 3              The Supreme Court is New York's court of general
 4    jurisdiction.  If a Supreme Court Judge wants to, he or she can
 5    take a matter that would otherwise be in family court or refer
 6    a matter to family court.
 7              I mean, the Supreme Court is our court of widest
 8    jurisdiction and can resolve issues like this created by the
 9    complicated legislation.
10              THE COURT:  Well, let's go back.  Let's suppose that
11    the state agency -- what is the name of the state agency?
12              MR. KRAFT:  The Office of Children and Family
13    Services, OCFS.
14              THE COURT:  OCFS?
15              MR. KRAFT:  OCFS.  Office of Children and Family
16    Services.
17              THE COURT:  Let's suppose that the OCFS had not
18    directed an independent review by the City and it just said
19    there was improper removal.  Because at one point you said
20    that's really what they have jurisdiction to do, right?
21              MR. KRAFT:  Correct.
22              THE COURT:  Now, let's suppose that they had just done
23    that and no more.  I think you indicated that the reason they
24    don't do any more is because it is up to the family court to
25    decide where children should be placed.
                    SOUTHERN DISTRICT REPORTERS, P.C.
```

65N5HAYA-53.txt
(212) 805-0300

65N5HAYA                    argument
1          You told me that, did you not?
2          MR. KRAFT:  Yes, I did.
3          THE COURT:  Now, it would follow, would it not, that
4    if the OCFS had simply made a finding of improper removal and
5    nothing more, then if anybody wanted to have the child moved
6    they would have gone to family court, right?
7          MR. KRAFT:  You would think so, but the family court
8    in the State of New York is a court of limited jurisdiction.
9    And the problem that Ms. Haynes has and any person in her
10   situation is that they can't bring a proceeding in family court
11   unless they have a specific right to be there under the Family
12   Court Act.  And she wouldn't have one and that's why I
13   suggest --
14         THE COURT:  Why wouldn't she have one?
15         MR. KRAFT:  Because, as I understand it, there is no
16   provision that specifically says that former foster parents can
17   bring proceedings in family court to have children returned to
18   them.
19         THE COURT:  But I want to follow.  Let's assume that
20   the OCFS had simply issued a ruling that the removal was
21   improper, period.  Nothing more.  Now, at that moment does
22   someone in Ms. Haynes' position have no remedy?
23         MR. KRAFT:  I believe her remedy at that moment would
24   be the one I mentioned earlier, that she can take either
25   government agency, either the City or the Office of Children
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

65N5HAYA                    argument
1    and Family Services, into Supreme Court through the Article 78
2    proceeding.
3          Our Article 78 is the way citizens can bring a
4    complaint against a government agency for almost anything that
5    they believe the government agency is doing incorrectly.  And
6    since we have limited jurisdiction in the family court,
7    Ms. Haynes and people in her position would bring Article 78
8    proceedings.  And they can do that.
9          Ms. Haynes can, if she wants to, still bring an
10   Article 78 proceeding about the February decision after hearing
11   if she thinks that was incorrectly decided by the state.  She
12   can bring that.
13         She can certainly bring an Article 78 proceeding about
14   the recent decision of the State not to give her a fair
15   hearing.  Maybe the Supreme Court will say, yes, State, you're
16   wrong in interpreting your jurisdiction that way.  You should
17   give her a fair hearing.
18         She can bring an Article 78 hearing about the City's
19   April 4th report and claim that it is arbitrary and capricious
20   I mean, that is the procedure in New York State practice to
21   address your complaints against the government even though, as
22   a matter of common sense, it might be best if she could go
23   straight to family court.  Since she can't, that's the remedy
24   open to her and her counsel.
25         THE COURT:  What would you say to that,
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

65N5HAYA                    argument
1    Ms. Kubitschek?
2          MS. KUBITSCHEK:  Several things, your Honor.
                     Page 11

65N5HAYA-53.txt

```
 3           First and foremost, that when there are Constitutional
 4    issues at stake as there are in this case, that an individual
 5    has the right to go into federal court and the federal court
 6    has jurisdiction to hear those constitutional issues.  The
 7    person does not have to exhaust state court remedies prior to
 8    going into federal court.
 9           And as you know, your Honor, if the person chooses to
10    go into state court, then the person is forever precluded from
11    going into federal court under the Rooker-Feldman Doctrine.
12           So, Ms. Haynes has the right, because this is a family
13    relationship, she has a Constitutionally protected liberty
14    interest in her grand-niece Ameena, she has the right to ask
15    this Court to vindicate her rights.  She does not have to
16    exhaust state judicial remedies.
17           THE COURT:  Okay, I'm sure you are right on that, but
18    the thing that was the basis for my ruling, the main ruling
19    denying the motion was my belief that at this juncture I could
20    not make a decision simply based on the fact -- and I found it
21    as a fact -- that there was a denial of due process in the
22    removal.
23           I was of the view that any consideration of a remedy
24    would need to take into account the kinds of circumstances
25    which were discussed in the April 4, 2006 report by the ACS and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
      65N5HAYA              argument
 1    that would involve having a trial, basically, about those
 2    issues; and Ms. Haynes challenges the factual findings in the
 3    April 4, 2006 report.
 4           But, let me ask you this.  Do you take the position
 5    that the federal court can order the child's return to
 6    Ms. Haynes simply on the basis of the original lack of due
 7    process in connection with the removal?
 8           MS. KUBITSCHEK:  We take the position, your Honor,
 9    that the state may not separate a child --
10           THE COURT:  No, no.  I asked a very simple question.
11           MS. KUBITSCHEK:  Okay.
12           THE COURT:  And you know the meaning of it.  I found
13    in that ruling that there was a denial of due process in
14    connection with the original removal, right?
15           MS. KUBITSCHEK:  Correct.
16           THE COURT:  Now, do you take the position that that,
17    in and of itself, without considering anything further, should
18    result in this court ordering the return of the child to
19    Ms. Haynes?
20           MS. KUBITSCHEK:  Not in and of itself; no, your Honor.
21           We take the position that a child and family member
22    have the Constitutional right to be together unless the family
23    member is unfit or the State has some other compelling interest
24    in separating them.  One compelling interest could be that if
25    the state came here and said we propose to send Ameena back to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
      65N5HAYA              argument
 1    her mother, the mother has now been rehabilitated and can take
 2    care of her, then Ms. Haynes would not have an interest in
 3    getting Ameena back and then this Court would properly say
 4    Ameena cannot be reunited.
 5           The government could say that there is some other
 6    compelling interest, that is, something has happened between
 7    June of last year and today which demonstrates conclusively
```

65N5HAYA-53.txt

```
 8  that Ms. Haynes is so unfit as a caretaker that she, Ameena,
 9  cannot be returned to her because it would be dangerous to
10  Ameena.
11         THE COURT:  That's virtually the kind of thing that
12  the Court would have to find in order to take a child from a
13  parent.
14         MS. KUBITSCHEK:  That is correct.  The law is clear,
15  we submit, that to interfere with the family relationship the
16  government must have a compelling state interest.
17         THE COURT:  See, one of the things I ruled in that
18  earlier ruling was really rejecting your current argument, I
19  addressed that.  I addressed the argument that Ms. Haynes
20  basically had the right of a parent and that only the kind of
21  very exceptional circumstances which would justify removal from
22  a parent could be used to justify the removal from and the
23  continued removal from Ms. Haynes.
24         I rejected that idea.  I said Ms. Haynes has an
25  interest but I did not feel that that interest was the interest
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

65N5HAYA                    argument
```
 1  that was equivalent to that of a parent.  So, I have ruled
 2  that.  And if that is your position now, I had no intention of
 3  departing from what I ruled in the original decision.
 4         So, if that's what we are really dealing with, then
 5  that's the end of the application for reconsideration because I
 6  do not accept that proposition now any more than I did at the
 7  time of the original decision.
 8         MS. KUBITSCHEK:  Your Honor, that is certainly not
 9  everything that we are dealing with.
10         THE COURT:  What else are you talking about?
11         MS. KUBITSCHEK:  What we are talking about is, number
12  one, if the standard is something less than Ms. Haynes'
13  fitness, it must be something more than hearsay statements of
14  an agency with an interest in this case, which Ms. Haynes has
15  now absolutely no chance whatsoever to refute.
16         The statement by a non-examining doctor, by a
17  pediatrician that Ms. Haynes couldn't care for a child, number
18  one, has been refuted by the fact --
19         THE COURT:  Wait a minute.  Wait a minute.  This gets
20  me into what I talked about.  This was my ultimate ruling, that
21  I felt that it would not be a proper activity by a federal
22  court in dealing with a constitutional claim to get into a
23  trial of the relative capability, the relative merit, the
24  relative benefit of Ms. Haynes as a foster parent versus the
25  new people as foster parents.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

65N5HAYA                    argument
```
 1         That, it seemed to me, was going way beyond my proper
 2  function in dealing with Constitutional questions.  And I still
 3  am of that view.  I would have to hold a trial and witnesses
 4  would come in.  I would be holding a trial about one foster
 5  care situation versus another foster care situation and that is
 6  not what I believe I have any power to do as a federal court.
 7         Now, what I do have the power to do is to see that
 8  there is due process on the State and City side.  That
 9  certainly becomes an issue because it is very clear that the
10  original removal was a violation of the Federal Constitution.
11         Now, if the City and State authorities -- let me just
12  interrupt myself.
```

65N5HAYA-53.txt

```
13            Ms. Haynes resorted to administrative remedies, she
14    did not immediately come into the federal court.  If she had
15    come into the federal court on June 30th or something, maybe
16    the federal court would have ordered the return of the child.
17    She didn't come in.
18            Whether she was required to exhaust the administrative
19    remedies, she did resort to administrative remedies and so one
20    view is this:  Once she resorts to the state administrative
21    remedies, then that's the end of the matter as far as a federal
22    court is concerned.  And that's certainly an arguable view,
23    that the original removal, that Constitutional problem is over
24    with.
25            She's now gone the way of the state administrative
```

```
      65N5HAYA                    argument
1     remedies.  I don't quite believe that, and it seems to me
2     that -- although, I think maybe there was a question about
3     whether I have jurisdiction to do what I am talking about now,
4     I will say it:  It seems to me that the State had an
5     obligation, under the Constitution, once having improperly
6     removed her, the child, to provide a process which would
7     involve a proper remedy for that.  The child had been
8     improperly removed.  The City and state held out that they had
9     a remedy for that.  That's what she was seeking.  They held out
10    they had a remedy.  It seems to me they have to provide a due
11    process remedy.
12            Have they done that?
13            MS. KUBITSCHEK:  No, your Honor.  They have not --
14            THE COURT:  Well, wait a minute.  I think it is highly
15    questionable that the remedy was sufficient when the State did
16    not have a hearing until November 30.
17            MS. KUBITSCHEK:  And plaintiff agrees.  And the
18    Seventh Circuit in the case of Dupuy against Samuels also
19    agreed when she said --
20            THE COURT:  Wait a minute.  I mean, that's really
21    quite outrageous, that the state -- wait a minute.
22            Right after the removal you said this -- and I have
23    just forgotten, I didn't make complete notes -- what did
24    Ms. Haynes do right after the removal?  Did she go to the City?
25            MS. KUBITSCHEK:  Yes, she did.
```

```
      65N5HAYA                    argument
1             And by the way, your Honor, the statute provides for a
2     pre-removal conference called an independent review.
3             THE COURT:  I know that.
4             MS. KUBITSCHEK:  But they violated that statute and
5     violated due process of law because they removed Ameena.
6             THE COURT:  What did she do after removal?
7             MS. KUBITSCHEK:  She requested her independent review,
8     which was held, and a decision was made on June 24th -- I'm
9     sorry, July 11th.  The independent review meeting was held on
10    June 24th and the decision was made on July 11th.
11            THE COURT:  July 11, and that was ACS.
12            MS. KUBITSCHEK:  That was ACS.
13            THE COURT:  Now, look.  And then did she, right away,
14    ask for a fair hearing?
15            MS. KUBITSCHEK:  Yes, your Honor.  She did.  And the
16    state delayed in scheduling the fair hearing.
17            THE COURT:  Okay, I would say that is basically a
```

Page 14

65N5HAYA-53.txt
```
18   violation of due process to delay that long, because then it
19   gives everybody an opportunity to say, well, we have got to
20   worry about the current circumstances. Well, the state has
21   made the current circumstances, something that involves months
22   and months later.
23            Wait a minute, Mr. Kraft. I will hear you in a while.
24            And then, when what was needed was a hearing on the
25   facts, not an appellate hearing but a hearing on the facts
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                     31
65N5HAYA                     argument
```
1    where the evidence could be presented, whatever about the
2    removal, I think it would be in order to take evidence about
3    some appropriate body to take evidence about the relative merit
4    of Ms. Haynes versus the new foster parents.
5             I cannot see that that's irrelevant.
6             MS. KUBITSCHEK: Your Honor, in fact there was --
7             THE COURT: Wait a minute.
8             MS. KUBITSCHEK: I'm sorry.
9             THE COURT: But recognizing that if this hearing had
10   occurred in a timely manner, for instance in July, then what
11   you would really be concentrating on is Ms. Haynes. There
12   wouldn't be a lot of time going by where she is with this
13   second home.
14            So, the delay until November 30 was really very, very
15   bad and unless maybe Ms. Haynes, maybe she asked for
16   adjournments and all that.
17            MS. KUBITSCHEK: She did not, your Honor.
18            THE COURT: Look. The problem is that there really
19   should have been a hearing, a fair hearing about Ms. Haynes and
20   her care and that should have happened promptly after the
21   removal on June 10.
22            What did the ACS report of July 11 find?
23            MS. KUBITSCHEK: The ACS report of July 11th found
24   that Ameena should not go back to Ms. Haynes.
25            THE COURT: All right.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                     32
65N5HAYA                     argument
```
1             MS. KUBITSCHEK: Despite the fact, your Honor, that
2    any conceivable reason --
3             THE COURT: Despite any conceivable reason they found
4    she should not go back.
5             Had she been placed in the new foster home by then?
6             MS. KUBITSCHEK: Yes, your Honor, she had.
7             THE COURT: Did they compare Ms. Haynes with the new
8    foster home?
9             MS. KUBITSCHEK: No. No, they didn't.
10            THE COURT: They just criticized Ms. Haynes.
11            MS. KUBITSCHEK: They criticized Ms. Haynes.
12            THE COURT: All right. Well see, it seems to me
13   that's the issue which should have been addressed in the fair
14   hearing and it should have been done promptly.
15            MS. KUBITSCHEK: Your Honor --
16            THE COURT: Let me continue.
17            And by the time of this terribly, terribly delayed
18   thing conducted by the state beginning on November 30 with a --
19   incidentally, when did the -- and no decision until February 7,
20   2006. This is just an impossible procedure.
21            MS. KUBITSCHEK: We agree.
22            THE COURT: Absolutely terrible.
```
                             Page 15

65N5HAYA-53.txt
```
23          And then, really then sending it back to the City who
24    had done the misdeed in the first place and then, according to
25    Mr. Kraft nothing but an appellate remedy available, not a
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

                                                                    33
```
      65N5HAYA                   argument
1     remedy before a fact-finder, not a remedy before somebody who
2     will, some agency or Court who will take the evidence, pro and
3     con. This is not due process.
4           And the question before the Court is what does this
5     Court do? Because I don't think that it is a very good idea
6     for this Court to become the fact finder or the trier of the
7     fact. In a way that should be done, that should be done by a
8     State or City entity but they haven't done it.
9           Mr. Kraft has been trying to get up so I will hear
10    Mr. Kraft.
11          MR. KRAFT:  Judge, I just wanted to point out, as Paul
12    Harvey likes to say, the rest of the story about the fair
13    hearing.
14          The fair hearing actually started in October and the
15    City and Ms. Haynes, who was at that time not represented,
16    appeared at the hearing. I have provided the transcript to
17    plaintiff's counsel as discovery.
18          The City asked for an adjournment because one of its
19    witnesses was not available. The ALJ asked Ms. Haynes if she
20    would consent to the adjournment. She said yes. And most
21    important, during the adjourned period is when she got this
22    counsel.
23          So, Ms. Haynes used the adjournment to her advantage
24    and got counsel who has been --
25          THE COURT:  When in October did it start?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

                                                                    34
```
      65N5HAYA                   argument
1           MS. KUBITSCHEK:  October 27th, your Honor.
2           THE COURT:  That's just as bad as November 30.
3           MR. KRAFT:  It is not much better, Judge.
4           THE COURT:  It is pretty bad.
5           MR. KRAFT:  It could be better, Judge.
6           THE COURT:  I am going to have a trial. I will hear
7     the evidence; whatever is relevant, whatever evidence is
8     relevant to the remedy. The trouble is I have got to refer it
9     to a Magistrate Judge because I'm gone for June and July and
10    this should be done as quickly as possible.
11          But if you would submit an order I will grant the
12    motion for reconsideration, to the extent that I'm directing
13    that a hearing be held. You can specify the issues. That
14    order can be settled by the end of the week because Friday is
15    the last day I will be in the office until August.
16          That's what we will do. And otherwise, I'm not at all
17    satisfied that due process is provided by going to the
18    appellate division and an Article 78 proceeding. The appellate
19    division does not take testimony of witnesses and that's what
20    is needed.
21          So, I have to adjourn now. That's my ruling and you
22    will submit an order and thank you very much.
23          MS. NEUSTAETTER:  Excuse me, your Honor?
24          THE COURT:  Yes.
25          MS. NEUSTAETTER:  The appellate division does not here
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

65N5HAYA-53.txt

35

65N5HAYA                argument
1   an Article 78 proceeding.  Article 78 proceeding is in the
2   Supreme Court, which is the lower court and which does hear
3   testimony.  I just wanted to clarify that.
4           THE COURT:  Well, I guess a made a huge, huge, huge
5   mistake.
6           MS. KUBITSCHEK:  No, your Honor.  You were absolutely
7   correct, because the Article 78 of the CPLR says that a
8   proceeding is brought in the Supreme Court.  However, if there
9   are evidentiary issues, that is, if there is a dispute about
10  the facts, then the proceeding must be transferred to the
11  appellate division so that the case then goes directly to the
12  appellate division.
13          THE COURT:  Let me go back.
14          MS. KUBITSCHEK:  And there is no testimony.
15          THE COURT:  Wait a minute.  Wait a minute.  Maybe my
16  mistake wasn't as bad as I thought.
17          Obviously an Article 78 proceeding does go to the
18  Supreme Court, but it is my impression that an Article 78
19  proceeding is a review proceeding.  And so, I will confess
20  right now that I don't have a precise knowledge of Article 78
21  proceedings, but I would be most surprised if I were to learn
22  that in an Article 78 proceeding the kind of trial that I
23  envision here would be held with issues of fact presented and
24  with examination of witnesses and cross-examination of
25  witnesses and that kind of thing.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

36

65N5HAYA                argument
1           Now, if I'm wrong and if that will go on in an Article
2   78 proceeding, then I have got to rethink what I just did.
3           Let me ask Ms. Neustaetter, in an Article 78
4   proceeding does the Court hear testimony of witnesses,
5   examination and cross-examination and treat the matter, do
6   they -- this is really a trial de novo.  This is a trial de
7   novo I'm talking about, not a review and an Article 78
8   proceeding is a trial de novo.
9           MS. NEUSTAETTER:  Mr. Kraft would like to answer that,
10  your Honor.
11          THE COURT:  All right.
12          MR. KRAFT:  Judge, it depends on what the Judge does.
13  In an Article 78 it depends on what is before the Court.
14          Ms. Kubitschek is correct if what's before the Court
15  is a hearing with a record already, the Court kicks it up to
16  the appellate division.  If the Article 78, though, is on the
17  arbitrary and capriciousness of the City's April 4th report,
18  for example, the judge would have to resolve that by having the
19  kind of hearing you are talking about because he or she will be
20  confronted with that report and Ms. Kubitschek's pleadings that
21  it is arbitrary and capricious.  And the City will have to put
22  in some kind of a defense and the Judge will make that
23  decision.
24          If the third kind of Article 78 that I mentioned
25  before, let's say they make an Article 78 about the letter that
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

37

65N5HAYA                argument
1   my client sent out denying them a hearing on this particular
2   issue, that's a matter of -- and they'll say that's arbitrary
3   and capricious and unlawful, the Judge wouldn't need a trial
                        Page 17

65N5HAYA-53.txt
```
 4  for that, he or she would just decide that as a matter of law.
 5          But, I think if the Article 78 is about the April 4th
 6  report the judge has the power under, I think it is CPLR
 7  7804(I) or maybe (J) -- I might have my letter wrong -- but he
 8  or she can have a hearing, if he needs one.
 9          MS. KUBITSCHEK:  Your Honor, may I be heard?
10          That is absolutely not true.  Ms. Haynes cannot have a
11  trial with examination and cross-examination of witnesses and
12  documentary evidence in an Article 78 proceeding.
13          An Article 78 proceeding is a review of a
14  determination by a state or local official.  It is not a trial
15  de novo.  It is not even a trial at all.
16          And the sole issue is whether or not -- the review is
17  extremely limited.  The issue is whether or not the action of
18  the governmental agent was arbitrary, capricious, contrary to
19  law or not supported by substantial evidence.  And if you say
20  it was not supported by substantial evidence, the matter goes
21  immediately to the appellate division.  It is a paper review
22  only.
23          Your Honor, we will be happy to brief this issue.  It
24  is simply not true that we could get a trial on the facts in
25  any state court.  Ms. Haynes has been completely foreclosed in
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                              38

65N5HAYA                    argument
```
 1  the state venue from actually having a trial of the type that
 2  the magistrate judge would hold.
 3          THE COURT:  Let me just say this.  This is an
 4  extremely difficult juncture because I believe there has not
 5  been reasonable process here.  But for the federal court to
 6  undertake the hearing, what -- I'm sorry to just be reopening
 7  this, but I am back to the dilemma that I discussed at the time
 8  of the original decision.
 9          MS. KUBITSCHEK:  I understand that, your Honor.
10          THE COURT:  It is really --
11          MS. KUBITSCHEK:  May I say something?
12          THE COURT:  I am providing a process but I'm not the
13  right decision-maker.  That's my problem.  The issue will be an
14  issue which is really different from the original violation of
15  due process and, inevitably, has to weigh the merits of the
16  foster care by Ms. Haynes and the foster care by the new
17  people.
18          And when you say one slightly different standard
19  versus another, it involves weighing the relative merits of
20  those two foster care facilities and I believe that due process
21  requires that that be done in a proper way -- hearing
22  Ms. Haynes and her witnesses and hearing the City and their
23  witnesses.  I believe that that should be done.
24          But, if the federal court does it -- I can do it --
25  then what is the kind of decision I'm supposed to come up with?
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                              39

65N5HAYA                    argument
```
 1  Do I then decide, as a federal court, whether the foster care
 2  in one place is better than the foster care in the other place?
 3          It is completely anomalous for me to decide that.
 4          MS. KUBITSCHEK:  Your Honor, it has been done before.
 5  Let me reassure the Court.
 6          In the case of McLaughlin v. Hearnsly in the Third
 7  Circuit, the Third Circuit was faced with a similar situation.
 8  A little boy named Raymond went into foster care as a newborn
```
                          Page 18

65N5HAYA-53.txt
```
 9    and was placed in the home of Mr. and Mrs. McLaughlin.
10           When Raymond was two years old -- the McLaughlins were
11    not family, they were strangers to Raymond but he grew to love
12    them as parents.
13           When Raymond was two years old a social worker in the
14    Pennsylvania child welfare system thought that Raymond should
15    be moved because Raymond was black and the McLaughlin's were
16    white and he should live with black foster parents.
17           THE COURT:  Who decided that?
18           MS. KUBITSCHEK:  A social worker within the foster
19    care system in Pennsylvania.  The Pennsylvania foster care
20    organization, whatever it was called -- Department of Human
21    Services.  And they moved Raymond.  And the McLaughlins said,
22    wait a minute.  We have some due process here.  And we also
23    have an equal protection problem because you cannot take
24    Raymond, you cannot make decisions, the government cannot make
25    decisions based solely upon race.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                        40
65N5HAYA                        argument
```
 1           And they tried to get into the Pennsylvania state
 2    court system to seek their remedies and they were thwarted and
 3    they could not get a hearing in the Pennsylvania system.  And
 4    so, they filed in the federal court in Pennsylvania in the
 5    Eastern District of Pennsylvania, and the federal judge says I
 6    think you are entitled to some kind of trial.  And they
 7    actually held a trial.
 8           THE COURT:  On what issues?
 9           MS. KUBITSCHEK:  On the issues of whether Raymond
10    should be returned to the McLaughlins or should stay in the new
11    foster home with the family named Williams P.  And the federal
12    Court determined, based upon the evidence presented, that
13    Raymond should be moved back to the McLaughlins.
14           THE COURT:  On what standard?  Why?
15           MS. KUBITSCHEK:  Because it was a violation of the
16    Constitution of equal protection because Raymond had -- and
17    also because it was in Raymond's best interest to be with the
18    family whom he had lived with for the first two years of his
19    life and whom he had bonded with.
20           And the Court heard testimony on both sides.
21           MR. CHARNEY:  Your Honor, let me just add something.
22    We will give you the cite.
23           The District Court in this case held the exact kind of
24    trial that you are suggesting now.  They heard testimony from
25    the plaintiffs, from the child welfare authority for
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                        41
65N5HAYA                        argument
```
 1    Pennsylvania, as well as from the new foster parents on the
 2    issue of where would it be most appropriate for this child to
 3    live because time had passed since the original removal -- just
 4    as we have here.  And it was a question now of where should the
 5    child live.  And it heard evidence, it heard testimony and made
 6    a factual determination that it would be better for the child
 7    to be returned to that foster home, the original foster home.
 8           So, it is virtually identical in terms of what the
 9    Court was doing and what it decided it needed to do is exactly
10    what your Honor is suggesting now.
11           THE COURT:  Let me just go to -- does anybody on the
12    defense side have a suggestion?  Please assume that I have
13    ruled that there has not been due process in the sense of an
```
                              Page 19

65N5HAYA-53.txt
```
14   appropriate factual hearing; does anybody have any better
15   suggestion as to how to have that factual hearing than to have
16   the federal court do it?
17           MS. NEUSTAETTER:  Well, your Honor, first of all, I
18   would like to say that in the family court proceeding the other
19   day, the plaintiff did not make a motion to intervene.  They
20   simply showed up.  The judge invited them to brief the question
21   of their standing in that proceeding.  The fact is that that
22   proceeding was a termination of parental rights proceeding, the
23   fact finding stage.  The proceedings in family court of this
24   sort have two phases, the first is fact-finding, the second is
25   disposition.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                      42
     65N5HAYA                     argument
```
1            In the fact-finding stage the only issue is whether
2    the mother Charia --
3            THE COURT:  Look, we're not --
4            MS. NEUSTAETTER:  No.  But what I want to say is they
5    have an absolute right to seek to intervene in the
6    dispositional phase.  That's the first thing.
7            THE COURT:  Well, the second part of that hearing was
8    about foster care, was it not?
9            MS. NEUSTAETTER:  That is correct.  And the judge
10   invited them to brief the issue of standing.  The Children's
11   Law Center, for one, did not oppose their being there and there
12   was no hearing on permanency on that date as.
13           As to the termination of parental rights proceeding --
14           THE COURT:  The parental rights is irrelevant for us.
15   I want to know about what happened on the foster care issue.
16           MS. NEUSTAETTER:  What happened on the foster care
17   issue that day was basically nothing.  It was put over.
18           It was on for --
19           THE COURT:  Put over until when?
20           MS. NEUSTAETTER:  Until July.
21           THE COURT:  Are you telling me that Ms. Haynes was
22   invited to --
23           MS. NEUSTAETTER:  To brief the issue of standing.
24           THE COURT:  The issue of standing?
25           MS. KUBITSCHEK:  Your Honor, that is simply not true.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                      43
     65N5HAYA                     argument
```
1    And I'm sorry, Ms. Neustaetter was not in court,
2    Ms. Neustaetter's colleague was in court and objected to
3    Ms. Haynes participating in any way.  The Judge ruled that
4    Ms. Haynes did not have standing and then said, would you like
5    to brief the issue? after she had already made her ruling.
6            Now, your Honor, we had thought that Ms. Haynes did
7    not have standing.  We had thought that state law was fairly
8    clear that Ms. Haynes does not have standing, that the New York
9    Court of Appeals says the only remedy that an aggrieved foster
10   parent has, even somebody who is the great aunt, the only
11   remedy is this administrative proceeding.
12           But, based upon the representations that were made in
13   this court on April 11th, we said let's try, since both the
14   City and the Children's Law Center said they would not oppose
15   Ms. Haynes' participation.  But, when we got to court they
16   opposed Ms. Haynes' participation.  And Mr. Lansner submitted a
17   sworn declaration saying that is precisely what happened.  He
18   was there.  He will testify, if necessary, in this court, that
```
                               Page 20

```
                          65N5HAYA-53.txt
19   he was told we have no standing to participate in any trial in
20   the family court.
21          Ms. Haynes has no remedy in the family court.
22          THE COURT:  Mr. Kraft said that she doesn't have any
23   standing, so.
24          MS. KUBITSCHEK:  So, Mr. Kraft and I and the family
25   court judge all agree that Ms. Haynes cannot be heard in the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
     65N5HAYA                argument
1    family court.
2           THE COURT:  Look, we have to go to something else.
3    Mr. Levine, do you have any ideas?
4           MR. LEVINE:  Your Honor, I believe that she does have
5    the right to petition to participate in the permanency hearing.
6           THE COURT:  In the family court.
7           MR. LEVINE:  In the family court and bring a custody
8    proceeding in the family court.
9           Now, there is a case that makes that difficult, but
10   the fact of the matter is New York Law is not settled on that,
11   and it is an additional reason for abstention under the Pullman
12   Doctrine where you have an unclear situation of law that has
13   not been resolved by the highest court.
14          THE COURT:  Okay now, look.
15          MR. LEVINE:  And then your Honor, finally, in terms of
16   hearing, they have the right to petition for adoption after the
17   termination of parental rights.
18          THE COURT:  It seems to me that the only sure way to
19   get a hearing is to have it in the federal court.  If I adjourn
20   this and order for Ms. Haynes to seek something in the family
21   court it is uncertain what, if anything, she will get.
22          And time goes on and already too much time has passed
23   and so I'm granting the motion for reargument.  I am directing
24   that a hearing be held in the federal court as to the proper
25   remedy for the violation of due process in the removal of the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
     65N5HAYA                argument
1    child.  The issues about the proper remedy will include issues
2    about the relative benefit or detriment involved in having the
3    child returned to Ms. Haynes versus keeping her in the care of
4    the current foster parents.
5           I will sign an order by the end of the week embodying
6    what I have just said and that should be circulated among
7    counsel and I want to sign that.  And it will be, that matter
8    will be referred to the magistrate judge who is on this case
9    and I don't know who that is at the moment.
10          MS. KUBITSCHEK:  Your Honor, it is Magistrate Judge
11   Katz.
12          THE COURT:  All right.  And that's the ruling.
13          MR. LEVINE:  Your Honor, I don't want to be
14   contentious but I would like to make one statement to reserve
15   the record, if that's okay.
16          THE COURT:  Okay.
17          MR. LEVINE:  And that is simply, your Honor, that with
18   respect to this kind of hearing, notwithstanding the case in
19   the Third Circuit that was decided on equal protection grounds,
20   we cited, on April 11th, a string of cases saying that the
21   federal court does not have subject matter jurisdiction in this
22   kind of hearing.  I just want to reiterate that much.
23          THE COURT:  All right, I believe I do.  It is the only
                              Page 21
```

65N5HAYA-53.txt
24  way I can see to get anything done.  If we sent it back to the
25  State and City side the risk is in a few weeks we will be back
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                46
        65N5HAYA                    argument
1  here, everybody frustrated, nothing accomplished.  And we can't
2  have that anymore.
3            Thank you.
4                              o0o
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1

6C4FRIVC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MABLE RIVERA AND ANTHONY
     RIVERA,
 4
                    Plaintiffs,
 5
             v.                                06 CV 7077 (TPG)
 6
     CITY OF NEW YORK, et al.,
 7
                    Defendants.
 8
     ------------------------------x
 9
                                       New York, N.Y.
10                                     December 4, 2006
                                       4:50 p.m.
11
     Before:
12
                        HON. THOMAS P. GRIESA,
13
                                       District Judge
14
                             APPEARANCES
15
     LASSNER & KUBITSCHEK
16       Attorneys for Plaintiffs Mable and Anthony Rivera
     DARIUS CHARNEY
     CAROLYN A. KUBITSCHEK
17

18   LESLIE A. ABBEY
     The Legal Aid Society
19       Attorney for Plaintiff Jada Chapman

20
     SUSAN BARIE
21   Brooklyn Legal Services Corp.
         Attorney for Plaintiff Mother
22
     JESSIE I. LEVINE
23       Attorney for Defendant City of New York

24   ROBERT KRAFT
         Attorney for Defendant State of New York
25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6C4FRIVC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MABLE RIVERA AND ANTHONY
   RIVERA,
4
               Plaintiffs,
5
          v.                              06 CV 7077 (TPG)
6
   CITY OF NEW YORK, et al.,
7
               Defendants.
8
   ------------------------------x
9
                                   New York, N.Y.
10                                 December 4, 2006
                                   4:50 p.m.
11  Before:

12                 HON. THOMAS P. GRIESA,

13                                      District Judge

14                      APPEARANCES

15  LASSNER & KUBITSCHEK
        Attorneys for Plaintiffs Mable and Anthony Rivera
16  DARIUS CHARNEY
    CAROLYN A. KUBITSCHEK
17

18  LESLIE A. ABBEY
    The Legal Aid Society
19      Attorney for Plaintiff Jada Chapman

20
    SUSAN BARIE
21  Brooklyn Legal Services Corp.
        Attorney for Plaintiff Mother
22
    JESSIE I. LEVINE
23      Attorney for Defendant City of New York

24  ROBERT KRAFT
        Attorney for Defendant State of New York
25

6C4FRIVC

```
1                    (Case called)

2                    (In open court)

3            THE DEPUTY CLERK:  Matter of Mable Rivera, Anthony

4    Rivera versus the Commissioner John Mattingly and the City of

5    New York.  Counsel, state your appearances?

6            MR. CHARNEY:  Darrell Charney, Lassner & Kutibschek,

7    325 Broadway, New York, New York  10007 for the plaintiffs,

8    Mable and Anthony Rivera, as well as the infant plaintiffs,

9    Erica Simmons and Bryanna Chapman.

10           MS. KUBITSCHEK:  Carolyn Kubitschek, Lassner &

11   Kubitschek, and, your Honor, standing to my left and your right

12   is Franco Munoz, who is an attorney with the AARP Foundation

13   litigation which represents the American Association of Retired

14   Persons, a 37-million member organization.  Mr. Munoz is a

15   member of the Bars of the District of Columbia and Virginia,

16   and also the DC circuit of the District and the District of

17   Virginia and the Fourth Circuit, and I would like to move his

18   admission pro hac vice.  I have an order --

19           THE COURT:  I have no problem.  He represents whom?

20           MS. KUBITSCHEK:  He will come in as co-counsel with us

21   representing the plaintiffs upon his admission.

22           MR. KRAFT:  Your Honor, if I may respectfully object.

23   I believe there's an attorneys fee application in this

24   complaint, and I believe under those circumstances the

25   defendants --
```

6C4FRIVC

1          THE COURT:  You believe what?  I'm sorry?

2          MR. KRAFT:  I believe since plaintiffs are seeking

3    attorneys fees from the defendants, should they prevail, the

4    defendants should bring certain matters to your attention.  The

5    AARP is already appearing in the class action before your

6    Honor, Balbuena, et al, versus the City of New York.  There's

7    no reason to have Mr. Munoz appear in this separate case, and

8    then bill for it.

9          The plaintiffs here are represented by able counsel,

10   and they don't need this, and this is just over-partnering, and

11   I don't think a private client, if Ms. Rivera and Mr. Rivera

12   had to pay Mr. Munoz, I don't think they would do it and I

13   think that's the standard you have to apply when considering

14   the appearance of extra attorneys in a case where counsel is

15   seeking payment from the government.

16         MS. KUBITSCHEK:  May I respond, your Honor?

17         THE COURT:  All right.

18         MS. KUBITSCHEK:  This is an application for an

19   attorney who is licensed to practice in the state and federal

20   courts of two other jurisdictions.

21         THE COURT:  I have no problem with his credentials.

22         MS. KUBITSCHEK:  It has nothing to do with fees.

23         THE COURT:  I don't understand why we have to have so

24   many lawyers for the plaintiff.

25         MS. KUBITSCHEK:  Well, your Honor, AARP has been --

6C4FRIVC

1          THE COURT:  What does AARP have to do with this

2     matter?

3          MS. KUBITSCHEK:  AARP has a great interest in

4     relatives over the age of 50 who are caring for children.  It

5     has been an interest of theirs for a long time, and, frankly,

6     your Honor, we can share the work.

7          THE COURT:  What about, you and Mr. Charney, can't you

8     handle it?

9          MS. KUBITSCHEK:  Your Honor, this is a situation where

10    the plaintiff is entitled to choose her own attorneys.

11         THE COURT:  But not endless numbers of people, though.

12         MR. MUNOZ:  Your Honor, if I may make a statement?

13         THE COURT:  Your name is, again?

14         MR. MUNOZ:  Franco Munoz.  I'm the attorney subject to

15    the motion for pro hac vice.  Your Honor, AARP has over 35

16    million members nationwide, 2.5 million members in New York

17    State alone.  Your Honor, the Census Bureau has found that the

18    traditional family, where there are two birth parents raising

19    the children, no longer exists.  The Census Bureau has found

20    that a majority of American families have either one birth

21    parent or no birth partners --

22         THE COURT:  What does that have to do with the issue

23    of how many lawyers we need?  What does it have to do with how

24    many lawyers the plaintiff needs?

25         MR. MUNOZ:  Your Honor, first of all, it's my

5

6C4FRIVC

1  understanding, and I apologize if I'm in error, but there was

2  no certification of the class as of yet, so we would like to be

3  part of all the cases in the event that the class certification

4  is not entered, first.

5          Secondly, your Honor, counsel stated --

6          THE COURT:  This is a motion for reconsideration.  We

7  do not need any further lawyers.  Thank you for coming, I

8  appreciate your being here, and I have no objection to your

9  credentials, but I will not add you to counsel on this case.

10  Thank you very much, and let's proceed.  This is a motion for

11  reconsideration.

12          MS. KUBITSCHEK:  May I please submit the order so your

13  Honor can deny it so that we can seek appropriate review?

14          THE COURT:  You're going to appeal from that?

15          MS. KUBITSCHEK:  Your Honor, we will -- the plaintiffs

16  must be --

17          THE COURT:  The record is what it is.  You applied and

18  it's denied on the record.  Please.  Let us move forward.  We

19  have a motion to cover in substance.  Can we do that?  Would

20  you like to sit down and somebody speak for the motion in

21  substance?

22          MS. KUBITSCHEK:  Your Honor, Mr. Charney is going to

23  speak on the motion.

24          THE COURT:  All right, Mr. Charney.  Thank you.

25          MR. CHARNEY:  Your Honor, before I do that, I want to

6C4FRIVC

1    note that one of the infant plaintiffs, Jada Chapman, has a new

2    attorney who is going to substitute in for her.  It's The Legal

3    Aid Society Juvenile Rights Division, which represents Jada in

4    family court.  They are also attorneys for the putative

5    subclass in the Balbuena case.  Again, it's putative because

6    that class has not been certified.  They clearly have an

7    interest in this case and I'll let Ms. Abbey note her

8    appearance.

9            THE COURT:  You represent who?

10           MS. ABBEY:  Your Honor, we represent Jada Chapman.

11   I'm Leslie Abbey I'm standing in for Jada Chapman.

12           THE COURT:  Jada is one of the infants in the case?

13           MS. ABBEY:  She's the youngest infant.  She's the

14   oldest, I apologize.

15           MR. CHARNEY:  The other two are Bryanna Chapman and

16   Erica Simmons, who are Jada's first cousins.

17           THE COURT:  Let me get those names again.  I know we

18   have them in the -- we have Erica?

19           MR. CHARNEY:  Erica Simmons and Bryanna Chapman.

20           THE COURT:  And Jada Chapman.

21           MR. CHARNEY:  Jada Chapman.

22           MS. ABBEY:  Your Honor, Legal Aid is asking only to be

23   substituted as Jada's counsel in this case.  We represent Jada

24   in the family court.

25           THE COURT:  All right.  Let's now talk about the

6C4FRIVC

1    motion, please.

2            MR. CHARNEY:  Your Honor, we last appeared before you

3    on September 14 of this year.  That was the day that we filed

4    this federal civil rights lawsuit and applied for a motion for

5    preliminary injunctive relief.  We were seeking at that time

6    the return of the three infant plaintiffs to the home of Mable

7    and Anthony Rivera, who are their great aunt and uncle, and had

8    been their caretakers for at that point over six and a half

9    years.  The girls came to them all when they were under the age

10   of two.  They lived with them for over six years and on

11   March 31 of this year, they were removed on an emergency basis

12   without prior notice or a prior hearing, based on an alleged

13   act of sexual abuse, not by the Riveras, but by their adult

14   daughter's boyfriend who was not a resident in their home.

15           That allegation was subsequently investigated by the

16   defendant City's Administration for Children's Services and was

17   proved to be false.  A report was completed in July of this

18   year, and it stated that all of the allegations against both

19   the alleged perpetrator, this gentleman by the name of Leandro

20   Johnson, as well as allegations against Ms. Rivera for what's

21   called inadequate guardianship meaning she either, A, failed to

22   protect them from this or exposed them to inappropriate

23   materials, all of those allegations were proven false.

24           At that point in time, this is July, Ms. Rivera asked

25   the foster care agency which contracts with ACS, is an agent of

6C4FRIVC

1    ACS, they're a defendant here, they're known as Family Support

2    Systems Unlimited, she asked if the girls could be returned to

3    her and Mr. Rivera's home where they lived essentially their

4    whole lives.  The agency did a safety assessment.  They came to

5    the Riveras' home on August 23rd, along with case workers,

6    looked around the house, asked a lot of questions, did an

7    assessment, which I guess as an agency they do in their normal

8    course of supervising children in foster homes.  They made a

9    determination that the home was safe to return the children to.

10           Your Honor has before him, I believe, as Plaintiff's

11   Exhibit 2, which was submitted in our original motion for

12   preliminary injunction, a letter from the attorney for Family

13   Support Systems stating that the girls would be returned on

14   August 26, 2006.

15           On that day, Mr. and Mrs. Rivera drove to the offices

16   of Family Support Systems to pick up the three girls.  The

17   girls were there with their suitcases.  Upon arrival, she was

18   informed by Family Support Systems that ACS had decided that

19   the girls could not be removed.  When she was asked for an

20   explanation, she was not given one.

21           Since that time, she has not seen Erica and Bryanna at

22   all.  She has seen Jada on one occasion, she was granted a

23   visit on October 17, but has not seen Jada since that time.  In

24   addition, she has been told she is not permitted to speak to

25   them on the telephone.

6C4FRIVC

1          Our lawsuit, which we filed on September 14, we allege

2    three constitutional violations in this case.  One was a

3    substantive due process violation based on the removal itself.

4    We allege that the removal was made without probable cause and

5    in violation of the fundamental liberty interests of the

6    Riveras and the girls to live together.  We also made an

7    allegation that the continued detention of the girls even after

8    it was proven that the allegation was false also violated the

9    Riveras' and the girls' subsequent due process right to live

10   together as a family, and, finally, we made an allegation that

11   the process that the Riveras have had to go through since

12   removal in order to try to be heard and obtain relief was a

13   violation of their procedural due process rights.  In other

14   words, it was completely inadequate.

15          To date, the Riveras have not received any sort of

16   hearing in the New York State Family Court.  Your Honor has

17   before him, I believe as Exhibit 9, a decision issued by the

18   Queens Family Court stating that the Riveras do not have a

19   right to be heard on this issue in the family courts in the

20   State of New York.

21          Following the removal in April, about three weeks

22   after the removal, there was a meeting convened at ACS, which

23   is called an independent review.  It is not a hearing.  There

24   is no sworn testimony, there's no ability to cross-examine

25   witnesses and the decision maker is an employee of ACS itself.

6C4FRIVC

1    That independent review, not surprisingly, determined that the

2    removal was correct.

3         Now, it's also important to note that that decision

4    was made prior to the completion of the investigation into the

5    allegations.  So, in other words, it was a decision that was

6    made before there was a complete record of the allegations

7    against the Riveras.  That report was completed in July and at

8    that point the agency itself, the foster care agency made a

9    decision to return the children.  The foster care agency is the

10   agency that actually goes to the home, visits the children,

11   visits the foster parents and has direct contact with these

12   families.  ACS overruled this decision, yet no one from ACS has

13   been to the Riveras' home, no one from ACS that we know of has

14   actually spoken directly to the children, other than the people

15   who investigated the allegations.  And remember, that

16   investigation concluded that there had not been any form of

17   abuse or maltreatment to those children.

18        After losing the independent review, the Riveras

19   requested what's called a fair hearing from the defendant, the

20   New York State Office of Children and Family Services.  Under

21   New York State law, that is their only remedy to a removal, as

22   the Family Court noted in its decision and is stated under

23   Social Services Law 400.

24        THE COURT:  What's the only remedy?

25        MR. CHARNEY:  The only remedy is an administrative

11

6C4FRIVC

1    remedy, it's known as a fair hearing that they have before

2    what's called the New York State Office of Children and Family

3    Services, which is a State agency that oversees all the local

4    child welfare agencies, including ACS.

5          This fair hearing is constitutionally inadequate in

6    many respects.  By regulation, the hearing officer is able to

7    admit all hearsay evidence, which means the Riveras do not have

8    the ability to confront witnesses who provide evidence against

9    them.  In this situation ACS did not appear at this fair

10   hearing.  The foster care agency Family Support did appear and

11   proceeded to submit as their only exhibit the investigation

12   report done by ACS, yet no one who actually performed that

13   investigation appeared at that hearing, and therefore the

14   Riveras did not have any opportunity to cross-examine any

15   witnesses from ACS who made these statements in this report

16   much less any persons whose statements are quoted in that

17   report.

18         In addition, the standard of proof, again, by state

19   regulation for these hearings is only substantial  evidence.

20   In other words, all that the agency or ACS has to do is prove

21   that there was some rational basis, some -- I don't even --

22   it's not even a rational basis -- some less than the majority

23   of the evidence that supports the removal decision, and in a

24   situation as this, where you're really talking about a

25   deprivation of a very important liberty interest, to have a

12

6C4FRIVC

1  standard of proof of less than preponderance of the evidence

2  cannot be constitutional.

3      Finally, or not finally, the third problem is that the

4  decision maker, again, is an employee of the state agency that

5  oversees ACS.  It's not an independent judiciary, an

6  independent branch that oversees this issue.  Finally, the

7  timing of these, this is something I'd like to draw your

8  Honor's attention to.  We addressed this issue, as I'm sure

9  you'll remember, in a prior case, Haynes v. Mattingly, several

10 months ago.  It was an identical situation.  The plaintiff, who

11 was a great aunt, pursued that administrative hearing.

12     The problem with the administrative hearing was

13 twofold.  One is that the hearing took many, many months to

14 commence and be completed, and then another two months to even

15 get a decision, so that by the time there was a decision, it

16 had been eight months since the child had been removed from the

17 aunt's home.

18     In this case, you have a very similar situation.  The

19 hearing was originally supposed to go forward on August 24.  As

20 your Honor noted in the hearing that we had on September 14,

21 for some reason, this hearing was adjourned over a month.  It

22 was adjourned from August 24th to then August 30th, and then

23 from August 30th to October 2nd, and your Honor both in this

24 case and in the Haynes case, very astutely pointed out that

25 this constant delay and this passage of time in and of itself,

6C4FRIVC

1    really harms the families and the children involved here,

2    because every day that passes and the longer that these

3    families are separated from each other, the more difficult it

4    is then for the children and the parents to really re-establish

5    that bond if and when it comes a time for them to be reunited.

6         I can cite to your Honor the transcript from the

7    Haynes case which we also submitted as an Exhibit, I believe

8    Exhibit 6.  I believe on pages 30 and 31 of that transcript,

9    your Honor correctly noted that this delay in timing in terms

10   of holding these fair hearings is very problematic, and in this

11   case, I believe the transcript from the September 14th hearing,

12   your Honor, on page 27 also makes reference to the passage of

13   time as very significant and very problematic in these

14   situations.

15        So that's -- the timing of these fair hearings is

16   really a problem and a violation of due process.

17             And, finally, and perhaps most importantly, the State

18   of New York went on record in the Haynes case before your Honor

19   on May 23rd.  Mr. Kraft was here, and stated to your Honor that

20   even if a situation where the kinship foster parent is

21   victorious on the merits in these fair hearings, in other

22   words, the State makes a determination that the removal was

23   wrong, the State will not order ACS to return the children.

24   They could not believe that they have the authority to tell ACS

25   to place the child back in the home from which they were

6C4FRIVC

1    wrongfully removed.  So, in effect, you have a substantively

2    meaningless remedy, and your Honor again in the Haynes case in

3    that hearing on May 23rd, correctly pointed out that that is

4    not due process when you have a remedy that is meaningless.

5         So the only remedies provided under State law for the

6    Riveras in this case are clearly constitutionally inadequate.

7    So you have a procedural due process problem and you also have

8    the substantive due process problem with the continued

9    detention.

10        The reason this is a motion for reconsideration, your

11   Honor, at the hearing of September 14, your Honor addressed the

12   original removal decision on March 31.  Your Honor did not

13   address the continued detention in view of the unfounding of

14   the allegations.  In addition, your Honor made a finding that

15   the investigation that OCI did constituted due process.

16   However, that investigation was not a hearing.

17        Secondly, since September 14, many, many things have

18   happened in this case.

19        THE COURT:  Look, can I interrupt you?

20        MR. CHARNEY:  Yes.

21        THE COURT:  I don't want to get technical and I don't

22   want to make labels and all of paramount importance.  This

23   isn't a motion to reconsider.  This is a brand new motion for

24   injunctive relief.  And I don't think it's a small matter.

25   It's labeled as a motion to reconsider.  It's not.  It's a

15

6C4FRIVC

1    motion for injunctive relief based on events that had not even

2    occurred as of September 14, so that's what we have, and that's

3    what you're addressing.  But I'm not sure that the defense side

4    has really perhaps had the opportunity that it should have.

5    Maybe it has had, but --

6           MR. CHARNEY:  Your Honor, the defendants have

7    submitted papers -- well, the City has submitted papers in

8    opposition to this motion, in fact, two sets of papers.  In

9    addition, I agreed to an adjournment because Mr. Levine had

10   some family issues he needed to deal with, gave him an

11   extension of time in fact to submit those opposition papers.

12   So I would submit the defendants have had the opportunity.

13           THE COURT:  I suppose they have.

14           MR. LEVINE:  Your Honor, may I address that?

15           THE COURT:  Yes.

16           MR. LEVINE:  Plaintiff has submitted four sets of

17   papers --

18           THE COURT:  You're Mr. Levine?

19           MR. LEVINE:  Yes.  Plaintiff has submitted four sets

20   of papers since October 30th, the adjourned date, including

21   papers submitted by other counsel.  We have not had an

22   opportunity to address, what, as the Court properly points out,

23   is essentially a brand new motion.

24           MR. CHARNEY:  Your Honor, the problem with --

25           THE COURT:  Wait a minute.  Mr. Levine, you submitted

6C4FRIVC

1   papers, haven't you?

2        MR. LEVINE:  We submitted papers on the motion, and

3   our papers at that point said this is not properly a motion for

4   reconsideration, and it was not properly brought under Rule 54,

5   which was the alternative relief.  Since that time, there were

6   three sets of papers produced, including as late as Thursday

7   this afternoon describing what allegedly went on in the family

8   court.  I'm not even going to get into the question where it's

9   counsel, witness, advocate dichotomy, I'm just saying this was

10  submitted Thursday afternoon and we have not had an opportunity

11  to address these issues.

12        If your Honor wants to treat it as a brand new motion,

13  we'll be happy to deal with it in that way.

14        THE COURT:  Well, now, look.  Look.  What I have from

15  you is a memorandum dated October 24 in opposition to the

16  motion for reconsideration.

17        MR. LEVINE:  That's correct.

18        THE COURT:  And there was a declaration of yours, and

19  it really --

20        MR. CHARNEY:  Your Honor, there's also a supplemental

21  declaration he did, I believe in November, and I would just add

22  that the papers that we have submitted --

23        THE COURT:  Look.  Look.  Just take it easy, please.

24  Take it easy.  Do I have everything on this motion?

25        MS. ABBEY:  Your Honor, Legal Aid also submitted a

6C4FRIVC

1    declaration in support of the motion.

2              THE COURT:  Right now I'm concerned about, for some

3    reason I don't have on the bench a second -- was there a second

4    declaration, Mr. Levine?

5              MR. LEVINE:  Yes, there were, just pointing out there

6    were ongoing proceedings, your Honor.

7              THE COURT:  There were what?

8              MR. LEVINE:  Just pointing out there were ongoing

9    proceedings in the family and state court.

10              THE COURT:  Can I see that?  Was there another

11    memorandum of law?

12              MR. LEVINE:  No, sir.

13              THE COURT:  Can I see the declaration?

14              MR. LEVINE:  Your Honor --

15              MR. CHARNEY:  I have a copy.

16              THE COURT:  All right, let me see that.

17              MR. CHARNEY:  Your Honor, if I just may point out one

18    thing?

19              THE COURT:  Wait a minute.  Wait a minute.

20              (Pause)

21              THE COURT:  Well, the November 14 declaration, is a

22    rather brief span; November 16 simply talks about proceedings

23    that have happened.  At least it's up to date, I assume,

24    through the middle of November, and talks about certain

25    proceedings that have been set for November 20.

6C4FRIVC

1          MR. CHARNEY:  And, your Honor, my supplemental reply

2     declaration, which Mr. Levine is referring to from last week,

3     simply picks up where he left off.  It describes what happened

4     on November 20, as well as what happened on November 29.

5          Since we submitted our reply memo of law on

6     October 30, which was the return date, we have not submitted

7     any additional legal arguments, and all of the declarations

8     that have been submitted have been to update the Court on what

9     has gone on in the intervening time.  Because as Mr. Levine

10    correctly points out, there is an ongoing case in the Family

11    Court.  However, the Riveras really have no opportunity to

12    participate in that.  That's what we were trying to make clear

13    to the Court.

14         MR. LEVINE:  Your Honor, may I suggest that if the

15    Court, and I think appropriately wishes to treat this as a new

16    motion, that the City be given a reasonable amount of time to

17    respond with memorandum and affidavits, and we'll be glad to

18    hear it again.

19         MR. CHARNEY:  I would object to the memo of law,

20    because they did an opposition and we did an opening brief and

21    a reply brief and that's all that everybody is entitled to.

22         THE COURT:  Well, maybe that's what people are

23    entitled to, but you really have labeled your motion as

24    something that it is not.  This isn't a motion for

25    reconsideration.  This is a motion for relief based on facts,

6C4FRIVC

1    on circumstances that exist now and have surely developed since

2    the time of your original motion.

3            Now, look, I am faced with two things.  Number one,

4    I've got what I regard as a fairly complex motion now, and it

5    has to be presented thoroughly, and I'm not confident that it

6    has been.

7            At the same time, I'm conscious that time is

8    important, and taking a lot of time for briefing and so forth

9    could work prejudice to the plaintiff's claim simply because of

10   the passage of time.

11           I'm going to ask, what's the situation about Jada now?

12           MR. CHARNEY:  Jada, her mother -- her mother's

13   attorney is actually sitting at the end of the table here,

14   that's Susan Barie.  She's the attorney for Jada's birth mother

15   in the family court.  Jada's mother, Latoya Chapman, signed

16   what's called a conditional surrender last year.  She

17   surrendered her parental rights in Jada only on the condition

18   that the Riveras adopt her.  The Riveras began filling out the

19   paperwork for Jada's adoption last year.  Jada has now been

20   removed, the process has stopped with respect to Jada and

21   according to the foster care agency case worker who testified

22   before the family court on October 23rd, they're actively

23   looking for a new adoptive home for Jada.

24           Jada's mother wants her to be adopted by the Riveras.

25   I'm not going to speak for them, but in my discussions with

6C4FRIVC

1    them they have stated they're in support of the Riveras

2    adopting Jada and, of course, the Riveras are interested in

3    adopting Jada.

4              THE COURT:  The Legal Aid Society represents Jada,

5    right?

6              MS. ABBEY:  Yes, your Honor.  We do represent Jada.

7    We very much want Jada to return to the Riveras.  She very much

8    wants to return there immediately.  She has lived there nearly

9    all her life and they've been separated for --

10             THE COURT:  She's how old?

11             MS. ABBEY:  She's nine.  She's been there since 1998,

12   and she was removed earlier this year and she very much wants

13   to return.  We'd like that to happen immediately.

14             THE COURT:  And her natural mother --

15             MS. BARIE:  I represent her natural mother and that's

16   exactly what the natural mother wants as well.

17             THE COURT:  What's preventing that from happening?

18             MR. CHARNEY:  That's part of the reason we brought

19   this lawsuit, your Honor, because ACS has not provided us

20   literally any reason.  It would be one thing if they provided

21   us --

22             THE COURT:  Let me just interrupt.  The evidence

23   before me in September was not so simple.  It was not so

24   simple.  It wasn't that the Riveras were engaging in any child

25   molestation or anything like that, but this young man by the

6C4FRIVC

1    name of Johnson was coming up to see the Riveras' daughter, I

2    think her name was --

3        MR. CHARNEY:  Rhonda, your Honor, yes.  The Riveras'

4    adult daughter.

5        THE COURT:  And the evidence was quite clear that he

6    was acting -- that the little infants would go over to that

7    part of the house where he would come.

8        MR. CHARNEY:  Your Honor, I don't know if that's

9    accurate.

10        THE COURT:  Well, let me finish.  And that Jada and

11    the two other infants, foster kids, would go over to this part

12    of the house, and Johnson would be there and what I found was

13    that there was evidence that he was not literally physically

14    molesting the little girls, but that he was talking in a way,

15    in an enticing way, in a sexy way, and that that was a problem.

16        MR. CHARNEY:  Well, your Honor, two things.  The

17    report that you're referring to, which is in evidence in this

18    case, actually does not say that.  It concludes, it has several

19    conclusions after a three-month investigation, that not only

20    did Mr. Johnson not sexually abuse the children, but he also

21    didn't what's called provide inadequate guardianship, which is

22    kind of a catch-all phrase about the things you're talking

23    about; exposing children to inappropriate materials, saying

24    inappropriate things to them, touching them in inappropriate

25    ways, all of that was found to be unsubstantiated.  In

6C4FRIVC

1    addition, the report you're referring to --

2            THE COURT:  When was it found unsubstantiated?

3            MR. CHARNEY:  It was found unsubstantiated in July of

4    this year, prior to this lawsuit.  That's why we brought this

5    lawsuit, your Honor.

6            THE COURT:  I apparently felt there was enough

7    evidence of that to cause me to deny the relief sought by the

8    plaintiffs then.

9            MR. CHARNEY:  Respectfully, your Honor, all you

10   addressed was the initial removal decision.  We're not

11   contesting that at this point.  We're questioning the continued

12   detention of the children even after a thorough investigation

13   determined that there was no abuse or neglect in the Rivera

14   home.  In addition, Mrs. Rivera has not permitted Mr. Johnson

15   to enter her home since April.  It's now been seven months.

16   The agency went to the home in August.  He wasn't there.  They

17   looked around the house.  They were aware of the situation,

18   they're the ones that removed the children initially and they

19   made a determination, I'm talking about Family Support Systems.

20   ACS overruled them and they have not provided us with a reason

21   why.  To have absolutely no reason, an absence of a reason for

22   doing something is clearly -- that's arbitrary and capricious

23   and unconstitutional.

24           THE COURT:  Basically, all I said at the time was, and

25   I looked at the transcript, there were factual issues, and the

6C4FRIVC

1    authorities were engaged in due process about those issues.

2    Now, if the issues have been resolved, and if the issues have

3    definitely been resolved and if the young man Johnson is not

4    allowed back in the home, then if in the course of this process

5    that has been worked out --

6         MR. CHARNEY:  But that's the problem, your Honor.

7         THE COURT:  Please, let me finish.

8         MR. CHARNEY:  I'm sorry.

9         THE COURT:  If that has been worked out, then it seems

10    to me due process has got to lead to some result.  It can't

11    just be processed forever, and if in the due process it is

12    established that the one source of danger that I felt, and that

13    was Johnson being around there, not the Riveras, I repeatedly

14    said the Riveras were totally innocent of any wrongdoing, but

15    my only concern was this fellow.  And if that has been resolved

16    in the course of the process, then there should be a result of

17    that process consistent with that resolution.

18         MR. CHARNEY:  We agree, your Honor.

19         THE COURT:  So, Mr. Levine, what has been the result?

20    There's been a lot of time for investigation or hearing and

21    everything you could possibly think of.  What has been the

22    result of this process, because that is what I found in my

23    bench ruling, that that could go on, but there's got to come an

24    end to that process.  What's been the result of that process?

25         MR. LEVINE:  Your Honor, we do not believe that the

6C4FRIVC

1    OCI investigation, which found the facts that you found, merely

2    made the conclusion that the mistreatment allegation was

3    unfounded, is not conclusive.  The agency --

4         THE COURT:  Well, what has happened to that?  Who has

5    investigated what, and what is --

6         MR. LEVINE:  Your Honor, the agency still believes

7    that the Riveras did not give --

8         THE COURT:  Who has investigated to determine, first

9    of all, whether the original, whether this sexy conduct ever

10   went on, and secondly, has the source of the sexy conduct been

11   excluded?

12        MR. LEVINE:  We don't know the answer to that, your

13   Honor.

14        THE COURT:  How can you not know the answer on

15   December 4th?

16        MR. LEVINE:  Because, your Honor, once the children

17   were removed, there was no supervision of the household.

18        MR. CHARNEY:  Your Honor, first of all, that's not --

19        THE COURT:  Please.  Mr. Charney, why don't you sit

20   down.  What do you mean, no supervision of the household?  Why

21   would there be?

22        MR. LEVINE:  There would not be, your Honor, because

23   they're no longer foster children.

24        THE COURT:  That's just no answer.  It's just no

25   answer at all.

6C4FRIVC

1          MR. LEVINE:  Your Honor, I understand it has a certain

2     circular logic.  However, in the sense that there is nothing to

3     assess at this point, but the assessment that the agency made

4     was that there was a danger, your Honor saw the --

5          THE COURT:  But that assessment was made when?

6          MR. LEVINE:  That was made in March and April, your

7     Honor.

8          THE COURT:  That's a long time ago.

9          MR. LEVINE:  I know, but one of the problems was, and

10    the report references that, is that Mrs. Rivera was defending

11    Johnson, calling the girls liars and defending Johnson and that

12    was the true source and the continuing source of the agency's

13    concern about her providing appropriate guardianship and

14    protection.

15         THE COURT:  Is there some finding that she was

16    falsifying in what she said about Johnson?

17         MR. LEVINE:  They didn't make a finding.  They pointed

18    out in their interviews --

19         THE COURT:  Pointed out in what, in some document?

20         MR. LEVINE:  In the OCI report that your Honor

21    referred to.

22         THE COURT:  In September?

23         MR. CHARNEY:  No.

24         MR. LEVINE:  In March.  At the time of the removal,

25    your Honor.

6C4FRIVC

```
 1              THE COURT:  Look, that's ancient history by now.
 2              MR. LEVINE:  No, there has not been an independent
 3    evaluation of the appropriateness of the home since that time,
 4    your Honor.
 5              THE COURT:  I have to tell you, one reason I denied
 6    the plaintiff's relief, I thought a process was going on.  But
 7    what you're telling me is no process is even going on.
 8              MR. LEVINE:  No, your Honor, that's the OCI process.
 9    The fair hearing process --
10              THE COURT:  What's the OCI, what does it mean?
11              MR. LEVINE:  That was the office of confidential
12    investigations.
13              THE COURT:  That's a City agency?
14              MR. LEVINE:  That's part of ACS, your Honor.
15              THE COURT:  ACS is what?  What does that mean?
16              MR. LEVINE:  Administration for Children's Services.
17              THE COURT:  Administration for Children's Services?
18              MR. LEVINE:  Yes, your Honor.
19              THE COURT:  And the OCI is part of that?
20              MR. LEVINE:  Yes.
21              THE COURT:  But the ACS is in charge of things, aren't
22    they?
23              MR. LEVINE:  That's correct, your Honor.
24              THE COURT:  And have they had any kind of inquiry,
25    made any kind of inquiry, investigation or whatever you want to
```

6C4FRIVC

1    call it, to determine what's the situation about this Johnson

2    fellow?  That was the problem.

3              MR. LEVINE:  I understand, your Honor, but not since

4    that time.  The independent review was held --

5              THE COURT:  I'm asking you about the ACS.  The ACS

6    is --

7              MR. LEVINE:  It has not made a further formal

8    investigation.

9              THE COURT:  Then there's no process by ACS, then?

10             MR. LEVINE:  Your Honor, the process was to evaluate

11   what happened.  They made the removal.  The parents had the

12   right to challenge, which they did.  They went to the

13   independent review, and then they went to the fair hearing.

14             THE COURT:  Independent review is what?  Conducted by

15   the state?

16             MR. CHARNEY:  No.

17             MR. LEVINE:  That's conducted by the City.

18             THE COURT:  Part of the ACS?

19             MR. LEVINE:  Yes.  They then went to the State.

20             THE COURT:  What happened at the independent review?

21             MR. LEVINE:  The removal was upheld at the independent

22   review.

23             MR. CHARNEY:  Your Honor, I just have to interrupt for

24   one second.

25             THE COURT:  Wait a minute, sit down.  Had the

6C4FRIVC

1    independent review finished by the time of my September

2    hearing?

3          MR. LEVINE:  Yes, your Honor.

4          THE COURT:  What?

5          MR. LEVINE:  Yes.

6          THE COURT:  And the independent review, what, did they

7    issue some findings or what?

8          MR. LEVINE:  They just held it as informal.  The

9    plaintiffs appealed for the fair hearing.

10          THE COURT:  The independent review, did they issue

11    some decision or finding or ruling?

12          MR. LEVINE:  Yes.

13          THE COURT:  And what was that?

14          MR. LEVINE:  That the removal was justified.

15          THE COURT:  And all right, the removal was justified

16    and the removal took place back in what, March?

17          MR. LEVINE:  March.

18          THE COURT:  Okay, and they didn't consider they had to

19    worry about what was the current situation?

20          MR. LEVINE:  No, your Honor.  That was challenged then

21    to the fair hearing, and I believe that there were four days of

22    hearings at the fair hearing which concluded --

23          THE COURT:  Who conducts the fair hearing; the State?

24          MR. LEVINE:  The State.  They concluded on November 7,

25    and they're awaiting decision on that.

6C4FRIVC

| | |
|---|---|
| 1 | THE COURT:  Decision is still being awaited? |
| 2 | MR. LEVINE:  Since November 7, your Honor. |
| 3 | THE COURT:  When is that decision going -- Mr.  -- |
| 4 | MR. KRAFT:  Kraft, Judge. |
| 5 | THE COURT:  When is the decision coming out? |
| 6 | MR. KRAFT:  I spoke with the head of fair hearings. |

7   He pointed out to me it was four days of hearing, it was a long

8   transcript.  The transcript has now been provided to the

9   administrative law judge for her review, and she's expected to

10  get her draft decision done either this week or next week, send

11  it up to the commissioner's designee and the commissioner's

12  designee will either approve it or tell her that based on the

13  facts she ought to write a new one, but that's how the process

14  works.  The administrative law judge drafts a decision based on

15  the transcript and the commissioner's designee reviews it.  I

16  expect a decision by the end of this month, hopefully sooner.

17          THE COURT:  What were the issues before the

18  independent -- what do you call it, independent hearing?

19          MR. KRAFT:  The fair hearing, Judge?

20          THE COURT:  The fair hearing.

21          MR. KRAFT:  I don't know exactly what issues were

22  raised there, because I don't get involved with them until

23  after there's a decision made.  I know that under the law, the

24  issue that could be brought there was whether the removal from

25  the Riveras was proper, and what specific issues were brought

6C4FRIVC

1        there, I don't know yet, Judge.

2                MR. CHARNEY:  Your Honor, that reaffirms the fact that

3        the more present inquiry of whether it would be proper to

4        return them now is not a subject of that hearing.  The Riveras

5        have not had an opportunity to have that issue addressed

6        anywhere, as Mr. Levine and Mr. Kraft have now acknowledged.

7        All that anyone seems to be focused on is the initial removal

8        decision and no one is doing a more current assessment of

9        whether their home is appropriate.  That's the problem, we're

10       not getting a hearing on that issue anywhere.

11               THE COURT:  Well, I have to tell you that I'm not

12       clear as to the extent of my power to deal with what I'll call

13       updating.  The lawsuit was brought, and I think this is the

14       only way it could be brought, claiming that the removal was a

15       violation of due process.

16               MR. CHARNEY:  But we also said that the continued

17       separation was a violation.  Because by the time we sued here,

18       we already knew that the OCI report had found everything

19       unsubstantiated, because that happened in July, so by

20       September --

21               THE COURT:  You go so fast, I can't follow you.

22               MR. CHARNEY:  Your Honor, in our complaint which we

23       feel was clearly pled, we said that it was not only the removal

24       that was unconstitutional, but it was the continued separation

25       of the children from the Riveras, even after the initial cause

6C4FRIVC

```
 1    for the removal had been invalidated.  In other words, this
 2    allegation of --
 3                THE COURT:  Did the OCI make a finding?
 4                MR. CHARNEY:  Yes, in July.
 5                THE COURT:  And did the OCI make a finding that there
 6    had been no misconduct at all on the part of Johnson?
 7                MR. CHARNEY:  In July.
 8                THE COURT:  Did they make a finding that --
 9                MR. CHARNEY:  Yes.  Your Honor, you have it as Exhibit
10    7.  It says all of the allegations, I can read it directly for
11    you.  All of the allegations are unsubstantiated, all of them.
12    That's the wording they used.  Now, there's pages and pages of
13    interviews that they did --
14                THE COURT:  All?
15                MR. CHARNEY:  Exhibit 7.
16                THE COURT:  I don't think that's the case.
17                MR. CHARNEY:  If you look at --
18                THE COURT:  Because I had that at the time of my
19    September hearing.
20                MR. CHARNEY:  Yes, you did, your Honor.
21                THE COURT:  Did they deal with the issue about Johnson
22    making sexy remarks to the little children?
23                MR. CHARNEY:  Your Honor, I would submit if you read
24    that report from page 1 to -- I don't know, page 24, you will
25    notice that there are notes taken by the investigator with
```

6C4FRIVC

1    interviews with all of the girls where they do say things about

2    Mr. Johnson, many of which contradict with each other, and then

3    if you turn to, I believe it's page, let's see, actually, it's

4    at the beginning.  If you look at page 4, I believe, page --

5    I'm sorry, not page 4.  Page 6.  If you look at page 6 of that

6    report, it says under Section C, it says "determination."  And

7    it says, "No evidence has been uncovered to substantiate the

8    allegations.  OCI has unfounded this case against Leandro

9    Johnson."

10            THE COURT:  Where are you reading?

11            MR. CHARNEY:  Page six.  Do you see where there's a

12   heading that says "unsubstantiated allegations"?  It's like a

13   big, bold font, Section C and then it says "unsubstantiated

14   allegations."

15            THE COURT:  No, I don't see that.

16            MR. CHARNEY:  I don't know if we --Exhibit 7.  It's

17   Exhibit 7 to our papers.

18            THE COURT:  Exhibit 7 to Ms. Kubitschek?

19            MR. CHARNEY:  Yes, and if you look at page 6, I

20   believe.

21            THE COURT:  Where does it say "unsubstantiated"?  I'm

22   on a different --

23            MR. CHARNEY:  The confusing part is there's two page

24   6's, unfortunately.

25            THE COURT:  I think there are.  Now, let me get your

6C4FRIVC

```
 1   page 6.  Okay.  I don't think that is what OCI found.
 2            MR. CHARNEY:  A couple of pages I would point out,
 3   page 4, two pages prior, it lists all of the allegations as to
 4   each of the children against both Mr. Johnson and Miss Rivera,
 5   and it lists in the far right column the status of all the
 6   allegations, that all are marked unsubstantiated.
 7            And then lastly, if you turn to the very last page of
 8   this report --
 9            THE COURT:  I would appreciate if you would focus on
10   what I found, not on something some other allegations as far
11   as, you know, literal, whether the children were physically
12   abused.  I never found that.  Please focus on what I found.
13            MR. CHARNEY:  Your Honor, my point --
14            THE COURT:  And I don't think I was dreaming.
15            MR. CHARNEY:  My point is, your Honor --
16            THE COURT:  I'm not interested right now in your
17   point.  Where in this material is there -- where does it deal
18   with what I found?
19            MR. CHARNEY:  I would look at pages 5 to 7, then, and
20   this would be the second pages 5 to 7, where each of the girls
21   is interviewed about what Mr. Johnson allegedly did, and you'll
22   notice that each of their stories seems to contradict the
23   others, and it is our submission that that piece of it, as well
24   as everything else that they looked at, led them to conclude
25   that nothing had happened, because that's what they -- they
```

34

6C4FRIVC

1    investigated everything.  It wasn't just the sexual abuse.

2    They investigated all the things that your Honor is concerned

3    about.  They looked into it, and they made a determination that

4    nothing that Mr. Johnson was alleged to have done in fact

5    happened.  Because they unsubstantiated everything.

6            MR. KRAFT:  That's not correct.

7            THE COURT:  You are not helping me at all.  It's as if

8    you're talking about a different set of allegations that I'm

9    talking about.

10           MR. CHARNEY:  Your Honor is concerned that Mr. Johnson

11   exposed the girls to the inappropriate material --

12           THE COURT:  I didn't say anything about inappropriate

13   material.

14           MR. CHARNEY:  Said inappropriate things, touched them

15   inappropriately --

16           THE COURT:  I didn't say anything about touching.

17           MR. CHARNEY:  What is your Honor concerned about what

18   Mr. Johnson has done?

19           THE COURT:  Don't you remember what I said on

20   September 14?

21           MR. CHARNEY:  Your Honor made reference to

22   Mr. Johnson, I believe, engaging in inappropriate conduct with

23   children.  Your Honor correctly pointed out that he may not

24   have sexually abused them, or had intercourse with them, but

25   that he had engaged in some other form of inappropriate

6C4FRIVC

1    behavior, and it's my submission that this report addresses all

2    of those concerns, the inappropriate behavior that your Honor

3    is concerned about.  That's my point.  I'm sorry if I did not

4    make myself clear.

5              MR. LEVINE:  Your Honor, may I respond?

6              THE COURT:  Just a minute.

7              MR. LEVINE:  Sorry, your Honor.

8              THE COURT:  Do you have the transcript of September?

9              MR. CHARNEY:  Yes, I do, your Honor.

10             THE COURT:  On page 51, I make findings very favorable

11   to the Riveras, as far as their personal conduct, and down at

12   the bottom, I said, the bottom of the page, there's no evidence

13   at all that they facilitated anything in the way of sexual

14   misconduct.

15             MR. CHARNEY:  You're right, your Honor.

16             THE COURT:  And then I said the evidence would

17   indicate that as to Mr. Johnson, they forbad him to come back

18   to the building, the building meaning the two dwellings.

19             MR. CHARNEY:  Yes.

20             THE COURT:  And then I go on on page 52 to say, "But

21   the issue is whether despite all I've said whether there was

22   grounds for the authorities to remove the children, and such

23   grounds can arise despite the best efforts, the best intentions

24   and the good faith of the Riveras.  What apparently is the case

25   is that this Mr. Johnson was a very frequent visitor of the

6C4FRIVC

1    adult daughter in her home, which was in the building and was a

2    separate home from the Riveras.  In other words, the adult

3    daughter had her home in this building, and the Riveras and the

4    children they cared for had their home in the other part of the

5    building.  But circulation went back and forth and the adult

6    daughter was hardly a stranger to the Riveras.  This was their

7    adult daughter.  And so the indications are, then, and the

8    facts would appear to be, that this Mr. Johnson visited the

9    adult daughter a great deal and the situation in the Riveras'

10   part of the house was somewhat complicated, because there were

11   two teenaged daughters, Ashley and LaPortia, who were not part

12   of this lawsuit, as well as the three girls under ten years

13   old; Jada, Bryanna and Erica.

14          "It appears that LaPortia accused Johnson in engaging

15   in sexual intercourse with her and this was ultimately reported

16   to the authorities.  And on the basis of that report, LaPortia

17   and Ashley and Erica and Bryanna and Jada, all five were

18   removed from the Riveras' home."

19          And then I say, I'll repeat, that there was no

20   negligence or intention on the part of the Riveras.  And then I

21   go on:  "I believe that the sequence of events was the

22   accusation then the removal of the children and then further

23   development of the facts.  And the further development of the

24   facts involved, first of all, LaPortia repudiating her

25   accusation that Johnson had sex with her."

37

6C4FRIVC

1          And then I say that, "Nevertheless, there were factual

2    issues," and so forth, at the bottom of 53.  And then at the

3    top of 54, I said, "The investigation indicated that although

4    probably Johnson did not have sex with LaPortia, as she accused

5    him of, Mr. Johnson was speaking and acting in a way which was

6    designed to allow some romance with these little girls or two

7    of them and to entice them."

8          Now, that was a very, very brief statement, but -- oh,

9    and page 55.  "There was a serious accusation of sexual

10   intercourse, which was later disproven, I guess -- I am

11   certain."  I spoke very briefly about Johnson's other conduct,

12   at the top of 54, but it was not brief in my mind, and it

13   seemed, and my memory is that this was supported in the

14   investigative material that was before me.

15          MR. CHARNEY:  Your Honor, I guess my question would

16   be, though, all the material you had before you, the

17   investigation you're referring to, had to do with the initial

18   removal itself.  Our concern here is that the Riveras don't

19   seem to have any avenue for seeking the return of the children

20   at this point, and your Honor very astutely pointed out, ACS

21   and the State are not providing a process that deals with the

22   current situation.  And by current, I mean as of July, when the

23   children had already been removed, this investigation was

24   completed, Ms. Rivera said she had banished Mr. Johnson from

25   the home.  There was no ability at that point, there was no

6C4FRIVC

1    avenue for the Riveras at that point to seek the return of

2    these girls.  And the Family Court won't let them have a

3    hearing.

4            As Mr. Kraft just got through saying, the fair hearing

5    is not the proper place, that's just where they can deal with

6    the original removal decision.  There is nowhere for the

7    Riveras to go to get a hearing on the issue of whether the

8    girls can come home now.  The clock is ticking.  It's now been

9    eight months since they were removed.  You yourself found the

10   Riveras themselves did nothing wrong, and we're left with a

11   situation where ACS is not providing either a process for

12   seeking return or a substantive reason for why today they won't

13   return the children.

14           We know why they took the children, we don't know why

15   they took them today, and we can't get an explanation from them

16   and we can't get a hearing on this issue and that is a

17   violation of the Riveras' constitutional rights.

18           THE COURT:  Let me say this to Mr. Levine.  All I know

19   on September 14 was that there was an accusation which

20   justified the removal, and that accusation was the accusation

21   by LaPortia that Johnson had had sex with her, and I felt that

22   that was an indication of enough danger and so forth that it

23   justified the removal.  I'm sure that's what I was referring to

24   when I said that the removal was justified.  And then I

25   referred to this conduct of Mr. Johnson vis-a-vis the little

6C4FRIVC

1    children, the three little infants that are involved in this

2    case.

3            But what I really was saying was there were factual

4    issues and it appeared to me then that the authorities were

5    providing a process.  Now, it seems to me very clear as a

6    matter of law that due process requires something besides

7    having perhaps issues which justified removal.  You can't stop

8    there.  There has to be a process to resolve the issues.  That

9    is due process.  And there has to be some process to resolve

10   issues in some reasonable time, and I don't think the City has

11   that process, and that's the problem.  And it was a problem in

12   another case where a huge amount of time went by, and it was

13   very hard to put things back together again.  I don't remember

14   what we actually did, but what seems to me absolutely evident

15   is there is no process.

16           What was certainly contemplated by me is that the City

17   authority which did the removal or authorized the removal would

18   engage in a process, reach a resolution and have some finding

19   or conclusion that the removal should be continued.  In other

20   words, there was a removal on a particular day, but surely

21   there was an issue about whether that removal should continue,

22   and I contemplated that, and I thought there was a process.

23           I don't think there is any process.

24           MR. LEVINE:  Your Honor --

25           THE COURT:  I just don't think there's any process at

6C4FRIVC

1    all, and I've heard this before.  The independent review

2    conducted by the State.  In the first place, it's woefully late

3    in occurring, and I've heard over and over again that the State

4    doesn't make a decision that is binding on anybody.  The State

5    doesn't issue an order to the City, and it's the City who

6    removed and has the responsibility to either keep these people

7    removed or send them back to their foster parents, the Riveras.

8    And there is no process.

9            I've heard of nothing that amounts to me even a

10   semblance of due process.

11           MR. LEVINE:  In the first instance, your Honor, we

12   believe that contrary to the position the State takes, the fair

13   hearing judge has the right to require the --

14           THE COURT:  Well, that's a nice disagreement.  It

15   seems to me -- haven't you told me that, that the State has no

16   authority to order the City?

17           MR. LEVINE:  The State says so.  The City doesn't

18   believe so.

19           THE COURT:  Well, that's a wonderful due process

20   situation, where the State thinks one thing and the City thinks

21   another.  Is that due process?

22           MR. LEVINE:  Your Honor, the due process from that

23   point --

24           THE COURT:  It's a ridiculous process.

25           MR. LEVINE:  It is an Article 78 proceeding, and the

6C4FRIVC

1    state court has the right to do that.

2            THE COURT:  Now, look here.  Don't tell me about

3    Article 78.  There was a valid lawsuit brought in this court

4    alleging violation of constitutional rights, and this court has

5    jurisdiction over such a case, and this court is not going to

6    be told, well, the matter should now go to the state court.

7            MR. LEVINE:  Respectfully, I don't want to antagonize

8    the court, but we believe the court lacks subject matter

9    jurisdiction, I must say that for the record, under the

10   domestic relations exemption to federal questions.

11           MR. CHARNEY:  Your Honor, that issue has been briefed

12   I think four times and your Honor correctly decided in the

13   Haynes case that that exception does not apply in this

14   situation.

15           THE COURT:  We've got to assume, unless the Court of

16   Appeals corrects me, that I have jurisdiction where plaintiffs

17   such as these sue, claiming that there was no due process in a

18   removal of foster children from them, and that's what I've held

19   basically in this case and in other cases, and unless the Court

20   of Appeals holds otherwise, that's my position.

21           Now, the thing is, I want to, I am very much dedicated

22   to the idea that as long as the local authorities are acting

23   with reasonable procedures to ascertain the facts and to make a

24   decision as to whether the removal from the Riveras not only

25   was justified but continues to be justified, that is due

6C4FRIVC

1    process.  But when I hear what has gone on in this case, I

2    don't have confidence that that is occurring.

3              MR. LEVINE:  Your Honor, may I --

4              THE COURT:  It seems to me that ACS and OCI have

5    really not followed through and made a determination about

6    whether the continued removal is justified.  What I believe has

7    occurred is, that they have been concerned almost exclusively

8    about whether the original removal is justified.  So if you can

9    point out to me some finding, it doesn't have to be current as

10   of today, but some finding that follows up the aftermath of

11   that removal, and makes a finding as to whether or not the

12   continued removal from the Riveras is justified, I would be

13   most glad to see it.  Is there such a finding?

14             MR. LEVINE:  Your Honor, as you pointed out at the

15   beginning of this argument, we view this as a motion for

16   reconsideration and not really an application for a new

17   injunction.  I would like a week's adjournment to respond to

18   the Court with respect to this.

19             MR. CHARNEY:  Your Honor, whether or not this is, what

20   kind of motion it's treated as, the City has now been on notice

21   for, we filed this motion, I believe the beginning of October,

22   in which we brought all these issues to the Court's attention,

23   the later events, the more recent events.  So the City has had

24   now two months to respond to it, and they have not addressed it

25   in either of their responsive sets of papers.

6C4FRIVC

| | |
|---|---|
| 1 | THE COURT:  Let me say this -- |
| 2 | MR. LEVINE:  Your Honor, that's because -- |
| 3 | THE COURT:  Let me say this. |
| 4 | MR. LEVINE:  Sorry. |
| 5 | THE COURT:  I don't think it was just a little minor |

semantic difficulty.  I think to call this a motion for
reconsideration really was making the wrong motion.  And that
has some consequences.  What I will do is to grant a week
adjournment, and what I would like to do is to follow this
closely.  We will have a hearing in a week, and either that day
or -- I don't want to ruin anybody's weekend -- that day or the
previous Friday, but I need to have information in response to
my question, and that is has ACS or any entity within ACS made
a finding as to whether the continued removal from the Riveras
of these three girls is justified.

    MR. LEVINE:  Your Honor --

    THE COURT:  And that is my question.  I'd like it
answered, and as far as the State is concerned, I would like to
know from the State everything that can possibly be known by a
week from now about the independent, what do you call it,
review.

    MR. CHARNEY:  The fair hearing, your Honor.

    THE COURT:  The fair hearing.

    MR. LEVINE:  May I, your Honor --

    THE COURT:  Just a minute.  The fair hearing.  I will

44

6C4FRIVC

1  say I am directing the State to have some finding by a week

2  from today.  This has gone on too long, and if they can't

3  produce something at this late date, then I will rather be

4  inclined to say that the State is not providing due process.  I

5  want some finding from the fair hearing by a week from today.

6  That is a direction.  We'll have a hearing a week from today,

7  and that's the direction of the Court.

8             Thank you very much.

9             MR. CHARNEY:  Just one other matter, your Honor.

10             THE COURT:  What?

11             MR. CHARNEY:  I just wanted to ask, this hearing that

12  we have a week from now, is there going to be testimony and the

13  opportunity to question witnesses?  In other words, if ACS

14  provides you with some kind of documentation or finding, would

15  we have the opportunity to question the people that wrote that

16  report?  Because otherwise --

17             THE COURT:  No.  Not then.  Let's see.  What should

18  come out of this process, if there is a process, and I'm not

19  really sure there is anything, but what there should be, not

20  witnesses coming in here, but there should be written

21  descriptions of what investigation or inquiry has taken place,

22  and findings.  That's the kind of thing that one would expect

23  from these agencies, and that's the kind of thing that my

24  problem is, that doesn't exist.  I hope it does exist, but

25  that's a very different thing than having a bunch of people

6C4FRIVC

1    come in who should be rendering reports and so forth, and

2    testifying.   I don't want that next Monday.

3              (Adjourned)

6CBCRIVH

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      MABEL and ANTHONY RIVERA,
 3
                   Plaintiffs, .        New York, N.Y.
 4
             v.                         06 R. 7077 (TPG)
 5
      MATTINGLY, et al., etc.,,
 6
                   Defendants.
 7    ------------------------------x

 8                                      December 11, 2006
                                        2:45 p.m.
 9    Before:

10                   HON. THOMAS P. GRIESA,

11                                      District Judge

12                        APPEARANCES
      LANSNER & KUBITSCHEK
13        Attorneys for Mabel and Anthony Rivea,
      DARIUS CHARNEY,
14    CAROLYN KUBITSCHEK,
          of Counsel.
15
      BROOKLYN LEGAL SERVICE CORPORATION A,
16        Attorneys for Latoya Chapman-Young.
      SUSAN BARRIE,
17        of Counsel.

18    THERESA B. MOSER,
          Attorney for Plaintiff J.C.
19
      LAW DEPARTMENT, CITY OF NEW YORK,
20        Attorneys  for New York City Defendants,
      JESSE I. LEVINE,
21        of Counsel.

22
      ATTORNEY GENERAL, STATE OF NEW YORK,
23        Attorney  for New York State Defendants,
      ROBERT KRAFT,
24        of Counsel.

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6CBCRIVH

1          (Case called)

2          MR. CHARNEY:  Darius Charney, Lansner & Kubitschek on

3    behalf of plaintiffs Mabel and Anthony Rivera as well as also

4    infant plaintiffs ES and BC.

5          MS. KUBITSCHEK:  Carolyn Kubitshek also from Lansner &

6    Kubitschek for the plaintiffs.

7          MS. BARRIE:  Susan Barrie, Brooklyn Legal Services

8    Corporation A, for Latoya Chapman-Young, biological mother of

9    Jada Chapman.

10         MS. MOSER:  Theresa Moser, Legal Aid Society, for the

11   infant Jada.

12         MR. KRAFT:  Robert Kraft From the New York State

13   Attorney General's office for the state defendant, Commissioner

14   Johnson.

15         MR. LEVINEE:  Joseph Levine, Assistant Corporation

16   Counsel, for the city defendants

17         THE COURT:  Do we have to refer to these initials?  I

18   thought we were referring to names.  I don't understand the

19   initials.

20         MR. CHARNEY:  The reason we are doing that, your

21   Honor, we can stop it for the hearing, but the caption now

22   reads, instead of the full names of the children, it has the

23   initials.  The caption was amended to comply with, I guess, the

24   district's privacy rules with respect to child parties.  I have

25   no objection to referring to them by name.  I am sure it's

6CBCRIVH

1    easier for your Honor, so --

2            THE COURT:  At least today.  Is it J-a?

3            MR. CHARNEY:  J-a-d-a.  Then you have Erica,

4    E-r-i-c-a, and then Bryanna, B-r-y-a-n-n-a.

5            THE COURT:  Those are the three?

6            MR. CHARNEY:  Yes.

7            THE COURT:  Ms. Moser, you represent?

8            MS. MOSER:  Jada.

9            THE COURT:  And Mr. Charney and Ms. Kubitshek, you

10   represent Erica and Bryanna?

11           MR. CHARNEY:  Yes, your Honor.

12           THE COURT:  As well as --

13           MR. CHARNEY:  Mabel and Tony Rivera.

14           THE COURT:  Refresh my memory also.  Ms. Rivera is

15   what relation to --

16           MR. CHARNEY:  Mr. and Mrs. Rivera are the great-aunt

17   and great-uncle of the three girls, on the -- I guess maternal

18   great-aunt and great-uncle; so they are -- the mothers of the

19   children are the nieces of Mr. and Mrs. Rivera.

20           THE COURT:  The mothers plural?

21           MR. CHARNEY:  Yes.  Erica and Bryanna have the same

22   mother and Jada has a different mother.  The relationship of

23   the three girls to each other is that Erica and Bryanna are

24   first cousins of Jada.

25           THE COURT:  You name again?

4

6CBCRIVH

1          MS. BARRIE:  Susan Barrie.  My client is the

2    biological mother of Jada Chapman.  Her name is Latoya

3    Chapman-Young.

4          THE COURT:  How do you spell your last name?

5          MS. BARRIE:  Barrie, B-a-r-r-i-e.

6          THE COURT:  Your client's name again?

7          MS. BARRIE:   Latoya Chapman-Young with a hyphen.

8          THE COURT:  She is the mother of --

9          MS. BARRIE:  Jada.

10         THE COURT:  Any developments since last week or last

11   time we were together?

12         MR. KRAFT:  Your Honor, I left with the court clerk a

13   transcript of the hearing which is completed.  I am submitting

14   it for in-camera -- for your in-camera review.  I have given

15   copies to the other parties, and in my declaration I am

16   requesting that your Honor permit me not to file it now since

17   it's large and since it's unredacted, and I request that

18   anybody -- you order that if they use it, attach it to papers,

19   that they do the redacting based on what pages they need to put

20   in.  This was a four-day hearing.  It was completed on November

21   7.

22         THE COURT:  Just a minute.  This is called what kind

23   of hearing?

24         MR. KRAFT:  This is called an administrative hearing

25   before the Commissioner of the Office of Children and Family

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6CBCRIVH

1    Services.

2             THE COURT:  It started when?

3             MR. KRAFT:  Started on -- well, started -- the first

4    formal hearing date was October 2.  Apparently there were some

5    appearances by some attorneys but not all the attorneys were

6    there on prior dates, but the first date evidence was taken was

7    October 2.  Apparently the hearing was requested in the spring,

8    but the plaintiffs asked to adjourn it for a couple of months

9    pending the report from the city's Office Of Confidential

10   Investigation.

11            That report, as your Honor is probably aware, didn't

12   come to plaintiff, so they had requested to put the hearing

13   off, and the hearing was supposed to start on September 18, but

14   Mr. Eyrman -- I believe that is spelled E-y-r-m-a-n -- who is

15   not here today, is the counsel for the agency defendants.

16            THE COURT:  The city?

17            MR. KRAFT:  Not the city, the city subcontractor.  I

18   forget the name of it.  It's in the caption.  Family Support

19   Services or whatever they are.  He is the counsel and he could

20   not appear at the hearing on September 18 because he was in

21   Family Court on this matter; so it was adjourned from September

22   18 and it started on October 2.  They had three more dates and

23   the last one was November 7.

24            The administrative law judge got the transcript,

25   reviewed it and wrote a draft decision.  The commissioner said

1    he'd sign the decision, I am told, on December 6.  It has been

2    sent up to Albany.  The decisions the different commissioner's

3    designees around the state write, they get sent to Albany to

4    one office where they get sequentially numbered and actually

5    issued.  They get date-stamped and issued by a single office in

6    Albany.  That decision should be issued shortly.  I hoped that

7    it would be issued today, but that has not happened.

8             I can tell you the outcome of the decision.  The

9    administrative law judge took a lot of testimony, including

10   some testimony from some city witnesses who were brought to

11   that hearing, I am not quite sure how, whether it was by

12   subpoena or otherwise, but the city employees testified and

13   agency employees testified, and I believe people testified on

14   behalf of the plaintiffs here, what they call the appellants in

15   the fair hearing, and the administrative law judge determined

16   that the removal was arbitrary and capricious, and she, the

17   administrative law judge, directed that the matter be remanded

18   to the city to examine the current circumstances of the

19   foster children, both the current foster care placement and the

20   Riveras, and the city has sixty days to make a decision about

21   the best place for these children.

22             That is the gist of what the decision says.

23   Obviously, there is reasoning behind that which I don't have

24   with me today.

25             THE COURT:  OCI is the Office Of Confidential

6CBCRIVH

1    Investigation; is that right?

2              MR. KRAFT:  Yes, Judge.  That is a city agency.

3              THE COURT:  When was the OCI ruling?  Mr. Levine, do

4    you remember that?

5              MR. LEVINE:  I believe it was in July, your Honor.

6              THE COURT:  July?  It seems to me we are faced with a

7    problem that I think came up in another case, and that is that

8    the original removal may have been a violation of due process,

9    and then there is process within the city and the state system

10   and it takes a long time for various reasons, maybe not with

11   anybody's fault particularly.  Then, at least in this case, we

12   have exactly the posture that has just been described, and the

13   issue is, does the federal court intervene now, or does the

14   federal court allow the process to conclude?  What is the

15   answer to that?

16             MR. CHARNEY:  Your Honor, if your Honor recalls from

17   the prior case where this exact same situation came up, what

18   happened was once the state made the rulings that the removal

19   was arbitrary and capricious and then sent it back to the city,

20   the city after 60 days, I guess, produced a report which the

21   plaintiffs in that prior case took a lot of issue with the

22   facts in that report.  However, there was no process for the

23   plaintiffs at that point to contest those findings because the

24   state's position was a fair hearing was held, it issued a

25   decision, and it sent it back to the city, because in the

6CBCRIVH

1    state's view, the city makes the final decision and that at

2    that point the state's involvement was done.  So there was no

3    opportunity for the plaintiffs in that prior case to be heard

4    on what the city did after the case came back to it.

5              THE COURT:  What did the city do?

6              MR. CHARNEY:  In that case the city recommended that

7    the children not be returned to that foster mother.  We came

8    before your Honor, I believe it was May 23 of this year, this

9    is in the Haines v. Mattingly case, I believe your Honor has

10   the transcript from that hearing as an exhibit in this case,

11   and again, the state and the city both stated that, you know,

12   at this point there were no more administrative processes for

13   the plaintiffs to pursue, and your Honor in that case ruled

14   that because there was no due process left for the plaintiffs,

15   no recourse, that the federal court would have to intervene at

16   that point and the federal court would have to decide that

17   issue, and just last week in this case --

18             THE COURT:  What did I do?

19             MR. CHARNEY:  You set a trial date for, I believe it

20   was July 31 to decide whether the children should be returned

21   to the plaintiffs or whether they should remain in their new

22   foster home, which was with nonrelatives.  The plaintiffs and

23   the city were able to resolve the case prior to trial and the

24   children -- I am sorry the child was returned to plaintiff.  So

25   the trial was not held, but your Honor had scheduled it.

6CBCRIVH

1          What I wanted to point out in this case though, your

2    Honor, is that last week your Honor directed the city by today

3    to provide an answer to your question as to whether the

4    continued removal of these three girls from the Riveras was

5    justified, and you have had a declaration, I believe, in front

6    of you that the city submitted this past Friday stating that

7    they don't have any other processes other than what they have

8    already done, and what they have already done admittedly they

9    admitted was just to look at the removal itself back in March

10   and April.  They have not looked into the current

11   circumstances.  So still yet nobody has done that.

12          THE COURT:  But it has gone to the state, and the

13   state has made a finding, and I gather from what was said that

14   the city would have responsibility now to decide what should be

15   done.  Isn't that right, Mr. Levine?

16          MR. LEVINE:  Yes, your Honor.

17          MR. CHARNEY:  But, your Honor, respectfully, that is

18   exactly what your Honor took issue with in the prior case.  You

19   were very irritated by that scenario.  You felt that that was

20   not adequate due process because you are giving it back to

21   essentially the same agency that made the wrong decision in the

22   first place and is not a objective decision-maker, and the

23   state effectively abdicated its responsibility to provide a

24   real remedy to the plaintiffs.

25          The remedy that the plaintiffs were searching for when

6CBCRIVH

1    they asked for this fair hearing was to have the children

2    returned to them, and the state believes it does not have the

3    authority to do that.  It won't order that even though the city

4    ruled that removal was improper.

5        THE COURT:  Let's go back to the prior case.  I could

6    be wrong, I could be completely wrong, but my memory is that

7    the record was somewhat different from what it is today, and my

8    memory is that the state fair hearing was really in a vacuum.

9        MR. CHARNEY:  In the prior case you mean?

10       THE COURT:  In the prior case, and that nothing was

11   going to be done by the state or by the city.  Am I right or

12   wrong?

13       MR. CHARNEY:  Well, in the prior case, your Honor, you

14   are correct that in that hearing they focused on the original

15   removal, and last week Mr. Kraft stated that that's what they

16   do in fair hearings:  They examine the original removal

17   decision at that time, and your Honor questioned both

18   defendants as to what about looking at the current

19   circumstances because the Riveras are seeking return of the

20   children now, and you had asked --

21       THE COURT:  You are talking about what was done in the

22   prior case?

23       MR. CHARNEY:  Well, in the prior case, that was part

24   of the problem, they only looked at the original decision.

25       THE COURT:  Right.

6CBCRIVH

1          MR. CHARNEY:  And then they sent it back to the city,

2   and your Honor felt that was not an adequate process, and they

3   are doing the exact same thing in this case.  The Riveras are

4   seeking return of the children.  That is the only reason they

5   pursued a fair hearing, because these are their grand-nieces,

6   they want them to live with them, and they don't have any

7   recourse in Family Court, state Family Court.  They only have

8   this administrative process.

9          In the Family Court they asked for a hearing on the

10  issue that your Honor is interested in, which is whether the

11  children should come back now.  The Family Court refused to

12  hear it.  You have the decision from the Family Court judge

13  from, I believe it was November 29, stating that the Riveras

14  don't have a right to a hearing in Family Court.  It's Exhibit

15  9, I believe plaintiff's Exhibit 9, so there really is no

16  forum.

17         THE COURT:  Let me just get Mr. Kraft.  Mr. Kraft, two

18  questions:  Does the decision deal at all with what should be

19  done now or just deal with whether the removal was right or

20  wrong?

21         MR. KRAFT:  The decision discusses the testimony of

22  people who testified at the hearing, which was in October of

23  2006, which is a lot more current than the removal date, and

24  the hearing judge assessed credibility and found some people

25  not credible and some people more credible, so she brought her

6CBCRIVH

1    findings up to her hearing date.  The final decision was that

2    the city has to apply the law and the facts that it knows about

3    the current foster placement, which were not discussed at the

4    hearing, and the Riveras' foster home, which was discussed at

5    the hearing.  The city has to decide what to do with this

6    child.

7         THE COURT:  In other words, the decision does not make

8    any finding, conclusion, or recommendation about what should be

9    done now; is that right?

10        MR. KRAFT:  Not beyond directing the city to consider

11   both foster homes.  It doesn't pick a particular thing, and the

12   reason it doesn't --

13        THE COURT:  That is fine, but does the decision direct

14   the city to do something or just leave it up in the air?

15        MR. KRAFT:  It directs the city to make a decision

16   within 60 days about the appropriate placement of these three

17   foster children based on current circumstances.

18        The city -- before saying that, the decision takes

19   some pains to criticize the city for the removal, and so if you

20   read that decision along with whatever current investigation

21   the city may do, the city may be well inclined to re-place

22   these children with the Riveras; but the state's position

23   continues to be that whether these plaintiffs, the Riveras,

24   that is, like it or not, custody of these children is not now

25   in the Rivera family.  Custody of these children is with the

6CBCRIVH

1    local Commissioner of Social Services, and the state does not

2    believe that the law empowers it, the state, to tell a local

3    commissioner where to place the children.

4            THE COURT:  All right, fair enough.  I understand.

5            MR. KRAFT:  That is the position.

6            THE COURT:  All right, let's forget about the prior

7    case.  There may be some similarities, some differences, but we

8    are talking about this case now.  Mr. Levine, what will happen

9    now in view of what Mr. Kraft has said?  What will happen on

10   the City's side?

11           MR. LEVINE:  The city will conduct a full

12   investigation of the Riveras' home and the current placement,

13   and decide which is appropriate.  I think it's very important

14   that that be done for the following reason, your Honor:

15   Although the infant Jada and her mother want to go back to the

16   Riveras, the other two, Erica and Bryanna, do not want to go

17   back to --

18           MR. CHARNEY:  That is not true, your Honor.

19           THE COURT:  Wait a minute.  One at a time.

20           MR. CHARNEY:  That is not true.  I want the record to

21   reflect that is not true.

22           THE COURT:  Why don't you let Mr. Levine speak.

23           MR. LEVINE:  They brought counsel prepared, and they

24   had not brought counsel for the infants and anyone else, and

25   there is a big difference, your Honor.  The permanency plan

6CBCRIVH

1   with respect to Erica and Bryanna is return to the mother.  The

2   permanency plan --

3              THE COURT:  Permanency plan developed by whom?

4              MR. LEVINE:  By the court.

5              THE COURT:  The Family Court?

6              MR. LEVINE:  Yes.  So that they don't -- the birth

7   mother of Erica and Bryanna and her attorney put in an

8   affidavit in the Family Court opposing the information, is that

9   they don't want those children to go back, whereas Jada's

10  representative indicated they do want her to go back.  So it's

11  important that the Commissioner be given the leeway to do that

12  investigation.

13             Further, your Honor, what Mr. Charney said was not

14  quite accurate about the city's position.  The city strongly

15  believes that the Family Court does in fact have the

16  jurisdiction to deal with the issue, and in the declaration of

17  submitted on Friday, stated that the city will be moving by

18  order to show cause this week to renew the motion originally

19  made by the plaintiffs to ask the Family Court to consider the

20  re-placement to the Riveras.

21             THE COURT:  Re-placement of whom?

22             MR. LEVINE:  Re-placement of all of the children.

23             THE COURT:  What does that mean?  What is the effect

24  of that application to the Family Court?

25             MR. LEVINE:  The effect of that is the Family Court

6CBCRIVH

1    will hold the best-interests hearing that your Honor is

2    concerned with to determine what the placement should be during

3    the pendency of the permanency claim.

4              MR. CHARNEY:  Your Honor, may I respond?

5              THE COURT:  Wait a minute.  Has the family court made

6    any ruling about this foster care situation at all, Mr. Levine?

7              MR. LEVINE:  No.

8              THE COURT:  All right.  Then the city is going in and

9    asking the Family Court to rule on what is the best foster the

10   situation?

11             MR. LEVINE:  Yes, your Honor.  We have agreed with

12   plaintiffs' position that they have asserted in the Family

13   Court, that the Family Court did have jurisdiction.  We believe

14   the referee who denied the application improperly applied the

15   Family Court Act.

16             THE COURT:  In other words, the plaintiff here went to

17   the Family Court and the referee denied it?

18             MR. LEVINE:  The referee declined to hear them saying

19   they have did not have standing.  We believe that certainly

20   with respect to Jada they do have standing, and we will

21   encourage the Family Court to hear that.

22             THE COURT:  I don't understand why at this date the

23   city suddenly goes to Family Court.

24             MR. LEVINE:  Because, your Honor, we believe -- I am

25   sorry --

6CBCRIVH

```
 1           THE COURT:  If it had gone to the Family Court a long
 2   time ago, if you want to go to the Family Court, what is the
 3   sense of going all these months after the removal?
 4           MR. LEVINE:  Your Honor, the city still believes the
 5   removal is correct, the issue that your Honor raised is what
 6   happens now in the context of the current placement.  We did
 7   not oppose the plaintiffs' application, and maybe that was a
 8   mistake we made in the Family Court, but we are now going to
 9   permanently -- and it's only a week after the decision at
10   essentially.
11           THE COURT:  When was the removal, by the way?
12           MR. CHARNEY:  March 31.  It's been over eight months,
13   and still no hearing, your Honor, on the issue of whether the
14   children should go back.
15           THE COURT:  Do I understand then that the city is not
16   going to have its own investigation, but is turning the matter
17   over -- trying the turn the matter over to the Family Court?
18           MR. LEVINE:  It will follow the dictates of the fair
19   hearing administrative judge.  We believe that the Family Court
20   determination would supersede that if in fact it made a ruling
21   on the current placement.
22           THE COURT:  I take it the city has the power to
23   conduct an investigation, right?
24           MR. LEVINE:  Yes, your Honor, absolutely.
25           THE COURT:  And come up with a conclusion, right?
```

17

6CBCRIVH

| | |
|---|---|
| 1 | MR. LEVINE:  Yes, your Honor. |
| 2 | THE COURT:  My question is, is the city going to do |
| 3 | that or not going to do it? |
| 4 | MR. LEVINE:  It is going to do that. |
| 5 | THE COURT:  And at the same time it is going into the |
| 6 | Family Court and asking the Family Court to do it? |
| 7 | MR. LEVINE:  We are asking that if the Riveras want a |
| 8 | Family Court hearing, that they get it. |
| 9 | MR. CHARNEY:  The Riveras already asked for it three |
| 10 | months ago, your Honor, and the city just stood silent.  They |
| 11 | didn't do anything.  They were invited to brief this issue in |
| 12 | the Family Court by October 27.  They submitted nothing. |
| 13 | THE COURT:  They were invited by the referee? |
| 14 | MR. CHARNEY:  Yes, your Honor, and it's very |
| 15 | interesting that Mr. Levine's declaration essentially quotes |
| 16 | the Riveras' brief to the Family Court, so I don't know what |
| 17 | new arguments the city plans on presenting to the Family Court |
| 18 | to get it to change its mind.  In fact, I would submit that |
| 19 | under state law the Family Court was correct, the Riveras do |
| 20 | not have a right to a hearing, and that is exactly why we are |
| 21 | in federal court. |
| 22 | THE COURT:  Why? |
| 23 | MR. CHARNEY:  Because under the New York State Family |
| 24 | Court Act, someone in the Riveras' position, a former foster |
| 25 | parent, is not a party to the child neglect proceeding |

6CBCRIVH

1    involving the child.   In other words, they do not have standing
2    to make motions, to cross examine witnesses, to participate in
3    these proceedings.   Therefore, the Family Court was correct as
4    a matter of state law to deny the Riveras as hearing.   That is
5    why we brought this lawsuit, because we believe the current law
6    of New York State, both in the administrative context and in
7    the Family Court context, is unconstitutional.   It does not
8    recognize -- this is not just a foster care relationship.   This
9    is a family relationship.   These are grand-nieces of the
10   Riveras.   This is a blood relationship that is entitled to
11   constitutional protection.   The Second Circuit ruled that 24
12   years ago.   And that's why we are here, your Honor, because
13   they are not being heard anywhere.   They are not getting a
14   hearing, they are not allowed to call witnesses to testify, to
15   present evidence about whether or not the children should be
16   returned now.

17        If the city does its own investigation, that doesn't
18   give the Riveras the opportunity to respond, to confront the
19   people that do that, to present their version of the facts.
20   They have not been allowed to do that yet.   The state won't
21   rule on the issue.   They are giving it back to the same agency
22   that removed the children in the first place.   They are not
23   giving it to a neutral decision-maker.   Due process requires a
24   neutral decision-maker.   There is no due process here that
25   satisfies the Fourteenth Amendment for the Riveras.

6CBCRIVH

1          THE COURT:  What do you say the process should be?

2          MR. CHARNEY:  If this were an ideal world, I would

3     like for the Family Court to hold a hearing to do what is

4     similar in the context of when you have had a parent whose

5     child is taken from them.  They can immediately request a

6     hearing, get it within, I believe, 72 hours, and the court will

7     make a ruling on whether the child should be returned.

8          I would like for relatives who are also entitled to

9     constitutional protection to have that sort of hearing.  They

10    can't have a Family Court hearing, the administrative hearing

11    doesn't contemplate as a remedy returning the children.  That

12    is the only remedy that the Riveras are seeking, that is the

13    only remedy that will make them whole.  That's what due process

14    requires, remedying a deprivation of liberty, and the only

15    remedy is reuniting a family that was torn apart unjustifiably,

16    and there is no process that I have heard when you have had a

17    neutral decision-maker who is deciding whether or not the

18    children should be returned to the Riveras.

19          Allowing the city to investigate it is one thing, but

20    the Riveras have to have the opportunity to respond to whatever

21    the city presents, and that is not what the state is ordering.

22    They are not saying, go do the universe and then bring it back

23    to us.  They are saying, you investigate it, you decide.

24          THE COURT:  In other words, the investigation is an

25    investigation, not a hearing?

6CBCRIVH

1    MR. CHARNEY:  It's not a hearing, and we have the

2  right to a hearing as a constitutional matter.

3    THE COURT:  Mr. Kraft?

4    MR. KRAFT:  Your Honor, it may do us some good to step

5  back here since Mr. Charney is raising the concept of the

6  family.  This family, including the Riveras, knew about the

7  mothers of these two children a long time before the state did,

8  and the Riveras as family members probably knew that these two

9  mothers, one Latoya and the other is named Ramona, just so you

10  have the names, two mothers.  They probably had a sense as

11  family members who knew these women that there were problems

12  with these women and their children.  There were a lot of

13  things that the Riveras as family members could have done

14  without getting the state involved.  They could have said to

15  these mothers, look, you are having trouble with your child, if

16  you leave it with me we will raise your child, see your child.

17  They could have done a number of remedies as a family within

18  the constitutionally protected sphere of family, and if they

19  had done knows things, they would be like Mrs. Moore, the

20  grandmother you read about in Moore v.  City of East Cleveland

21  who is dealing with family matters without state involvement.

22    The real problem in this case, Judge, is that the

23  Riveras did not do that soon enough, and the children were

24  removed from these two mothers for reasons.  I don't know

25  whether they were good reasons or not.  They were removed from

6CBCRIVH

1    these mothers.  One mother surrendered the child and the state

2    did get involved, and custody was transferred not to the

3    Riveras but to the Commissioner.

4              THE COURT:  What happened that got the state involved?

5              MR. KRAFT:  Because the Riveras did not deal with the

6    problem of their great-nieces without state involvement.

7              THE COURT:  I don't understand it.

8              MR. KRAFT:  They knew before the courts got involved.

9              THE COURT:  Did they kidnap the children or what did

10   they do?

11             MR. KRAFT:  The state you mean?

12             THE COURT:  No, the Riveras.

13             MR. KRAFT:  No, the state removed these children from

14   their mothers for -- I believe one was a removal and one might

15   have been a surrender.  I am a little hazy.

16             THE COURT:  The state?

17             MR. KRAFT:  The city, I am sorry, the city did it.

18   The city did that as provided by state law and --

19             THE COURT:  Who asked them to do that?

20             MR. KRAFT:  There must have been reports made about

21   the care that the mothers were giving these children.  Frankly,

22   that's beyond the record in this case.  I honestly don't know

23   why these children got removed from Latoya and Ramona.

24             THE COURT:  You are saying that the Riveras should

25   have simply gone to the mothers and said, "Please allow us to

22

6CBCRIVH

1    raise these children?"

2              MR. KRAFT:  As family members in a constitutionally

3    protected family, that is what could have happened, and if it

4    had happened, we wouldn't be here because the Commissioner of

5    the New York City department would not have gotten custody of

6    these children.

7              THE COURT:  That is pretty much ancient history, and

8    we don't know why, maybe the mothers would not have given --

9    maybe they refused.  Who knows at this point?  Do you know?

10             MR. KRAFT:  No, I don't know.

11             THE COURT:  We don't know.  So that is pretty much it.

12   The fact is that I gather, unless somebody corrects me, that

13   the city did remove the children from the natural mothers and

14   give them to the Riveras has faster parents.  I don't hear any

15   dissent from that state of facts, so that was done.  We can't

16   undo that.  That is where we are now, so let's go from there.

17             MR. LEVINE:  Your Honor, I wanted to make one

18   correction of something Mr. Charney said.  In the previous case

19   what you did is refer it to a magistrate.  Apart from that,

20   your Honor --

21             THE COURT:  Not much difference.

22             MR. LEVINE:  Apart from that, your Honor, we believe

23   that the investigation constitutes due process.

24             MR. CHARNEY:  Under what basis?  Not a hearing.

25             THE COURT:  Why don't you let Mr. Levine speak?

6CBCRIVH

1          MR. CHARNEY:  I am sorry.

2          THE COURT:  He has been very orderly, hasn't done

3     anything wrong today so let's let him speak.

4          MR. CHARNEY:  I apologize, your Honor.

5          MR. LEVINE:  I apologize for the last time, your

6     Honor.

7          The Court of Appeals of New York has said that the

8     independent review fair hearing and Article 78 proceeding

9     constitutes due process in this kind of case.  Plaintiffs have

10    chosen not to seek an Article 78 proceeding.  In that instance

11    I believe that if in fact the state should mandate return, they

12    could ask the Appellate Division to do that, so that's one

13    avenue.  The second avenue is the investigation.

14         THE COURT:  What would they bring an Article 78

15    proceeding about?

16         MR. LEVINE:  To mandamus the fair hearing, Judge, to

17    determine whether the child should be returned.  That is the

18    relief they want, and if it was arbitrary and capricious for

19    the fair hearing judge to say the city was completely wrong and

20    leave no remedy, the state court could remedy that wrong and

21    say that it was arbitrary and capricious not to direct that.

22         And the second thing, your Honor, is that we did not

23    object to them appearing in the Family Court.  We supported it.

24    We didn't submit papers before.  We would support it now, and

25    it would be our policy to seek this kind of hearing.  They have

6CBCRIVH

1    a specific statutory right on behalf of Jada to seek that kind

2    of relief because the statute, Section 1089 of the Family Court

3    Act, specifically provides that in addition to his other powers

4    of temporary placement, that where there is a child presented

5    for adoption the court can direct that the child been placed in

6    the home of the prospective adoptive parents; so we believe at

7    this point, your Honor, there still is due process available to

8    the plaintiffs in both the Family Court and through the fair

9    hearing process.

10            MR. CHARNEY:  Your Honor, Ms. Moser I think wants to

11    speak.

12            THE COURT:  Yes.

13            MS. MOSER:  Your Honor, if I could just be permitted

14    to make a couple of points:  First, I think that an

15    investigation at this point would not only not be due process,

16    but it would also be a continuing harm, a continuing violation

17    of my client's liberty interest in her family relationship.  At

18    this point, both my client, Jada, and the Riveras have brought

19    themselves to the attention of both the city and state

20    adequately so that the city and state should be well aware of

21    what issues are involved, and have had ample opportunity to

22    assess the situation as it currently stands, and whether there

23    would be any risk to my client in being returned to the

24    Riveras' home -- I would venture to say that --

25            THE COURT:  How old is Jada now?

6CBCRIVH

1          MS. MOSER:  She is nine years old.

2          THE COURT:  Are you acquainted with her?

3          MS. MOSER:  I have not yet met her personally.  She

4   has a law guardian.  Based on my communications with Jada's law

5   guardian in Family Court, I am able to represent to your Honor

6   what her position is with regard to these matters.

7          THE COURT:  You mean Jada's position?

8          MS. MOSER:  Jada's position is that she wants to

9   return to the Riveras immediately.

10          THE COURT:  Where is she now?

11          MS. MOSER:  She is in a nonkinship foster home in a

12   different borough from where the Riveras reside.  She has not

13   been provided with regular visitation with the Riveras despite

14   the fact that the city represented in Family Court that that

15   would be provided.  She has also has not been freely permitted

16   to communicate with them by telephone.

17          I would submit that all of these things further the

18   harm that is caused by the removal itself and make even more

19   urgent the need for this court to order that Jada be returned

20   to the Riveras immediately.  I haven't heard any of the

21   parties, your Honor, submit a single factual assertion that

22   would militate against returning Jada to the Riveras.

23          THE COURT:  I said we would go back to the previous

24   case.  Wasn't there a case where there was a question about the

25   physical capacity of the foster --

6CBCRIVH

1      MR. CHARNEY:  You are absolutely correct, your Honor,

2  and I would submit in this case, this is an even more

3  open-and-shut case.  In other words, there are literally no

4  factual issues that really arise here as to whether it's

5  appropriate to return the children.

6      THE COURT:  I haven't heard anything to date that the

7  Riveras are in any way improper or incapable as far as being

8  foster parents, and when I denied the original motion it was

9  solely on the ground that -- well, there were two grounds:  I

10  held that the accusation of sexual intercourse directed against

11  that young man, that was a ground for removal, it raised

12  factual issues; and I also said that the indication in a report

13  that maybe this young man was acting enticingly to the little

14  girls, that raised factual issues.

15      All I had said though was that there were factual

16  issues, and by the time of my decision the accusation of sexual

17  intercourse had been completely withdrawn.  So that was gone,

18  and all I said was that there were factual issues, and that it

19  appeared to me that the city was pursuing those factual issues

20  in a way that comported with due process, but the only factual

21  issues that existed were these issues about the possible sexual

22  problems, and there was no information in the record at all

23  about any inability or incapacity or any anything else

24  derogatory in the least degree against the Riveras, and in my

25  finding I said over and over that as far as the Riveras

6CBCRIVH

1    themselves were concerned, they were totally innocent as far as

2    any of the possible sexual aspects of this.

3            What really has happened is that I think the record

4    sustains the idea that this young man has been forbidden to

5    come into the dwelling, and the Riveras have tried to

6    successfully remedy that problem.  I haven't heard a word about

7    any dangerous situation about child abuse that could possibly

8    exist now.

9            I am not going to dictate a ruling right at the

10   moment, but it seems to me everything points in the direction

11   in this case for the return of Jada.  Now, the other two, what

12   is the situation about Erica and Brian?

13           MR. CHARNEY:  Your Honor, Mr. Levine was correct that

14   the "permanency" goal for them is to be returned to first

15   mother.  What that means that both ACS and the contracting

16   foster care agency, which is known as Family Support Systems,

17   are actively working with Erica and Bryanna's mother to try to

18   prepare her to have the children come back and live with her.

19   The problem is that that has not happened yet.  In fact, every

20   six months in the Family Court there is what is called a

21   permanency hearing for Erica and Bryanna in which this case is

22   reviewed and there is updates given about the progress being

23   made, and that this has been going on for some period of time,

24   I believe now a few years.

25           The most recent permanency hearing I think was in -- I

6CBCRIVH

1    want to say in August -- I think that is the last one, and
2    again they reaffirmed that the goal is return to the mother.
3    It hasn't happened yet.  The children have been away from the
4    Riveras for eight months now.  There is another permanency
5    hearing on January 9.  Neither the city nor Family Support have
6    given any indication that they are anywhere close to returning
7    the children to -- Ms. Ramona Chapman is that mother.
8            Our position, and the reason we brought this case is
9    not to prevent the children from returning to their mother.
10   Obviously, their own mother has the most superior rights to
11   having them in her home.  She is the mother, she has the right
12   to care for her children unless her rights are terminated.  Our
13   position is that if the children are not returned to their
14   mother or are currently not living with their mother, they
15   should be living with the Riveras.  That is their blood
16   relatives.  They had been living with them for six years prior
17   to being removed.
18           THE COURT:  How old is Erica?
19           MR. CHARNEY:  Erica is now I believe eight years old.
20   She was born in -- I am sorry, yes, eight years old.  She was
21   born in January of 1998.  She will be nine.
22           THE COURT:  How old is Bryanna?
23           MR. CHARNEY:  Bryanna is six years old.
24           THE COURT:  Back to Jada, how old is Jada?
25           MR. CHARNEY:  Jada is nine.

6CBCRIVH

1          THE COURT:  You represent Erica and Bryanna?

2          MR. CHARNEY:  Yes.

3          THE COURT:  Are you acquainted with Erica and Bryanna?

4          MR. CHARNEY:  I am not, but the Riveras, who are in

5     the front row there, are.

6          Your Honor, I will state for the record now that it is

7     before your Honor that transcript that your Honor has before

8     you from the fair hearing, there is testimony in that

9     transcript by I believe a case worker for the foster care

10    agency Family Support Systems, stating that Bryanna had

11    expressed to her a desire to return to live with Mr. and Mrs.

12    Rivera.  That was following their removal.  So for Mr. Levine

13    to say that Erica and Bryanna did not want to return, I don't

14    think that is anywhere close to being true.

15         THE COURT:  I am not trying to criticize anybody.  But

16    Erica and Bryanna are your clients?

17         MR. CHARNEY:  Yes.

18         THE COURT:  And can't you talk to them so that you

19    could tell --

20         MR. CHARNEY:  The problem is we are not permitted, the

21    city or the foster care agency, to do that.

22         THE COURT:  Who said so?

23         MR. CHARNEY:  The city and the foster care agency

24    won't allow us to.  They are represented in Family Court by a

25    law guardian, and I want to point out, your Honor, that every

6CBCRIVH

1    single motion paper, pleading, that the plaintiffs have filed

2    in this case, has been forwarded to the law guardian for Erica

3    and Bryanna. She was notified of the fair hearing --

4            THE COURT:  Who is the law guardian?

5            MR. CHARNEY:  Her name is Christine Marshall.  She is

6    an attorney who practices in Queens.  I am not aware if she is

7    admitted to practice in the Southern District, but I have kept

8    her fully abreast of all of these decisions.

9            THE COURT:  Did you talk to her?

10            MR. CHARNEY:  I have seen her in the in the Family

11    Court.  I participated in a mediation with her in November on

12    this case.

13            THE COURT:  Did she speak to her socalled clients?

14            MR. CHARNEY:  I would have to idea.  I want to point

15    something else out also:  She was only assigned to this case in

16    June, I believe.  Prior to that, Ms. Moser's office actually

17    represented Erica and Bryanna as well and I believe at the end

18    of May, at that time before they had to withdraw.

19            THE COURT:  Is there anybody in this courtroom among

20    all these lawyers who has ever talked to these kids?

21            MR. CHARNEY:  No, your Honor, only the Riveras who are

22    not lawyers.

23            THE COURT:  Ms. Moser, have you talked to them?

24            MS. MOSER:  I am sorry, your Honor, I have not.

25            MR. CHARNEY:  I was going to say, your Honor, that in

6CBCRIVH

1  May the Legal Aid Society, which at the time was representing

2  Erica and Bryanna, did draft although they did not file a

3  motion with the Family Court that Erica and Bryanna be returned

4  as well, again that is in May, so I can't speak for what the

5  situation is now.  But at that time their attorneys in the

6  Family Court supported them being returned to the Riveras, so

7  it seems to me your Honor pointed out that we don't have any

8  new information that would suggest the Riveras are incapable of

9  taking care of these children; and if in May their attorneys

10  were supporting returning them, it seems to me that I am not

11  understanding why today they would not be supporting returning

12  them.

13        THE COURT:  I don't know.  I am obviously faced with a

14  great deal of formality, which is unusual, and it apparently it

15  prevents the usual rapport that a lawyer has with his client,

16  and there are probably a lot of reasons for that, and I don't

17  want to initiate some process that has a committee going out

18  and visiting these children.

19        MR. CHARNEY:  I understand, your Honor.

20        THE COURT:  I have no doubt about the good faith and

21  honesty of all the lawyers here, but somebody, it seems to me,

22  has got to go speak to these children.  I don't want them

23  brought into court.  I don't think that is a good idea.

24        MR. LEVINE:  Your Honor, may I be heard?

25        THE COURT:  Yes.

6CBCRIVH

1          MR. LEVINE:  I had reported at the September 14

2    hearing that I spoke with Ms. Marshall, and she opposed the

3    return.

4          THE COURT:  Who is Ms. Marshall?

5          MR. LEVINE:  The law guardian for Erica and Bryanna,

6    and she was against the return of the children.

7          THE COURT:  All three?

8          MR. LEVINE:  Erica and Bryanna, her clients.

9          THE COURT:  What did she say?

10         MR. LEVINE:  That they didn't want to go back, and she

11   didn't want them to go back.  That is what she told me.  That

12   was after May, that was in September.  And in October, the

13   birth mothers, Ramona and Latoya, filed an affidavit in

14   opposition to the proposed intervention because the birth

15   mother doesn't want her children going back.  The birth mother

16   has a permanency plan where the children will come back to her,

17   and I can't speak for why she doesn't want them to go back to

18   the Riveras.  It would seem to me that this concept of family

19   unity would be harmed if the birth mother doesn't want the

20   return of the children, and the Riveras insist over her

21   objection getting them back.

22         MR. CHARNEY:  Your Honor, I'd like to point out that

23   since Mr. Levine said what he said in September, I have spoken

24   to Ms. Marshall, and that would have been in November, and at

25   that point she said that the children informed her this did

6CBCRIVH

1    want to go back.  She did not take a position one way or other.

2    She wanted to look into the issue further, which seems like a

3    very reasonable --

4            THE COURT:  Should she have been here today?

5            MR. CHARNEY:  She should have, your Honor.  I have

6    invited her to every hearing, and I don't know if that's is not

7    like her practice, if she has too big a case load.  There is

8    nothing excluding her from the process despite what the city

9    appears to be saying.  I have invited her to every proceeding.

10   The Bell goes her encouraged her, provided her with papers and

11   she does nothing, and so I don't know what else the plaintiffs

12   can do to facilitate her attention.

13           THE COURT:  The situation as far as your representing

14   Erica and Bryanna and Ms. Marshall, whatever she has to do with

15   Erica and Bryanna.

16           MR. CHARNEY:  She is their law guardian in the Family

17   Court.  The children involved in a child neglect proceeding,

18   her mother charged with child neglect.  I believe it's now

19   serve or eight years ago, so whenever there is a Family Court

20   proceeding concerning Erica and Bryanna, Ms. Marshall

21   represents them in that procedure.  This is a federal lawsuit

22   involving constitutional violations.  She has not participated

23   in it, she is not asked to participate in it.  I have invited

24   her to participate in it, but she has thus far not decided or

25   refused to.  In the Family Court, again, the Riveras

34

6CBCRIVH

1   are not --

2           THE COURT:  Is she representing just Erica and Bryanna

3   in the Family Court?

4           MR. CHARNEY:  Yes, your Honor.

5           THE COURT:  I don't see how I can do anything about

6   Erica and Bryanna until I get more information.

7           MR. CHARNEY:  I agree, your Honor.

8           THE COURT:  But it seems to me, and I don't say that

9   the record is ideal in the way sometimes we view evidence and

10  basis of findings and so forth, but it does seem to me that

11  there is reliable information to indicate that Jada would be

12  happy to go back to the Riveras.  Nobody brings up any

13  suggestion otherwise, and if I direct that that is to be done,

14  who will do that and how will it be done?

15          MS. MOSER:  Your Honor, I think typically what would

16  happen is that the order would be communicated to the foster

17  care agency, Family Court Systems Unlimited, which is the

18  contract agency with ACS, and they would make arrangements for

19  Jada to be brought to the foster care agency.  She would

20  probably undergo a brief medical hearing before the transfer,

21  and then she would be transferred to -- the Riveras would come

22  to the foster agency to pick her up.

23          MR. CHARNEY:  Your Honor, they have no problem doing

24  this.  In fact in August when we originally thought -- the

25  Riveras have no problem coming to pick Jada up at offices of

6CBCRIVH

1    Family Support.  They attempted to do that one other time in

2    August, which is what led to this lawsuit.  All three of the

3    girls were brought to the agency with their suitcases, the

4    Riveras were told to come pick them up.  They came to pick them

5    up, and they were told when they arrived that ACS had

6    essentially overruled the contract agency and said, "You are

7    not taking them today," so --

8            THE COURT:  Let me put a ruling on the record.

9            I do not intend in this ruling to recapitulate the

10    entire train of facts involved in this case.  I am going to

11    concentrate on the present issue.  I think the record amply

12    shows the background, and I will not attempt to review that.

13            The issue now is whether in the present posture, which

14    has been reviewed thoroughly in the earlier part of this

15    hearing, whether in the present posture it is appropriate for

16    this court to order the return of Jada to the foster parents,

17    the Riveras.  The record shows the relationship of the Riveras

18    Jada, and all of that, and again, I am not going to review all

19    of that.  I am speaking right now of Jada, and I will not speak

20    for the moment of Erica and Bryanna.

21            As I said a few minutes ago, and this is reflected in

22    an earlier transcript, I refused at an earlier juncture a

23    motion to have Jada immediately transferred back to the Riveras

24    or returned to the Riveras, and I did so because of the reasons

25    reflected at that time on the record, and there was a hearing

6CBCRIVH

1    or September 14 of this year.

2            Factual issues existed, factual issues dealing with

3    possible sexual misconduct in the Rivera home which could

4    affect Jada and the other two young girls. The Riveras

5    themselves played no part in that problem at all except in

6    their home or part of their home where an adult child lived.

7    There was in my view an issue about whether there was some

8    threat of sexual misconduct affecting Jada and the other two

9    girls.

10            I held that as far as I could see from the record, the

11    removal of Jada and the other two girls -- I will speak of the

12    other two girls in context because I can't separate them -- but

13    the removal of Jada and the other two girls was justified in

14    order to resolve certain factual issues; and that is exactly

15    the way I put it, and I felt at that time that the city was

16    taking steps to determine the facts.

17            By the time of the September 14 hearing, the issue

18    raised by some report of actual sexual intercourse with one of

19    the older people in the home that accusation had been

20    withdrawn. There was still a issue, as I said, about whether

21    there was some possible threat of sexual activity with the

22    young girls.

23            Now, due process required resolution of those factual

24    issues, and due process required a determination, a reasonable

25    determination as to whether, first, the original removal was

6CBCRIVH

1    justified, and second, whether the removal should be continued.

2        Many months have gone by since the removal of March

3    31, and two months have gone by since the hearing of September

4    14.  The city has made its investigation, and the result of

5    that investigation is that the Riveras were exonerated as far

6    as the situation which existed at the time of the removal.  The

7    state has had a hearing, and although the final decision is not

8    here, the attorney for the state has stated that the finding is

9    that the removal was arbitrary and capricious.

10        The state has requested the city to make a further

11    investigation within 60 days as to what should be done

12    currently in view of the fact that all these months have gone

13    by since the removal on March 31.  There has been discussion of

14    a possible renewal of some attempt to get the Family Court

15    involved in the issue of the proper foster care.

16        So what we have is a record which shows conclusions

17    reached both by the city and the state that the original

18    removal was improper.  That means that there was certainly

19    process within the city and state in attempting to determine

20    what conclusion should be drawn about the original removal.

21    The problem about due process that remains is that a great deal

22    of time has gone by, and there is as yet no resolution by the

23    city, which has the authority, that is, there has been no

24    resolution by the city as to whether the removal should

25    continue, and as to what should be done currently, and it is

6CBCRIVH

1    the city which has the responsibility to make that

2    determination and not the state.

3            There surely is an issue as to whether this court

4    should act in advance of the city completing its investigation

5    and coming up with its own findings and conclusions about what

6    should be done under the current circumstances, but what I have

7    concluded is that due process required resolution much earlier

8    than now, and surely much earlier than 60 days from now as to

9    whether the removal was proper and as to whether the removal

10   should continue.  It appears that there was an agreement

11   reached to return the children in August, although I am not

12   clear at the present moment exactly --

13           MR. CHARNEY:  May I interrupt for a second, your

14   Honor?  There is a letter, I believe it's plaintiff's Exhibit

15   2, from the attorney for the foster care agency stating on

16   August 20 that the children would be returned on August 25.

17   That's in the record.

18           THE COURT:  That confirms what I was stating.

19           MR. CHARNEY:  I am sorry.

20           THE COURT:  And for reasons that are not at all clear,

21   that agreement was not carried out, but even August was a long

22   time after the removal in March.  The passage of time may be

23   necessary, but the passage of time is also detrimental, and it

24   is my conclusion that there has been a violation of due process

25   rights in not resolving what needs to be resolved by now.  I

6CBCRIVH

1   have heard, of course, that adjournments of the fair hearing

2   have been for various reasons.   Of course, there are always

3   reasons why things are delayed and adjourned.   The city had the

4   opportunity and the responsibility, despite everything that has

5   been said about adjournments and so forth, to resolve this

6   matter long ago rather than having it still dangling unresolved

7   today.

8          The record before me indicates that the issues that

9   were relied upon to remove the children have been completely

10  resolved.   The record indicates that there is no threat, no

11  circumstance involving the kind of possibility of sexual

12  intrusion on these girls.   All of that has been resolved and

13  the record indicates that the Riveras have taken steps to

14  remedy that situation completely.   There is no suggestion of

15  any other reason whatever justifying the removal from the

16  Riveras.   Consequently, I am ordering that Jada be returned to

17  the Riveras forthwith.

18         The findings that I have made, despite some

19  introductory remarks of mine, the findings apply also to Erica

20  and Bryanna.   However, I am not ready to enter any order about

21  Erica and Bryanna because there must be some communication with

22  them and return communication to me about their desires.   I am

23  confident that what has been told to me about Jada's desires

24  are reliable, and I am informed reliably that Jada wishes to

25  return to the Riveras.   I have no such information about Erica

6CBCRIVH

1    and Bryanna.  As soon as there is information available, I will

2    convene a hearing and we can take care of that matter.

3         As far as Jada is concerned, Jada is represented in

4    this case by Mr. Charney and Mrs. Kubitshek --

5         MR. CHARNEY:  No, your Honor, Jada is represented by

6    Ms. Moser.

7         THE COURT:  I am sorry, Jada is represented by

8    Mrs. Moser.  I have got to ask you, Ms. Moser, to follow this,

9    and somehow if Jada indicates in this process something

10   different from what I believe to be true, you have got to

11   inform the court.

12        MS. MOSER:  Yes, Judge.

13        THE COURT:  And I don't know the mechanics, I don't

14   know what will happen exactly, but if you are representing her,

15   you have got to somehow see her and know what is going on with

16   her.  That concludes our hearing today.

17        MR. LEVINE:  Your Honor, may I ask a question and make

18   a request?

19        THE COURT:  Sure.

20        MR. LEVINE:  The question is whether your preliminary

21   injunction is intended to stay the city from proceeding with

22   compliance with the fair hearing decision, and my request is

23   for a 10-day stay of the effectiveness of the order so that if

24   we are so inclined to appeal and seek a stay from the circuit,

25   we can do so.  As your Honor indicated, this implicates the

6CBCRIVH

1    courts, our jurisdictional issues, and federal-state comity

2    with respect to court proceedings.

3         THE COURT:  Look, the city can go ahead with whatever

4    investigation it wishes to pursue.  As far as any stay, I am

5    granting no stay whatever.  As far as I am concerned, the

6    problem with this case has been endless delays, and as far as

7    this court is concerned I am not going to contribute to any

8    further delay.

9         MR. CHARNEY:  Your Honor, may I ask one question?  You

10   pointed out with respect to Erica and Bryanna you would like to

11   have more information about what their wishes are.  I mentioned

12   earlier that my office has not been permitted to have any

13   contact with them.  I would ask that we have had a social

14   worker -- there is one in our office, she has forty years of

15   experience in child welfare.  I could submit her resume for

16   your consideration.  But I would ask that you order the city to

17   permit my social worker, not me, not any attorneys, but my

18   social worker to meet with Erica and Bryanna and find out

19   exactly what they want, because I am in the dark because I have

20   not been allowed to speak to them and --

21        MR. LEVINE:  Mr. Charney does not represent them.

22        MR. CHARNEY:  In the federal case we do.  I am not

23   talking about Family Court.  I am talking about the federal

24   proceedings.  In Family Court the issue about --

25        THE COURT:  You have got to, either personally or

6CBCRIVH

1    through a representative you have got to talk to your client.

2         MR. CHARNEY:  That is what I am asking, your Honor.

3         THE COURT:  Of course. I will sign any authority you

4    need that is reasonable.

5         I want to say about Jada, I have entered an order

6    which is appealable, there is no doubt about it, but there is

7    no issue about jurisdiction or standing.  The Riveras are

8    family members, they have rights.  That's really been resolved

9    long since.

10        I would only hope that as to Jada we just get that

11   over with.  She should be returned to the Riveras, and if the

12   city has any common sense at all, that will be done, there will

13   be no further objection.

14        As far as Erica and Bryanna, of course there is an

15   issue, I believe, about their desires, but at this point if we

16   have -- these are not girls in a crib, they are old enough to

17   know what they want to do, and if it is true that Jada wants to

18   go back to Riveras, there is no earthly reason on this record

19   that this should not be done; and as far as I am concerned at

20   this point it's really what Erica and Bryanna want to do, and

21   that should be determined.

22        The city is faced with a finding by the state that the

23   original removal was arbitrary and capricious, so to talk about

24   an appeal, of course you have a right to appeal, but it's not

25   sensible.  This case ought to be wound up.  Jada should be

6CBCRIVH

1   returned unless she somehow indicates in the course of it that

2   she doesn't want to be.  Erica and Bryanna should be treated in

3   the way they wish to be treated, and that should be the end of

4   it if the parties have any sense of things at all.  Thank you.

5            MR. LEVINE:  Thank you, your Honor.

6                            -o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6CK9RIVH                    Hearing                                    1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     MABEL and ANTHONY RIVERA,
 3
 4                   Plaintiffs,          New York, N.Y.

 5             v.                         06 R. 7077 (TPG)

 6   MATTINGLY, et al., etc.,

 7                   Defendants.
     ------------------------------x
 8
                                         December 20, 2006
 9   Before:                             4:15 p.m.

10                    HON. THOMAS P. GRIESA,

11                                        District Judge

12                         APPEARANCES
     LANSNER & KUBITSCHEK
13       Attorneys for Mabel and Anthony Rivea,
     DARIUS CHARNEY,
14
     THERESA B. MOSER,
15       Attorney for Plaintiff J.C.

16   LAW DEPARTMENT, CITY OF NEW YORK,
         Attorneys  for New York City Defendants,
17   JESSE I. LEVINE,
         of Counsel.
18
     ATTORNEY GENERAL, STATE OF NEW YORK,
19       Attorney  for New York State Defendants,
     ROBERT KRAFT,
20       of Counsel.

21

22

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1          (In open court; case called)

2          THE COURT:  I have now received some materials in

3    response to the questions I left opened and they're helpful so

4    what -- before you get to what you, I'm sure you want to say,

5    just review again the procedural posture.

6          My memory is that the state held a fair hearing and

7    Mr. Kraft reported that there was a draft, now there's a

8    decision.  I think the fair hearing -- I don't think this is

9    quoted but he said that the removal was improper.

10         MR. CHARNEY:  Yes, your Honor, I actually have a copy

11   of the decision.  It was issued on December 13.  I believe the

12   parties have it, seen it.  I can provide a copy to the court.

13         THE COURT:  Please, of course.

14         MR. CHARNEY:  I'll paraphrase.  Obviously, you can

15   read it yourself.  It's my understanding from reading it that

16   the state found that the removal of the girls was arbitrary and

17   capricious and abuse of the discretion by ACS and the foster

18   care agency.  However, the state did not order the girls

19   returned.  It ordered ACS and the foster care agency to do a

20   new evaluation of the current circumstances.  It gave them 60

21   days to do that.  And at that point, according to Mr. Kraft, he

22   submitted a letter to your Honor, I believe, on yesterday which

23   basically says that once ACS and the agency make that

24   determination, that's the end of the matter.  So, in other

25   words, the Riveras would at that point not have any further

1    ability to contest what ACS and the agency find.

2            Last week your Honor ruled that -- and also not only

3    last week but in a prior case involving an identical situation,

4    that this way of handling a fair hearing by the state is not

5    due process because effectively the Riveras have not received

6    any remedy.  They were seeking the return of the girls.  They

7    did the entire fair hearing, were victorious on the merits, but

8    yet did not get the relief that they were seeking.

9            The only reason they did the fair hearing was to get

10   the children back.  Mr. Kraft seems to believe -- and it's his

11   client, the state, Office of Children and Family Services,

12   seems to believe that the purpose of the fair hearing is not to

13   provide a way for a kinship foster parent to get the kinship

14   foster child back.  He feels that the only decision the fair

15   hearing judge can make is whether or not the removal was

16   incorrect.  It's then left up to ACS whether the child should

17   be returned.

18           Your Honor found in the Haines v. Mattingly case that

19   that was not adequate due process, and I believe your Honor

20   found last week that that was not adequate due process.

21           Your Honor then ordered last Monday that one of the

22   three children should be returned immediately, J.C..  She was

23   returned to Ms. Rivera on Tuesday, December 12.  You also

24   signed an order that I submitted which gave my social worker

25   from my office, Barbara Winter, who is sitting in the front

6CK9RIVH                    Hearing

1    row, the opportunity to meet with E.S. and B.C. outside the

2    presence of any attorneys or any of the parties to find out

3    what they wanted to do.

4              Your Honor did not rule on E.S. and B.C. last week

5    because your Honor wanted to find out, rightfully so, what the

6    girls themselves wanted.

7              Ms. Winter is here today.  I believe you have a

8    declaration from her which was filed last night.

9              Ms. Winter is willing to either sit at counsel table

10   and give a report to you, or if you would like for her to take

11   the stand and answer questions, we could do it either way, if

12   your Honor is so inclined.

13             We believe that -- Mr. Winter met with each of the

14   girls independently yesterday.  She then observed a visit

15   between E.S. and B.C. and Ms. Rivera and J.C., and I believe

16   she discusses it in her declaration.

17             THE COURT:  J.C. has gone back to the Riveras?

18             MR. CHARNEY:  Yes.  She's been back now for a week.

19             THE COURT:  Good.  So Mrs. Rivera and J.C. came?

20             MR. CHARNEY:  The meeting was at the foster care

21   agency because that is where visits are supposed to take place.

22   We did not feel it was appropriate to ask to have the meeting

23   at my law office because we wanted to make this as normal as

24   possible for the girls, to the extent it is normal.  But the

25   agency is where they visit with relatives.  So we felt that if

6CK9RIVH                    Hearing                          5

1   the meeting and the visit took place there, that would be the

2   easiest for the girls. So that's where it took place on Monday

3   afternoon.

4

5        THE COURT: And at some point Mrs. Rivera and J.C.

6   came?

7        MR. CHARNEY: Yes. They did come. They asked the

8   agency whether or not they were permitted to visit. The

9   agency, family support systems, again, this was their office,

10  did permit a visit to take place at the agency's office.

11  Ms. Rivera was not allowed to take the girls outside of the

12  office.

13       The visit lasted from about 4:45 to 5:45. Ms. Winter,

14  the social worker in my office, observed the visit from

15  approximately I think it was about 4:50 to 5:30, so for about

16  40 minutes she observed, did not -- you know, intercede in any

17  way. She just observed the girls' interactions with

18  Mrs. Rivera and J.C. and then she put her observations in a

19  declaration. She's also here to answer any questions you may

20  have or to clarify anything for your Honor.

21       I also want to mention, I attached the resume of

22  Ms. Winter. She has been working in the field of child welfare

23  now for -- I don't want to give away her age, but for about

24  four decades. She's testified as an expert witness in several

25  family court proceedings, including child abuse and neglect

6CK9RIVH                    Hearing

1    proceedings.  She works with children and families in foster

2    care, so this is really her area of expertise.  And I felt that

3    she was a lot more qualified to speak to the girls than I as a

4    lawyer would be.  So that was the reason that we ask that she

5    be allowed to meet with them.

6               THE COURT:  So I assume you wish to now have the same

7    direction entered as far as E.S. and B.C. as I did with J.C.

8               MR. CHARNEY:  Yes, your Honor.

9               THE COURT:  Okay.  Mr. Levine.

10              MR. LEVINE:  Yes, your Honor.  First, with respect to

11   certain statements Mr. Charney said.  Mr. Kraft's letter did

12   not say that upon remand that was the end of the matter.

13              What Mr. Kraft's letter said was that after the

14   remand, whatever the city determined was final because it was

15   not subject to further administrative review, and that can be

16   challenged in the New York State Supreme Court.

17              Secondly, your Honor, we have moved for

18   reconsideration of the availability of this kind of hearing in

19   the family court.  That motion was returnable today.  I don't

20   know the results of that motion.

21              MR. CHARNEY:  Your Honor, I can speak to that if you'd

22   like me to.  I was there, but I'll let him finish.

23              MR. LEVINE:  With respect to this report, your Honor,

24   your Honor's order specifically said that the interview is to

25   be outside the presence of the plaintiffs, defendants, FSSU,

6CK9RIVH                    Hearing

1    and ACS, and yet the most important finding, according to

2    Ms. Winter's declaration, was the interaction between the

3    children and Mrs. Rivera, which was clearly prohibited by your

4    order.

5            More importantly, your Honor --

6            THE COURT:  What did I prohibit?

7            MR. LEVINE:  That the interview be held outside -- you

8    prohibited the interview from being held in the presence of any

9    of the parties, in the second paragraph of your order of

10   December 15, your Honor.  And yet the most important finding

11   that Ms. Winter made was based on the interaction between the

12   children and Ms. Rivera.

13           THE COURT:  Certainly, she interviewed both E.S. and

14   B.C. by herself and then the others came, and I would think

15   it's extremely helpful what happened, extremely helpful.

16           MR. LEVINE:  The law guardian for the children in this

17   case, Kristine Marshall, has submitted a declaration.  She also

18   interviewed one of the children yesterday.  She found her, and

19   she had found her and her sister previously conflicted about

20   where they wanted to reside temporarily.  They both --

21           THE COURT:  Did Ms. Marshall go see --

22           MR. LEVINE:  Yes.  She saw E.S. yesterday.

23           THE COURT:  Did she see B.C.?

24           MR. LEVINE:  No.

25           THE COURT:  Why not?

6CK9RIVH                    Hearing

1          MR. LEVINE:  She was not able to see her.  They were

2     not able to get her there in time.

3          And the law guardian said in her view there are

4     questions about the home, the children are conflicted, and that

5     there should be no return until there has been an independent

6     forensic examination.

7          THE COURT:  Look, what you're proposing is to go on

8     and on and on with no resolution.  That is the problem I had

9     last week.  It's the problem I still have.

10          I said when I originally denied relief that there were

11     factual issues to be resolved.  Of course there were.  But that

12     means resolving them.  The removal took place -- wasn't it last

13     March?

14          MR. CHARNEY:  Yes, your Honor.

15          THE COURT:  My finding last week, and it is my finding

16     today, that there is a violation of due process because there

17     is no mechanism created by the city or the state to

18     administratively resolve the factual issues that need to be

19     resolved.  Of course, one initial problem or issue was whether

20     the removal was proper.  It seems to me that the fair hearing

21     decision resolves that administratively to the effect that the

22     removal was improper.

23          Now, one could argue that that's sufficient.  If the

24     removal was improper, the girls should go back.  I don't take

25     that view.  I feel that once -- even though the removal was

6CK9RIVH                    Hearing

1    improper, the authorities have a right to consider what remedy

2    is appropriate.  And it is conceivable that even though a

3    removal is improper, it is conceivable that the proper remedy

4    may not be the return of the child to the foster parent.

5    That's debateable whether that's a proper issue, but I believe

6    it is.

7            But surely where there is an improper removal, any

8    questions about the proper remedy should be administratively

9    resolved in something less than three-quarters of a year.  And

10   in my view it's a violation of due process to hold out the idea

11   that there should be further investigation as of this time that

12   can take as much as 60 more days or that there is a possibility

13   that the family court may provide some remedy, and I'll hear

14   about that.

15           But my problem is as of this time, December 20, 2006,

16   there is still no administrative determination of the issues

17   about the proper remedy, the proper placement, something that

18   should have been resolved, in my view, months and months ago.

19   I know there have been excuses of one kind or another.  None of

20   those excuses are satisfactory in my view.

21           Now, what has happened in the family court?

22   Mr. Charney said that he has some report on that.

23           MR. CHARNEY:  Yes.  As Mr. Levine stated, the city

24   brought a motion to reconsider the family court's denial of Mr.

25   and Mrs. Rivera's motion -- Mr. and Mrs. Rivera brought a

1    motion in the family court in September to get a hearing on

2    whether or not the girls should be returned to them.  The

3    family court ruled on November 29 -- I believe you have that

4    decision.  It's exhibit 9 to the plaintiffs' papers.

5            THE COURT:  Ruled when?

6            MR. CHARNEY:  November 29, so very recently, ruled

7    that the Riveras did not have a right to such a hearing in the

8    family court, that the only remedy was the administrative

9    remedy that we've heard so much about, the fair hearing, the

10   independent review, and that that was their only recourse.

11           ACS, I believe it was last week -- I think it was last

12   week brought an order to show cause in the family court to get

13   a hearing on their motion to reconsider that decision.  In

14   other words, they wanted the family court to reverse itself and

15   allow for such a hearing.  Today was the return date on that

16   order to show cause in the family court.  I was present, as was

17   an attorney for the city's Administration for Children's

18   Services, Ms. Marshall, the law guardian for E.S. and B.C., and

19   the attorney for E.S. and B.C.'s mother.

20           The family court did not grant the motion to

21   reconsider today.  It did not actually decide it one way or the

22   other.

23           What the judge did say, because I informed the judge

24   that we had this hearing today, was that she believed that it

25   was possible that the case could be resolved in federal court

6CK9RIVH                        Hearing

1    as soon as this afternoon and that in that case the motion

2    would become moot.

3                She gave ACS until January 9 of '07 to provide her

4    with caselaw to convince her that she should have such a

5    hearing.  At this point she does not believe that under New

6    York State law Mr. and Mrs. Rivera are entitled to this

7    hearing.  So, on January 9 if ACS is able to provide her with

8    cases she may -- there is no guarantee -- grant the hearing;

9    again, just a hearing, not resolving the issue.

10               She also said -- and I think your Honor has this in

11   that decision on November 29, she quoted your decision from the

12   Haines case, which basically said that there has to be a trial

13   in these constitutional violations and it should be in federal

14   court because this is a constitutional problem and that's

15   obviously within your jurisdiction.

16               You have found that there is a violation of due

17   process.  It's, obviously, the federal court's province to

18   remedy any constitutional violation.  And the family court

19   judge did not say today that she was in any way irritated or

20   offended by having the federal court resolve what is clearly a

21   constitutional problem.

22               If the federal court does not resolve it, then she

23   will entertain ACS's application for hearing, which she has

24   already denied when the Riveras made it.  It doesn't mean she's

25   going to hold such a hearing.  She's going to listen to whether

1    or not there's any law to support the Riveras' right to a

2    hearing.

3              I mentioned last time we were before you that I think

4    as a matter of state law the family court is absolutely

5    correct.  That's why we had to bring this federal lawsuit.

6    Because under New York State law there is no right for the

7    Riveras --

8              THE COURT:  It's inconclusive in the family court.

9              MR. CHARNEY:  Exactly.

10             THE COURT:  Is Ms. Marshall here?

11             MR. CHARNEY:  No.

12             MR. LEVINE:  No, she's not, your Honor.

13             THE COURT:  I'd like to take some testimony or allow

14   some testimony of the social worker.

15             MR. CHARNEY:  Okay.  Would you like me to call --

16             THE COURT:  I read the declaration of Kristine

17   Marshall.  It simply raises some questions.  It is inconclusive

18   and suggests that there should be further investigation.

19             I find that it is difficult to believe that we have to

20   continue having one investigation after the other and not come

21   to some resolution.  I really cannot give weight to the

22   declaration of Kristine Marshall.

23             Now, I would like to have Ms. Winter take the stand.

24   Barbara Winter,

25       called as a witness by the Court,

1          having been duly sworn, testified as follows:

2               THE COURT:  Any attorney can conduct examination, but

3     I think we all know what's in the declaration.

4               What I would like to ask you, you interviewed, did you

5     not, E.S. and B.C.?

6               THE WITNESS:  Correct.  Yes, I did.

7               THE COURT:  Did you interview E.S. by herself?

8               THE WITNESS:  Yes, I was with E.S. alone for

9     approximately 20 minutes.  She arrived first.  And B.C. did not

10    arrive until at least a half-hour, 30 minutes later.

11              THE COURT:  Where was this interview?

12              THE WITNESS:  It was in a conference room in the

13    agency but nobody else -- with E.S. nobody else was there.

14              THE COURT:  What agency is that?

15              THE WITNESS:  Family Support Systems, a foster care

16    agency.

17              THE COURT:  What was the substance of that interview

18    with E.S.?

19              THE WITNESS:  I explained to E.S. as I understood what

20    my role was here, that I was asked to come and talk to the

21    children because you wanted to know, your Honor wanted to know

22    what the children wanted to do about where they lived.  And I

23    told them that the reason J.C. had gone home was because her

24    law guardian knew what she wanted, what J.C. wanted, and

25    presented that in court, but that the court didn't know what

1    E.S. and B.C. wanted.

2            THE COURT:  Refresh my memory.  How old is E.S.?

3            THE WITNESS:  E.S. will be 9 next month.

4            THE COURT:  Did she appear to understand that

5    explanation?

6            THE WITNESS:  Yes.  I thought she did.

7            THE COURT:  Go ahead.  What happened?

8            THE WITNESS:  Well she said to me -- I actually asked

9    her, because sometimes children are very shy, whether she

10   wanted to wait for B.C.  And she said no.  And she said that

11   she wanted to go back to Ms. Rivera -- she calls her Aunt

12   Mabel.  And I did ask them -- it's not in my statement.  But I

13   did ask them if they wanted to be home before Christmas.  And

14   she said that she did.

15           THE COURT:  Now, did she make any comment about her

16   present -- she's in another foster home, right?

17           THE WITNESS:  Yes.  She's in a foster home, correct.

18           THE COURT:  Did she make any comment about the current

19   foster home?

20           THE WITNESS:  No.  She was not complaining about it.

21   She did not make any comments about it.

22           She told me a little bit about school and that she'd

23   have to change back, but she didn't --

24           THE COURT:  Did she change -- when she was removed

25   from the Riveras last spring, did that involve a change of

1  school?

2          THE WITNESS:  Oh, yes, for all three children.

3          THE COURT:  Did she say anything about the school

4  situation?

5          THE WITNESS:  No.  She didn't.  She knew which school

6  she'd go back to because it was the one she had come from, but

7  she wasn't expressing any opinion about either school.

8          THE COURT:  Okay.  She didn't say she liked one versus

9  the other?  She just --

10         THE WITNESS:  No, she didn't.

11         THE COURT:  Did she appear to be -- I guess we could

12 find out but in other words -- but she did not appear to object

13 to going back to the school?

14         THE WITNESS:  No, no she didn't.

15         THE COURT:  Now, what about B.C.?  Did you talk to

16 B.C. by herself?

17         THE WITNESS:  By the time B.C. came -- Ms. Rivera and

18 J.C. had arrived prior to B.C. and J.C. -- E.S. just ran down

19 the hall to hug J.C. and then they both came in to the

20 conference room.  They were sitting and talking at one end of

21 the table while I was talking to B.C. at the other end of the

22 table.  But they were very much caught up in what they were

23 doing.  They had no interest in what I was talking with B.C.

24 about.

25         THE COURT:  You mean E.S.?

6CK9RIVH                     Hearing

1           THE WITNESS:  And J.C., correct.

2           THE COURT:  They appeared to be friendly?

3           THE WITNESS:  They're very friendly.  They're like

4    sisters.  They were very close.  Really E.S. just ran down the

5    hall and grabbed J.C., and then ran out to the waiting room and

6    saw Ms. Rivera and hugged her.

7           THE COURT:  Did she appear to be affectionate toward

8    Ms. Rivera -- we're talking about E.S. now.

9           THE WITNESS:  Correct.

10           THE COURT:  Did she appear to be affectionate towards

11   Ms. Rivera?

12           THE WITNESS:  Yes, she did.  She ran over and hugged

13   her.

14           THE COURT:  Tell me about your talk with B.C..

15           THE WITNESS:  B.C. and I sat at the opposite end of a

16   conference table that had to be, I would say four or five feet

17   long.  J.C. and E.S. were talking and B.C. and I were talking.

18           B.C. also very quickly said -- I explained the same

19   thing to her and she --

20           THE COURT:  Did she appear to understand it?

21           THE WITNESS:  I believe so, your Honor.  She was a

22   little slow, but I think that she did.  And she said she wanted

23   to go back to Ms. Rivera.  But I want to say what I noticed was

24   after I asked them to let Ms. Rivera come in the visit -- she

25   has not seen these children since they were removed -- B.C.

6CK9RIVH                    Hearing

1   just stayed with Ms. Rivera.  She was very attached to her.

2   She'd come over, hug her, walk away, come back, but she seemed

3   very attached to Ms. Rivera.

4           THE COURT:  But during the time that you talked to --

5   during the time you talked to B.C., I think you said that J.C.

6   and E.S. were at the other end of the table?

7           THE WITNESS:  Correct.

8           THE COURT:  Where was Ms. Rivera?

9           THE WITNESS:  Ms. Rivera was still in the waiting

10  room.  It was still an interview --

11          THE COURT:  She wasn't in this room?

12          THE WITNESS:  Oh, no.  It was still my interview, not

13  a visit.  And then I -- after I spoke to --

14          THE COURT:  So B.C., have you said everything that

15  went on with B.C.?

16          THE WITNESS:  Yes.

17          THE COURT:  And then what about, did Ms. Rivera come

18  in or did they go to see Ms. Rivera?  What happened?

19          THE WITNESS:  No.  I asked -- I watched the kids

20  together for maybe ten minutes and then I asked if Ms. Rivera

21  could join the children.  And one of the workers got her from

22  the waiting room, brought her to the conference room.

23          THE COURT:  Got Ms. Rivera?

24          THE WITNESS:  Correct.  So then I believe they visited

25  for about 25 minutes.  I left early.  The agency said they

6CK9RIVH                    Hearing

1   could continue their visit.  But I didn't really need to be

2   there at that point.

3           THE COURT:  How did -- I think you said, but how did

4   the children greet Ms. Rivera?

5           THE WITNESS:  They were both very happy to see her.

6   As I said, B.C. was very bonded to her.  E.S. and J.C. were

7   very close with each other.  E.S. is more mature than B.C..

8   B.C. is slow.  But she -- E.S. was quite independent and

9   interacting with J.C., but nobody seemed to be afraid of

10  Ms. Rivera or unhappy to see her.  E.S. was just delighted to

11  see J.C. and I think the fact that J.C. has gone back to her

12  old school, very -- makes it much easier for E.S., they're in

13  the same school, or were until --

14          THE COURT:  Does any lawyer want to ask questions?

15          MR. LEVINE:  Yes, your Honor.

16          THE COURT:  Okay.

17  BY MR. LEVINE:

18  Q.  Ms. Winter, do you know how it happened to be that

19  Ms. Rivera and J.C. were at FSSU?

20  A.  Yes.  We asked them to come.

21  Q.  Who asked them to come?

22  A.  My office did.  Ms. Rivera, actually, and the children are

23  our clients, and we did ask her to come.

24  Q.  Were you aware that the order permitting your discussion

25  with the children was to be outside the presence of the other

1  plaintiffs?

2  A.   I interviewed E.S. alone.   I interviewed B.C. with the

3  other children there but in a separate corner, but Ms. Rivera

4  was not there at any time when I spoke with the children nor

5  was the agency worker who asked if she was supposed to sit in

6  and I said I didn't think so.

7  Q.   Did you -- I believe in your declaration you indicated that

8  you thought observing the interaction of E.S. and B.C. with

9  J.C. and Ms. Rivera was an important part of your determining

10  that it was in their best interests to go back to Ms. Rivera's

11  home; is that right?

12  A.   I thought observing the interaction was extremely helpful.

13  Otherwise because talking to the children is sort of in a

14  vacuum.   To observe them together adds a lot.

15  Q.   Did you observe either of the children in the presence of

16  their current foster mother?

17  A.   No, not really.   The current foster mother simply brought

18  B.C. to the conference room and then left.   So I really didn't

19  know.

20  Q.   What questions did you ask the children about their current

21  foster home?

22  A.   I asked E.S. what it was like, whether it was an apartment

23  or a house, what the school was like, what she liked best in

24  school.

25       She said she liked math.   So she and I began to do

6CK9RIVH                    Hearing

1    math puzzles or whatever.  And she was very happy with that.

2    Math problems.  Thank you.

3    Q.  Did you ask them how they were treated by their current

4    foster mother?

5    A.  No, I didn't.

6    Q.  Was that of interest to you in determining where their best

7    interests lay?

8    A.  My understanding was that I was to find out which they

9    preferred, to remain with the foster parent or to return to

10   their aunt.

11        Were I to try to determine best interests, I would

12   have had to do a lot more than just one interview.

13   Q.  Well, did you think it was important to know how they

14   related to their current foster mother?

15        THE COURT:  No.  She was not -- she really did what

16   she was asked to do, find out the desire.  She wasn't to

17   investigate; and she did, in my view, a splendid job of doing

18   what she was asked to do.

19        MR. LEVINE:  Do you want me to terminate my

20   examination, your Honor?

21        THE COURT:  No, I don't.  But I don't --

22   Q.  Do you think it was -- would have been appropriate to see

23   the children relating to their current foster mother?

24        MR. CHARNEY:  I'm going to object, your Honor.

25        THE COURT:  Sustained.

6CK9RIVH                          Hearing

1   Q.  Did you have any discussion with the children as to whether

2   they knew they were -- the plan was for them to return to their

3   mother on a permanent basis?

4   A.  No, I didn't.  I didn't discuss that with them.

5            My understanding was that I was supposed to find out

6   whether they wanted to go with Ms. Rivera or stay where they

7   were, not whether the -- returning to their mother was a

8   choice.

9   Q.  Well did they understand that going from one home to

10  another would be temporary?

11  A.  You mean back to their aunt?

12            MR. LEVINE:  Yes.

13            MR. CHARNEY:  Your Honor, this line of questioning I

14  don't see the relevance.

15            THE COURT:  Absolutely -- those children don't know

16  what's going to happen with the legal proceedings about the

17  birth mother.  They don't know that.

18            MR. LEVINE:  I believe, your Honor, in Ms. Winter's

19  declaration she stated that she told them that their Aunt Mabel

20  had sued to get them to come back with her.

21            THE WITNESS:  Yes, I did.

22            MR. CHARNEY:  She didn't sue to keep them from going

23  back to their mother.  That's not what this lawsuit is about.

24            THE COURT:  That's right.  The issue about the birth

25  mother is a separate issue.  And nothing that -- I would

6CK9RIVH                    Hearing

1    imagine the children are not acquainted with the legal

2    proceedings there and they have no -- all I can say is that

3    Ms. Winter did what she was asked to do and she wasn't asked to

4    go beyond that, find out their desires as far as the foster

5    care.

6        MR. LEVINE:  Your Honor, I know that you haven't been

7    impressed with Ms. Marshall's declaration as law guardian, but

8    the comments she made is that these children are easily led and

9    that's why an independent examination was appropriate.  And I

10   think that it's singularly inappropriate for the basis of the

11   decision to be made on the interaction with the plaintiffs who

12   are supposed to be excluded from the interview.

13       THE COURT:  I disagree, I'm sorry to say, just

14   thoroughly disagree.

15       Let's conclude this.  Thank you very much.  You did a

16   fine job.

17       MR. LEVINE:  Before your Honor rules may I make one

18   quick statement.

19       THE COURT:  Sure.

20       MR. LEVINE:  Just to -- for the record, we reiterate

21   or objections with respect to the subject matter jurisdiction

22   of the court in this kind of matter and also indicate that we

23   believe that your Honor's initial analysis of why there is a

24   liberty interest is to protect the family unit with respect to

25   kinship foster parents.  And in this case, your Honor, I

6CK9RIVH                    Hearing

1    believe that is not the proper view because in effect this

2    court is interceding in a dispute between the birth mother and

3    the foster parents.

4         MR. CHARNEY:  Note my objections to his arguments,

5    mischaracterization.

6         THE COURT:  The response to that is that my -- the

7    issues before me are strictly related to foster care, and I

8    have nothing before me about the issue about whether the

9    children return to their birth mother or birth mothers.  That

10   isn't before me and what course that takes in the agencies or

11   the courts that have jurisdiction, that's a matter completely

12   separate from what I'm dealing with.

13        The one remaining question which I left opened at the

14   last hearing has been resolved, and I find that there is very

15   clear evidence that B.C. and E.S. wish to return to the Rivera

16   household and to the foster care of -- is it the great aunt?

17        MR. CHARNEY:  Yes, your Honor.

18        THE COURT:  The great aunt Ms. Rivera.  And nothing

19   has been shown anymore now than before as to any incapacity or

20   any misconduct on the part of Ms. Rivera that would render her

21   an improper foster parent.  Consequently, I am directing that

22   E.S. and B.C. be returned to the Rivera household and the

23   findings and conclusions that I stated at our last hearing on

24   the legal issues apply, of course, to the situation about E.S.

25   and B.C. and that is my ruling.

6CK9RIVH                          Hearing

1           Thank you very much.

2           MR. CHARNEY:  Your Honor, when should they be

3     returned?

4           THE COURT:  As soon as possible.

5           MR. CHARNEY:  Does that mean within 24 hours?  J.C.

6     was returned within 24 hours.

7           THE COURT:  J.C. was returned -- it seemed to me what

8     happened was that -- J.C.'s attorney was here and I think that

9     I asked that -- all I asked was that there be some appropriate

10    escort or something to make sure that J.C. was -- that things

11    went well with the transfer of J.C. and if a problem came up I

12    wanted to know about it.  Now who -- somebody really will have

13    to do that kind of office with respect to E.S. and B.C..  And

14    if something comes up that there's an indication of a problem

15    and if it somehow conflicts with what Ms. Winter said, I want

16    to know about it.

17          MR. CHARNEY:  Yes, your Honor.  I guess my question is

18    at the last hearing you ordered that J.C. be returned

19    forthwith.  Ms. Moser, who is J.C.'s attorney, and I'll let her

20    elaborate, but I believe she informed the court that the child

21    has to be medically cleared before she can be returned.

22          MS. MOSER:  Your Honor, what I claimed on the last

23    court date was simply that typically what happens when a child

24    is moved from one home to another is that the child is brought

25    to the foster care agency by the foster parent, medically

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6CK9RIVH                     Hearing

1    cleared at the foster care agency, and then the new parent who

2    is bringing the child home brings the child from the agency

3    home.

4              THE COURT:  Whatever procedure is proper, just --

5    you're the attorney for E.S. and B.C..

6              MR. CHARNEY:  Yes, in this case, yes.

7              THE COURT:  So you need to watch over that process.

8              MR. CHARNEY:  I was -- your Honor's decision last week

9    was very clear that it be done forthwith meaning as soon as

10   possible.

11             THE COURT:  I intend to have it done forthwith.

12             MR. CHARNEY:  Thank you, your Honor.

13             THE COURT:  Thank you.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25